1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION at LONDON
- - -

UNITED STATES OF AMERICA,    : Docket No. 6:18-CR-56-S-1
                             :
              Plaintiff,     : London, Kentucky
                             : Thursday, September 12, 2019
                             : 9:30 a.m.
versus                       :
                             : Day 1 of 2
ROBERT C. ENGLAND,           :
                             :
              Defendant.     :

                        - - -
          TRANSCRIPT OF MOTION TO SUPPRESS
             BEFORE HANLY A. INGRAM
      UNITED STATES MAGISTRATE COURT JUDGE
                        - - -

APPEARANCES:

For the United States:       JENNA E. REED, AUSA
                             U.S. Attorney's Office - London
                             601 Meyers Baker Road
                             Suite 200
                             London, Kentucky 40741

For the Defendant:           TRAVIS ALAN ROSSMAN, ESQ.
                             Rossman Law, PLLC
                             220 Court Square
                             P.O. Box 209
                             Barbourville, Kentucky 40906

Court Reporter:              ELAINE S. HABERER, RPR
                             Official Court Reporter
                             101 Barr Street
                             Lexington, KY 40507
                             (513) 708-6772



      Proceedings recorded by mechanical stenography,
transcript produced by computer.

1          (Proceedings commenced at 9:30 a.m.)

2          THE COURT:  Thank you.  Madam Clerk, would you call

3     the pending matter, please?

4          THE CLERK:  Yes, Your Honor.  London Criminal

5     18-CR-56-S, Defendant 1, United States of America versus

6     Robert Christopher England.

7          THE COURT:  Thank you.  I see Ms. Reed from the

8     United States.  Good morning to you.

9          MS. REED:  Good morning, Your Honor.

10          THE COURT:  Thank you.  You've got Special Agent

11     Lambdin with you as well.  Good morning, sir.

12          AGENT LAMBDIN:  Good morning, sir.

13          THE COURT:  Thank you.  I recognize Mr. Rossman, of

14     course.  Good morning to you.

15          MR. ROSSMAN:  Good morning, Your Honor.

16          THE COURT:  Thank you.  I see Mr. England is present.

17     Good morning to you, sir.

18          MR. ENGLAND:  Good morning, sir.

19          THE COURT:  Thank you.  We're here to resume an

20     evidentiary hearing on a motion to suppress that began on

21     July 9th, was continued so that materials that had recently

22     been obtained by the United States could be reviewed by the

23     defense.

24          Significant planning, of course, has gone into this

25     hearing.  I know there are a number of witnesses that the

1    parties anticipate presenting, so I have received the exhibits
2    from the defense.  Those were e-mailed.  I've got all those
3    with me.  I re-reviewed the transcript, the briefs.  I'm
4    prepared for the hearing.  Let me make sure everyone else is
5    ready to proceed as well.

6         Ms. Reed, are you ready to proceed, ma'am?
7              MS. REED:  Yes, sir.
8              THE COURT:  And Mr. Rossman?
9              MR. ROSSMAN:  Yes, Your Honor.
10             THE COURT:  We've discussed on a number of occasions
11   the burden the parties bear.  We don't need to revisit that
12   unless you all need clarification or think there's been any
13   mistake so far in that analysis.

14        I'm just going to save time.  When exhibits are proposed
15   to be tendered to the witness, I usually ask if there is an
16   objection to it being tendered.  I'm going to skip that.

17        So you all be aware, watch for the exhibits that look
18   like they are headed up to the witness.  If you have not seen
19   it or you're concerned about whether you've seen it or want to
20   lodge an objection to it being tendered, let me know.  Speak
21   up, and we'll save a little bit of time with that hopefully.

22             The rule on separation was invoked previously,
23   although the formal Rules of Evidence don't apply to the
24   hearing.  Are we compliant with that this morning as well,
25   Mr. Rossman?

1          MR. ROSSMAN:  I believe so, Your Honor.  I don't know

2     who he is.

3          THE COURT:  Okay.  Not a witness?

4          MS. REED:  Not a witness.

5          THE COURT:  Okay.  I think we have roughly 12

6     witnesses, is that right, maybe total, something in that

7     neighborhood?

8          MR. ROSSMAN:  I have seven, Your Honor.

9          THE COURT:  Okay.  Well, I can't police who the

10    witnesses are.  You all are responsible for watching who comes

11    in and out of that courtroom in helping me to police the rule.

12       Are there any preliminary issues we need to take up

13    before the presentation of evidence resumes, Ms. Reed?

14          MS. REED:  No, Your Honor.

15          THE COURT:  Mr. Rossman?

16          MR. ROSSMAN:  No, Your Honor.

17          THE COURT:  All right.  Where we left off was you

18    were examining Special Agent Lambdin on direct examination,

19    right, Mr. Rossman?

20          MR. ROSSMAN:  Yes, Your Honor.

21          THE COURT:  Okay.  I will -- although I said he would

22    still be under oath, let's go ahead and re-swear Special Agent

23    Lambdin and he can take the witness chair, please.

24             THAD LAMBDIN, DEFENSE WITNESS, SWORN

25          THE COURT:  Good morning again to you, sir.  Just, if

1    you don't mind, restate your name for us, please.

2              THE WITNESS:  Yes.  My name is Thad Lambdin.

3              THE COURT:  Okay.  Go ahead, Mr. Rossman.

4              MR. ROSSMAN:  Thank you, Your Honor.

5                    DIRECT EXAMINATION (CONTINUED)

6    BY MR. ROSSMAN:

7    Q.   Good morning.

8    A.   Good morning.

9              MR. ROSSMAN: I would like to tender to the witness

10   some exhibits, just kind of go through these and authenticate

11   them and admit them.

12             THE COURT:  You can pass them up to them, Mike.

13   That's fine.  Thank you.

14   BY MR. ROSSMAN:

15   Q.   I would like to tender to the witness what's been marked

16   as Defense Exhibit 7 and 8.

17        Go ahead and take a look at those and let me know when

18   you're ready.

19   A.   I'm ready.

20   Q.   For Exhibit 7, do you recognize that as a true and

21   correct copy of the statement that Joseph Josh Cheek gave you

22   on or about October 23, 2018?

23   A.   Yes, I do.

24             MR. ROSSMAN:  Your Honor, I move to admit Exhibit 7.

25             THE COURT:  Objection, Ms. Reed?

1          MS. REED:  No, Your Honor.

2          THE COURT:  That will be admitted.  I'm going to

3     assume there's no objection to the admission of documents

4     entered by the FBI during the course of the investigation.  Is

5     that a fair assumption, Ms. Reed?

6          MS. REED:  Yes, Your Honor.  I think to save us some

7     time, I have received all the defense exhibits prior to the

8     hearing and I have no objection to -- the ones I have end at

9     17.  I have no objection to 1 through 17.

10         THE COURT:  And you have exhibits 11A, B, C, D, E, F,

11    G, H, I, and J, as part of those exhibits?

12         MS. REED:  The photographs, yes, sir.

13         THE COURT:  Okay.  Do you want to pre-move to have

14    those admitted then, Mr. Rossman?

15         MR. ROSSMAN:  Yes, Your Honor.  I would move to admit

16    Defense Exhibits 9 through 17.

17         THE COURT:  Okay.  That will be granted.  So 1

18    through 8 were previously admitted; is that right?

19         MR. ROSSMAN:  Yes, Your Honor.

20         THE COURT:  Were they, Sheila?

21         THE CLERK:  1 through 6 were.

22         MR. ROSSMAN:  Well, I just moved to admit 7 and he

23    was going to do 8.

24         THE COURT:  Okay.  Thank you.  So 7 through 17 then

25    will be admitted.

1          Okay.  Did I get it right, Sheila.

2               THE CLERK:  Yes.

3               THE COURT:  So go ahead, Mr. Rossman.

4     BY MR. ROSSMAN:

5     Q.   I would like to go back and talk a little bit about use

6     and possession of a laptop and what your investigation

7     revealed in that regard.  So I'll ask you some questions and

8     you just tell me true or false.

9          Your investigation revealed that Defendant Robert

10    Christopher England exclusively used and possessed the laptop?

11    A.   Yes.

12    Q.   Your investigation revealed that the laptop was assigned

13    to him in February of 2018?

14    A.   I believe that's accurate.

15    Q.   Your investigation revealed that the defendant frequently

16    took the laptop home with him?

17    A.   Yes.

18    Q.   Your investigation revealed that the laptop was at his

19    home on the day when the police seized it?

20    A.   Yes, it was at some point, in what was relayed to me.

21    Q.   Your investigation revealed the laptop was password

22    protected?

23    A.   I believe it was, but I'm not confident of that.  I don't

24    think it was in the report from the lab, but I believe it was.

25    Q.   Your investigation revealed that the laptop had a sticker

1    with his name on it?

2    A.   Yes.

3    Q.   Your investigation revealed that the government forensic

4    reviewer of the laptop said that it appeared to have one user?

5    A.   Yes.

6    Q.   Your investigation revealed that the contents of the

7    laptop were consistent with sole use of the defendant and

8    there were no contents suggesting another user?

9    A.   That's correct.

10   Q.   Your investigation revealed that the laptop had logged

11   into the defendant's home WiFi network?

12   A.   Yes.

13   Q.   Your investigation revealed that there was patient care

14   reports and personnel files on the laptop?

15   A.   Yes.

16   Q.   And did your investigation reveal that those reports are

17   confidential?

18   A.   I believe the patient reports would all be HIPAA

19   protected.  And as far as records for training, I would assume

20   they would be confidential unless there was a need for those

21   to be requested by someone.

22   Q.   Your investigation revealed that the defendant had

23   day-to-day control of the laptop?

24   A.   Yes.

25   Q.   Your investigation revealed that his employer, the City

1    of Middlesboro, exercised no active control over the laptop?

2    A.   I don't think any daily active control, no.

3    Q.   Any control at all?

4    A.   Just when they provided the consent to the police.

5    Q.   Isn't it true that the indictment in this case calls for

6    the forfeiture of the defendant's interest in the laptop?

7    A.   I believe it's probably listed on that, but it's a city

8    laptop.

9    Q.   Isn't it true that the defendant often spent the night in

10   his office with the laptop?

11   A.   I believe that several people said that there were nights

12   that he did not come in to sleep and he would likely be in

13   that room, yes, that's true.

14   Q.   And your investigation revealed that no routine search of

15   the laptop at issue ever occurred?

16   A.   I never heard of any.

17   Q.   Moving on to where we kind of left off last time, are you

18   aware of any regulation or prior notice that would diminish

19   the defendant's expectation of privacy in the laptop?

20   A.   Not in the policies that I read that were given to us by

21   the city.

22   Q.   Was there any policy anywhere?

23   A.   There was a policy on the laptop that had to do with the

24   use of the computers.

25   Q.   And that policy was never enacted by the City of

1  Middlesboro, was it?

2  A.   I do not know.  It's not in the official city books.  I

3  don't know if there is any process for the fire department or

4  not.

5  Q.   Did the defendant ever sign any of those documents?

6  A.   They were on the computer.  They were not signed.

7  Q.   So would it be correct they were just unsigned drafts?

8  A.   They were just unsigned documents that were on the

9  computer.

10 Q.   Did they have a header, City of Middlesboro or

11 Middlesboro Fire Department?

12 A.   I don't believe so.

13 Q.   And similarly, was there any policy or practice that

14 would permit a routine search of the laptop the defendant

15 used?

16 A.   There was only a policy that was on there that was

17 unsigned, that was on the computer itself.  I didn't get

18 anything from other locations regarding computers

19 specifically.

20 Q.   Can you elaborate on that answer?

21 A.   Well, from the city, when the city gave us their city

22 personnel policy, fire department SOP, EMS SOP, and then there

23 were some minutes that we received, I didn't see in those

24 items any specific references to the electronics.

25      MR. ROSSMAN:  Your Honor, if I may, I would like to

1   pass to the witness documents produced in response to a FOIA

2   request.

3            THE COURT:   Okay.   Those can be tendered.

4   BY MR. ROSSMAN:

5   Q.   I would ask you to take a quick look at those if you

6   would, please.

7   A.   Yes.

8   Q.   Are those the policies and procedures that you received

9   from the City of Middlesboro in response to a Freedom of

10  Information Act request?

11  A.   It is.   I think it's missing the one minutes page that we

12  received, or the one thing with the minutes.   It's the only

13  thing I didn't see here.

14  Q.   Okay.   Was there anything in those minutes that had

15  anything to do with the policy or procedure affecting the use

16  of the laptop?

17  A.   I don't recall any being in that that had anything

18  related to a laptop specifically.

19  Q.   And would you agree with me that all of those documents

20  reflect policies or procedures that are in effect in the City

21  of Middlesboro and for the fire department?

22  A.   That's what was given to us by the City of Middlesboro;

23  and yes, they would be in effect.

24  Q.   And in those documents, was there anything relating to a

25  policy or notice diminishing the defendant's expectation of

1    privacy in the laptop?

2    A.   Not specifically mentioning laptop.  I think there's some

3    references to equipment, but I don't -- it did not

4    specifically apply to computers.

5    Q.   Okay.  And was there anything in those documents that

6    would make the laptop subject to a routine search?

7    A.   No.  No.  There's nothing stating anything that I recall

8    about a routine search for that.

9    Q.   Okay.  Let's move on to a different topic.

10             MR. ROSSMAN:  I'm not going to move to admit those.

11             THE COURT:  Okay.  Do you want to get them back?

12             MR. ROSSMAN:  Yes.  I think that would be a good

13   idea.

14             THE COURT:  We'll take that up there, we'll return

15   them to counsel.

16             THE WITNESS:  Thank you.

17             THE COURT:  Sure.

18   BY MR. ROSSMAN:

19   Q.   I want to move on to the events that led up to the

20   seizure and search of the laptop at issue in this case.

21        Can you tell us what you know about those events, please?

22   A.   Could I -- I have a note just of the timeline over here.

23   Could I get that and it will help me to keep the sequence a

24   little straighter.

25             THE COURT:  Sure.  Is that a document that you

*Lambdin - Direct*                                                        13

1    prepared?

2         THE WITNESS:  Yes, before coming in.  It's just

3    basically a list of different things that I wrote in.

4         THE COURT:  If the lawyers don't have an objection,

5    it's fine with me.

6         MR. ROSSMAN:  I just would like to see it before he

7    looks at it.

8         THE WITNESS:  It's on the yellow sheet.  Yeah, the

9    yellow pad.

10        MR. ROSSMAN:  I don't have any objection to him

11   referring to it.

12        THE COURT:  Okay.

13   BY MR. ROSSMAN:

14   Q.   Back to the question on the table.  Can you tell us about

15   the events that led to the seizure and search of the laptop at

16   issue in this case?

17   A.   I believe originally there was a report on 6/4/2018 about

18   a Walmart incident, and that started any law enforcement

19   interest in that at that point.  Then there was a police

20   interview on 6/23 that lasted approximately 20 minutes.

21        About 20 minutes after the interview, the state trooper

22   received information that the defendant may be deleting items

23   off of the work computer at the fire station, and then there

24   was an outreach from the police department to the fire chief

25   regarding getting the laptop.

1    And I believe at 12:30 -- which that happened at 9:48 was

2    the end of the interview.  And at 12:30 the fire department

3    chief delivered the laptop to the police, I believe at the

4    parking lot of the police station and then signed the consent

5    for search.

6        And then there was a signed consent for search by the

7    mayor as well.  I didn't see a date on the mayor's form.

8    Q.   Okay.  Let's go back and talk about this in some more

9    detail.

10       I believe the first date you reference was June 4, 2019,

11   the Walmart incident.  Can you elaborate on what the Walmart

12   incident is?

13   A.   The Walmart incident was an allegation that came in

14   originally through a child that said that he had been -- the

15   subject had -- he didn't know who the subject was, but that a

16   man had exhibited his -- or shown his penis to him, was

17   exhibiting that in the restroom at the back of the Walmart in

18   Middlesboro, Kentucky.

19   Q.   And was the defendant, Mr. England, accused of that?

20   A.   Yes.

21   Q.   Okay.  And did that incident relate to the defendant's

22   work in any way?

23   A.   No.

24   Q.   Would you agree with me that that incident occurred away

25   from his premises of work?

1    A.   Yes, I do.

2    Q.   Would you agree that that incident allegedly occurred at

3    a time when he was not working?

4    A.   Yes.

5    Q.   Okay.   In between June 4 and June 23, tell us what you

6    know about the investigation during that time.

7    A.   At some point in there, I believe they met with Walmart

8    and they were able to identify the subject from video that

9    they had at the Walmart.   And I think the sergeant that was

10   doing the investigation, he had other things he was doing at

11   the time so there was a delay before he got to do the

12   interview and that's why, on the 23rd, he reached out to do

13   the interview.

14   Q.   Who was that sergeant?

15   A.   That was Floyd Patterson.

16   Q.   So Floyd Patterson interviewed the defendant on

17   June 23rd, 2018, concerning Walmart, correct?

18   A.   That's correct, the 6/4 incident.

19   Q.   At that point, is there any investigation of the

20   defendant for child pornography?

21   A.   Not that I'm aware of.

22   Q.   At that point, is there any investigation of the

23   defendant for any work related misconduct?

24   A.   Not work related, no.

25   Q.   What happened after the interview?

*Lambdin - Direct*                                                    16

1    A.   He leaves the fire department.  It's a relatively short

2    interview.  And then about 20 minutes later, Sergeant

3    Patterson receives information from a KSP trooper that he's

4    been told that the defendant was apparently deleting stuff, or

5    appeared to be deleting stuff off of the laptop and then took

6    the laptop and left the fire station.

7    Q.   Okay.  I'll refer you to Defense Exhibit 17, please.  And

8    can you tell us what we are looking at here?

9    A.   This is an exchange, a text -- looks like a text

10   conversation.

11   Q.   I'm sorry?

12   A.   I see two there at the top, which should be the KSP

13   trooper, Mr. Howard.

14   Q.   Who else is a party to this conversation?

15   A.   I have not seen where it says on this sheet.

16   Q.   Let me ask it another way.  Who reported the tip to the

17   state trooper that the defendant might be deleting things?

18   A.   To recall that I would have to look at my interview of

19   the state trooper, if you have that.

20   Q.   I think it might be helpful to refer to Defense

21   Exhibit 10.

22   A.   This is the interview of Jonathan Farmer.

23   Q.   Does that refresh your recollection that Jonathan Farmer

24   contacted the state police to report that the defendant may be

25   deleting things off of his laptop?

1    A.   Yes.

2    Q.   So back to Defense Exhibit 17, would this accurately

3    reflect a text message conversation between Jonathan Farmer

4    and the state police trooper George Howard, I believe?

5    A.   Yes.

6    Q.   Okay.  I'll call your attention -- well, let me ask you

7    this:  Do you know, the green parts, is that Jonathan Farmer

8    or is that the trooper; do you know?

9    A.   I think the white parts would be the trooper.  I think

10   the green portion would be -- let me double check that.  Yes,

11   the green portion would be Jonathan Farmer.

12   Q.   Okay.  And I would just ask you to read this and I'll get

13   you to a point and I'll ask you to stop and ask you some

14   follow-up questions.

15   A.   Just from the top down?

16   Q.   Yes.

17   A.   "You up?"

18        "Yeah."

19        "I think MPD is getting ready to drop the hammer on the

20   chief's boy over here.  LOL."

21        "What did he do?"

22        "Stalking some little boy in Walmart.  Shook his dick at

23   him in the bathroom."

24   Q.   Okay.  Let's stop there.  Would you agree with me that

25   MPD refers to Middlesboro Police Department?

*Lambdin - Direct*                                                                              18

1    A.    Yes.

2    Q.    And this text message conversation is in reference to the

3    June 4 Walmart incident we've talked about?

4    A.    Yes.

5    Q.    Okay.  Please continue.

6    A.    "Something has been going on for months.  He took out and

7    hung.  Anyway, they called him over there to interview him

8    while ago.  He come back and went straight to him computer.

9    I'm pretty sure he's erasing kiddie porn."

10   Q.    Okay.  Let's stop there.  Did your investigation reveal

11   that Jonathan Farmer ever saw the defendant accessing or

12   erasing kiddie porn on the day in question?

13   A.    No, no one actually saw -- or anyone that I talked to --

14   him actually getting or looking at child porn.

15   Q.    Did your investigation reveal that Jonathan Farmer even

16   saw his screen?

17   A.    No.

18   Q.    Would you agree with me that Jonathan Farmer was entirely

19   speculating about what the defendant was doing on the laptop?

20   A.    I believe he was interpreting what he saw as that, and

21   that would be -- that would involve speculation, yes.

22   Q.    Can you explain the relationship where Farmer was

23   standing in relation to the defendant when he saw these

24   events?  And it may be helpful to refer to Defense Exhibit 11.

25   A.    11 is showing the doorway that is at the end of the

1    office that goes into the hallway that then leads into either

2    the bay or back into the fire station.

3    Q.    Would you agree with me that Jonathan Farmer was looking

4    through a window into the office when he allegedly saw these

5    things that gave rise to these text messages?

6    A.    I don't know where he was.  I don't recall where he was

7    when he saw that.  I mean, it would either have to be through

8    the window or the door.

9    Q.    Okay.  But you don't know?

10   A.    I don't recall, no.

11   Q.    Okay.  But you agree with me that he did not see the

12   screen?

13   A.    I don't have any indication that he saw the screen.

14   Q.    Can you tell me what he did see?

15   A.    What he said, he came in and went straight to the

16   computer and it looked like he was deleting items.  That's --

17   I don't know specifically beyond that.

18   Q.    Without seeing the screen, how could he tell if someone

19   was deleting something?

20   A.    I don't know.

21   Q.    If you didn't see the screen of someone's computer, could

22   you tell if they were deleting something?

23   A.    It would be difficult to be sure.

24   Q.    Okay.  Is there anything necessarily wrong about deleting

25   things off of a computer?

1   A.   Just deleting things on a routine basis, no.

2   Q.   Is deleting things off of a computer necessarily

3   suggestive of child pornography?

4   A.   No.

5   Q.   Let's go back to Exhibit 17, and I would ask you just to

6   continue reading that.

7   A.   "Floyd, the one working it, I think, he needs to get that

8   comp."

9        "No doubt."

10       "I reckon every time he goes in Walmart he goes straight

11  to the toys."

12       "You up?"

13  Q.   Okay.  You can stop there.  So tell us, is this the

14  exchange that led to the seizure of the laptop in this case?

15  A.   This is the exchange that led to the call to Sergeant

16  Patterson by Trooper Howard, I believe.

17  Q.   Okay.  Was there any attempt ever to get a search warrant

18  based on this information?

19  A.   I don't believe there was a search warrant ever sought in

20  this.

21  Q.   Is it your position that Jonathan Farmer's tip would rise

22  to the level of probable cause?

23  A.   With the circumstances of the timing and the history, I

24  don't know if that would or not.  I think it might fall in the

25  area where you would be having a hearing about it, yes.

1    Q.   What do you mean?

2    A.   It -- I think it would be light on probable cause, so it

3    would really -- without seeing more.

4           THE COURT:  Did you say light probable cause?

5           THE WITNESS:  Yeah.  I think without more context --

6           THE COURT:  I want to tell you, we are getting a

7    little -- I need you to speak up a little bit, Special Agent.

8           THE WITNESS:  Uh-huh.

9           THE COURT:  Did you say light on probable cause or

10   like probable cause?

11          THE WITNESS:  No, light.  I think it would be it on

12   the weaker side of that approach.

13          THE COURT:  Okay.  Sorry to interrupt you.

14          THE WITNESS:  I'm sorry.

15   BY MR. ROSSMAN:

16   Q.   So, what happens next in reference to the events of

17   June 23, 2018?

18   A.   The police department receives a phone call from Trooper

19   Howard that something is going on with that laptop, and they

20   seek the laptop from the chief, the fire department chief.

21   Q.   Was there any connection between what Jonathan Farmer

22   thought he saw and the Walmart investigation?

23   A.   Well, the connection would be that if he's deleting

24   things relative to the interview that had just occurred across

25   the street, that he came back and was getting rid of evidence,

1    that it might pertain to that specific investigation.

2    Q.   And what evidence from the Walmart investigation could

3    have been on the laptop?

4    A.   I don't know unless there's an interest in children that

5    would, you know, support why he was, you know, accused of

6    going and doing that in front of a child.

7    Q.   So you would agree with me, this wasn't a look for

8    specific investigatory information based on what happened at

9    Walmart.  It was more of a generalized suspicion that the

10    defendant might have an interest in children?

11    A.   I would say looking at it, they would say he was the --

12    they knew that he was coaching boys that age, that there was a

13    boy that was exhibited to at the Walmart, that they had just

14    interviewed him related to that and he was taking actions in

15    the computer.  The concern would be is there information that

16    shows he's interested in boys that age?

17    I think there's a logical flow to, is there something

18    that's related to this case or its interests that would

19    explain why this event may have happened at Walmart.

20    Q.   Was any evidence related to the Walmart incident,

21    specifically related to the Walmart incident, ever recovered

22    from the laptop?

23    A.   No.

24    Q.   Let's go back to June 23, 2018.  What happened next?

25    A.   The chief brought the computer back.  It was, I guess,

1    around 10:00.  It would have been close to 10:00, a little

2    after 10:00 when they asked for it.  So about 12:30, he

3    brought it back and gave it to them at the fire station -- or

4    at the police station parking lot.  And then the chief signed

5    a consent to search the laptop as city property.  And then at

6    some point in time, there was a signed consent by the mayor.

7    I just don't -- the signed consent is not dated, so I don't

8    know specifically the date and time of that.

9    Q.   Okay.  Let's go to Defense Exhibit 14, and I would just

10    ask you to have that available to refer to.

11        Was the investigation in the laptop primarily for

12    indecent -- let me strike that.

13        Was the seizure and the search of the laptop geared

14    toward the investigation for indecent exposure or child

15    pornography?

16    A.   It says that Chief England was advised that his employee,

17    Mr. Robert Christopher England, was under a criminal

18    investigation in reference to indecent exposure.

19    Q.   Okay.  Let me stop you there.  Would you agree with me in

20    this memorandum that there is no reference to investigation

21    for child pornography?

22    A.   There's no reference to child pornography specifically,

23    no.

24    Q.   And there's no reference to any investigation of anything

25    that could be work related misconduct?

1   A.   No, no reference to work issue.

2   Q.   Okay.  Let's go back to Defense Exhibit 13.  I would

3   really ask you the same questions -- well, first of all, tell

4   us, what 13 is?

5   A.   13 is a witness interview sheet.  Sergeant Floyd

6   Patterson is the name of the witness, and it's by Sergeant

7   Floyd Patterson.

8   Q.   Okay.  And can you read the first full sentence under

9   statement?

10  A.   "On 06/26/2018 approximately 20 minutes after I

11  interviewed Mr. Robert Christopher England for indecent

12  exposure allegations, I received a call from a KSP Trooper

13  George Howard.  Trooper Howard stated to me that he received a

14  call stating that Mr. England was possibly deleting things off

15  of the laptop belonging to the City of Middlesboro Fire

16  Department."

17  Q.   Okay.  Let's stop there.  And would you agree with me

18  that there is no reference here to a child pornography

19  investigation or work related misconduct?

20  A.   There's no reference there in that, no.

21  Q.   This is only about indecent exposure which relates to

22  Walmart?

23  A.   Yes.

24  Q.   Let's go on to Defense Exhibit 15, please, and if you

25  could tell us what we are looking at there.

1    A.   This is a Middlesboro Police Department consent to search

2    form, and it is by Rob England, the MFD chief, which would be

3    the Middlesboro Fire Department Chief, saying, "Knowing that I

4    have a constitutional right to refuse a search of," and then

5    crossed out is "my premises."  It says, "City of Middlesboro

6    Fire Department Acer laptop, computer model," is that V5WE2, I

7    believe -- it doesn't matter?  Okay.

8    Q.   Go ahead.

9    A.   It just goes on further to say that.

10   Q.   And just for the sake of clarity, this was signed by the

11   defendant's father, not the defendant, correct?

12   A.   This is signed by the fire chief, Robert England, 6/23/18

13   at 12:30.

14   Q.   And they both go by Robert England sometimes?

15   A.   They do.

16   Q.   Okay.  And I'll call your attention to where it says,

17   sort of in the middle of the page:  "Who are conducting an

18   investigation concerning."

19        And can you read what comes after that for us, please?

20   A.   I have a hard time reading the first portion, it looks

21   like it begins with I, so it's most --

22   Q.   Let me help you.  Does it look like maybe somebody

23   started to write the word "indecent" and crossed it out?

24   A.   It does look like someone started to write that and then

25   "criminal investigation" after.

1    Q.   Okay.  Would you agree with me there is no reference to

2    child pornography?

3    A.   I don't see any reference to child pornography, no.

4    Q.   No reference to any work related misconduct?

5    A.   No.  It just says criminal investigation.

6    Q.   Okay.  Let's go on to Defense Exhibit 16 and can you tell

7    us what we are looking at here?

8    A.   This is a City of Middlesboro letter with Bill Kelley,

9    the mayor listed, and it has to do with the computer.

10   Q.   Can you read the second full paragraph for us, please?

11   A.   "Sergeant Floyd Patterson of the Middlesboro Police

12   Department is conducting an investigation into alleged sexual

13   misconduct involving minors and the computer has become part

14   of the investigation.

15       I hereby give consent for a complete examination of the

16   computer by Kentucky State Police Electronic Crimes Unit for

17   the purpose of discovering any evidence related to child

18   sexual abuse, child pornography, or any other violation of

19   Kentucky Revised Statutes."

20   Q.   Would you agree with me that the seizure of the laptop

21   and the subsequent search was solely for the purpose of a

22   criminal investigation?

23   A.   I would say yes, for the purpose of criminal -- there was

24   not an administrative.

25   Q.   It wasn't a routine search?

1    A.   I don't -- no, it was specific for --

2    Q.   Okay.  And coming back to the second paragraph, it

3    references alleged sexual misconduct involving minors.  Tell

4    us what your understanding of that is.

5    A.   Well, the alleged sexual misconduct would be exhibiting

6    his penis to a child at Walmart.

7    Q.   And would you agree with me at that point, there's really

8    no non-speculative evidence of child pornography?

9    A.   No.

10   Q.   You wouldn't agree with me?

11   A.   No, I would agree that there is no specific, you know,

12   information that would say there's child pornography.

13   Q.   And there's no specific evidence that there was work

14   related misconduct on this laptop?

15   A.   No.

16   Q.   And then the second part of this paragraph, it talks

17   about for the purpose of discovering any evidence relating to

18   child sexual abuse, child pornography, or any other violation

19   of Kentucky Revised Statutes.  Can you tell us what your

20   understanding of that statement is?

21   A.   It looks like they were -- he was providing information.

22   He had been told enough to say that, look, they suspect there

23   might be something that they are looking for related to

24   children and that, and that they are also looking for anything

25   in general that may be in violation of state statutes.

*Lambdin - Direct*                                                    28

1   Q.   And was that suspicion based solely on what Farmer told

2   them, or was there other evidence?

3           MS. REED:  Objection, Your Honor.  This is

4   speculation on the witness' part as to what a witness that's

5   waiting to testify was thinking when this was written.

6           MR. ROSSMAN:  Judge, he's the FBI lead case agent.  I

7   think he can testify as to how the investigation unfolded and

8   what evidence there was and was not.

9           THE COURT:  Okay.

10          THE WITNESS:  This was before I was involved.

11          THE COURT:  Hang on a second, Special Agent.

12      I'll allow it.  I'll overrule the objection.  Go ahead.

13   Do you need to restate the question, Mr. Rossman?

14   BY MR. ROSSMAN:

15   Q.   Do you need me to restate the question?

16   A.   No, I think I understand what you're saying.  I don't

17   know what the thought was at this time.  I wasn't involved or

18   anywhere near this.  I didn't know this was even going on at

19   the time, so I don't know what Sergeant Patterson was thinking

20   at this moment.

21   Q.   Would you agree with me that as far as you know at this

22   time, other than Farmer's tip, there was no specific evidence

23   tying the laptop to child pornography or work related

24   misconduct?

25   A.   Other than the tip and the timing with what was going on

*Lambdin - Direct*                                                                 29

1   with the computer, I don't see any other link at that moment

2   to that.

3   Q.   Let's go back to the consent.  Just to make sure I've

4   clarified this, the defendant never consented to a search of

5   the laptop, correct?

6   A.   No.

7   Q.   And the basis for the consent search was the signature of

8   the father, who is the Middlesboro fire chief, and the mayor,

9   correct?

10  A.   That is correct.

11  Q.   Okay.  And the laptop belonged to the city, correct?

12  A.   Yes.

13  Q.   So what happens to the laptop after there is the consent?

14  A.   They take the laptop on 6/29 up to the KSP lab.  Kentucky

15  State Police lab, I believe it was in Frankfort that they took

16  it.

17  Q.   And from that point, there was a full forensic workup,

18  correct?

19  A.   There was a forensic review.  It was not -- we found

20  later they didn't do any carving at that time, and so there

21  was a review of the laptop and they did find some -- some

22  indication that there were some images related to children.

23  Q.   When did you become involved in the investigation?

24  A.   I became involved around 10/2 of 2018.  I might have had

25  a meeting prior to that, but I didn't actually do -- I picked

1    up the evidence at the lab on 10/2 and my opening EC was on

2    10/3, when I had enough to put everything together and kind of

3    open the investigation.

4    Q.   Was there ever any concern that he might somehow be able

5    to remotely wipe the laptop or delete things from it?

6    A.   It's not -- it wasn't connected to anything and it was in

7    the possession of the lab.

8    Q.   So the answer would be no?

9    A.   No.

10   Q.   Was there any concern about any other exigent

11   circumstance that might lead you to need to search this laptop

12   without getting a warrant?

13   A.   No.

14   Q.   Let me ask you this:  If the concern was that he was

15   deleting things, why was there a full forensic workup of the

16   laptop?

17   A.   Well, the concern is he deleted things.  They would have

18   to take the laptop from the moment that they got it to see

19   what was there.  And a lot of times when you're deleting

20   items, there are still pieces of those items on that computer.

21   So you have to do a forensic image to preserve the evidence

22   that may be there, and then you can carve and look for things

23   that were either deleted previously or were in the process of

24   being deleted.

25        It takes some time sometimes, depending on the quantity

1   of the data, for it to go, and it doesn't always get rid of

2   everything.

3   Q.   Why not look in the trash box in the computer?

4   A.   That's not the only place things get deleted from.  They

5   don't all go to the trash box.

6   Q.   When would you say the investigation into child

7   pornography actually began?

8   A.   I would say the child pornography is when the state lab

9   found images that were -- of children that were of concern.

10  At that point, they got the report back from the state saying

11  this is -- it was a sanitized report that they initially got,

12  and they started looking at child pornography at that time.

13  And I was called shortly after that report came back to the

14  Middlesboro Police Department.

15  Q.   Do you recall what the date was when the events that

16  started the investigation would have been?

17  A.   I think the lab report was dated 9/18 of 2018, and I

18  think there was some, a few days in there where they were

19  discussing what they were going to do from that point, and so

20  we would have gotten that initial call sometime after that

21  date.  And then I had gone down and met with, I think it was

22  Hays, the attorney, Mr. Hays and Sergeant Patterson, who said,

23  hey, this is kind of where we are at.

24  Q.   So the child porn -- just for clarity, the child

25  pornography investigation really began September 18, 2018?

*Lambdin - Direct*                                                           32

1    A.   I think that's when they got the lab report back is

2    where, yes, they said there's now child pornography involved.

3    Q.   Okay.  And just to clarify, after the police seize this

4    laptop, there was never any kind of search for a

5    non-investigatory work related purpose such as to retrieve a

6    file, correct?

7    A.   No.

8    Q.   Not correct or correct?

9    A.   No, that's correct.  I'm sorry.  I'm confirming that

10   there was not one.

11   Q.   Okay.  Poor phrasing on my part, I'm sorry.  I'll try to

12   be clearer.

13        Now, did you investigate whether the defendant's father

14   and the mayor ever used the laptop or possessed authority over

15   it?

16   A.   When I went to interview the father, he didn't -- he

17   called his attorney and didn't want to talk to me, and that

18   was later on.  And then the mayor, he knew that the laptop was

19   owned by the fire department but he had -- there was no use by

20   the mayor of the laptop.

21   Q.   Did your investigation reveal that the father ever used

22   the laptop?

23   A.   The father had been present when the laptop was being

24   used but I have no indication that he actually used it.  I

25   know there were tests, exams that they had to create the

1  questions for as part of their training process, and I know he

2  was there at the time they were doing that, but I don't know

3  if he actually used it or not, or whether he was just present.

4  Q.   Okay.  And I refer you to Defense Exhibit 9 and I would

5  ask you if you've ever seen that document before.

6  A.   Sorry.  Take me a second to -- I'm out of order here.

7       I believe I saw this last time we were here.  I think you

8  showed it to me.

9  Q.   But you've not seen that as part of your investigation?

10  A.   I don't think I was ever given a copy of it.  I was told

11  that there was a memo, but I don't think I actually had ever

12  seen a copy of the memo.

13  Q.   Okay.  We'll move on from Exhibit 9.

14       Would you agree with me that neither the mayor nor the

15  defendant's father ever possessed common use or authority over

16  the laptop?

17  A.   Well, I would agree that they never -- they never used

18  the laptop but, I mean, they maintained that they had control

19  of the laptop because it was city property.

20  Q.   So their control of the laptop is based solely on the

21  city's property interest in the laptop?

22  A.   Yes.  The mayor said that -- and this specifically why I

23  believe this.  The mayor said that if it's city property, it's

24  the responsibility of the fire department, or the head of

25  whatever department the property is under, to maintain who

1    uses the property and how it's used.  And then the fire chief

2    would have the ultimate authority as to, you know, who was

3    using the computer and who was assigned, you know, that type

4    of thing.

5    Q.   So are you familiar with the legal doctrine of apparent

6    authority to grant consent to search?

7    A.   I've not read anything specifically on that.

8    Q.   Are there any facts in this case that would suggest that

9    the mayor and the defendant's father had apparent authority?

10          THE COURT:  Can you restate the question without

11   using the legal term?  I mean, this is a factual hearing.

12          MR. ROSSMAN:  Right, okay.

13          THE COURT:  Can you ask him in a factual way?

14          MR. ROSSMAN:  I think I can.

15   BY MR. ROSSMAN:

16   Q.   Are you aware of any fact that would suggest that the

17   police office -- that we've not talked about already, that

18   would suggest that the police officer could rely on the

19   consent of the defendant's father or the mayor?

20   A.   I don't know about the legal background and case law

21   related to that, but the mayor is in charge of the city, you

22   know, the city budget and the city property as a whole, an

23   umbrella coverage.

24          The fire chief, and from what I was told by the mayor,

25   was in charge of everything issued to the fire department and

1    he had the ability to determine who controlled it, who had it,

2    and where it went.  So if he ordered somebody to bring it in,

3    they would have to bring it in under that control of the

4    property.

5          That's the control that I understood was there.  Not that

6    they had used the item, but they had control of the physical

7    item, and it was owned by the city and they could choose what

8    happened with it.

9    Q.   Did your investigation reveal that the sticker with the

10   name Chris England, I think a photograph is Defense Exhibit 6,

11   was that there at the time the laptop was seized?

12   A.   Yes, it was there.

13   Q.   Okay.  But nobody ever contacted Chris England to try to

14   get consent?

15   A.   No.  The only contact they had with Chris England was the

16   interview that they had.

17   Q.   And that was relating to Walmart, correct?

18   A.   To Walmart, yes.

19   Q.   He never gave a statement about the laptop?

20   A.   No.

21   Q.   Is there any other fact about the seizure of the laptop

22   revealed in your investigation that we've not discussed?

23   A.   Not that I know of.

24   Q.   Is there any other fact pertaining to the circumstances

25   of the consents revealed by your investigation that we've not

1    discussed?

2    A.    I think we've discussed it.

3         MR. ROSSMAN:  I think that's all I have, Your Honor.

4

5         THE COURT:  Okay.  Ms. Reed, your cross, ma'am.

6         MS. REED:  Yes, Your Honor.

7                         CROSS-EXAMINATION

8    BY MS. REED:

9    Q.    Special Agent Lambdin, you stated that at the time that

10   the laptop was turned over by the chief, that there was no

11   evidence of child pornography, correct?

12   A.    Correct.

13   Q.    At that time within the firehouse there were multiple --

14   let's run through some things that were known by the

15   firefighters at that time, at the time that Farmer called or

16   texted Trooper Howard.

17         At that point in time during your investigation, it was

18   revealed that firefighters had already determined or had been

19   told that there was a potential hands-on victim, correct?

20   A.    They knew that, yes.  They knew that there was an

21   investigation regarding Walmart and indecent exposure to a

22   child.

23   Q.    But they also specifically knew that there was an

24   allegation that a child who was within the firehouse had been

25   inappropriately touched by the defendant prior to the Walmart

1    incident?

2    A.   I don't know if every one of them knew it; but yes, it

3    was known by several.

4    Q.   It was also known by multiple firemen that the defendant

5    had shown firefighters in the firehouse photos of minors in

6    their underwear making snow angels.

7    A.   Yes.

8    Q.   And he had specifically told his fellow firefighters in

9    the firehouse that he had instructed those children to take

10   off their clothes and to make the snow angels or they weren't

11   getting back in the truck, or something to that effect.

12   A.   That statement had come in, yes.

13   Q.   They also relayed to you that prior to the laptop being

14   turned over, that they were aware that within the firehouse,

15   there was discussion with regards to minors' pubic hair;

16   specifically, those that were on the defendant's youth

17   football league team?

18   A.   Yes.

19   Q.   Additionally, they reported to you that prior to the

20   laptop being turned over, they were aware that the defendant

21   had minors, young boys, within his office -- the office, the

22   lieutenants' office, with the door closed, lights off, playing

23   video games?

24   A.   I know that the boys were in the office, I would have to

25   review the actual document in the interview about the lights

1  being off, but I knew that the boys would play video games in
2  the office.
3  Q.   So it was reported to you specifically by the firemen
4  that he would have minors in the fire department in that
5  office?
6  A.   Yes.
7  Q.   And it was also relayed that at one point they knew that
8  one of the minors was looking at something on that laptop,
9  correct?
10  A.   Yes.
11  Q.   And this was prior to the laptop being turned over.  This
12  occurred prior?
13  A.   That all would have occurred prior to that.
14  Q.   Then it was common knowledge amongst the firefighters
15  about the indecent exposure at Walmart, correct?
16  A.   Yes.  That was commonly known, or the allegation was
17  known.
18  Q.   The allegation of what occurred at Walmart specifically?
19  A.   Yes, I don't know how much detail, but they knew that
20  something had happened there.
21  Q.   And then, again, prior to this laptop being turned over,
22  it was also known to firefighters that inappropriate comments
23  had been made to a firefighter, one of the newest ones that
24  were hired by the name of Harris, correct?
25  A.   That is correct.

Q.    Specifically, Harris went into the lieutenants' office and was told by the defendant that he was in there, quote, sexting and had a, quote, boner, correct?

A.    That is correct.

Q.    So all this information was known to some, all, or at least multiple firefighters, prior to that computer being turned over?

A.    Yes, prior to that call being made.

Q.    You stated that the Walmart incident was not work related, correct?

A.    That's correct.

Q.    Now, you received a number of documents from the City of Middlesboro in regards to a FOIA request?

A.    Yes.

Q.    And you are not an expert on those policies, correct?

A.    No.  No, I'm not an expert on those policies.

Q.    You haven't done a legal analysis of what is and what is not workplace conduct, have you?

A.    I have not.

Q.    I want to go through some of the policies that you received from the City of Middlesboro in a document entitled the Standard Operating Guidelines of the Middlesboro Fire Department.  That was part of the FOIA response, correct?

A.    Yes.  I think there were two parts to that.

Q.    Do you still have those documents?

*Lambdin - Cross*                                                    40

1    A.   I don't have them up here.

2    Q.   I'll provide them to you in a second.

3         MS. REED: If I could tender to the witness part of

4    the FOIA response.

5         THE WITNESS: Thank you.

6    BY MS. REED:

7    Q.   And you would agree with me that the fire department

8    falls under city employees, correct?

9    A.   Yes, it does.

10   Q.   So these are government employees of the city, correct?

11   A.   Yes.

12   Q.   So I'm turning now to rules and regulations under Section

13   A.   "Every employee of the Middlesboro Fire Department and

14   ambulance service."

15   A.   Yes, I have got this here.  It looks like it's the fifth

16   page in.

17   Q.   Number 16 of the Standard Operating Guidelines of the

18   Middlesboro Fire Department states that employees will always

19   conduct themselves in a manner that creates good order within

20   the fire department and city government, correct?

21   A.   That's correct.

22   Q.   17 requires all employees to obey the law, correct?

23   A.   Correct.

24   Q.   If we go down to Section B it states:  "No employee in

25   the City of Middlesboro," and then it continues with 3, "will

1   conduct themselves in a manner that will reflect discredit on

2   the fire department or impair its efficiency," correct?

3   A.   That is correct.

4   Q.   So it appears that the guidelines seem to encompass

5   actions that are both on and off duty, correct?

6   A.   That's correct.

7   Q.   And you would agree that exposing yourself to a minor in

8   a Walmart bathroom may discredit the fire department and/or

9   city employees, correct?

10  A.   Yes.

11  Q.   Additionally, if we go to Section B, once again, "No

12  employee of the City of Middlesboro," and this is under 9,

13  "shall engage in any sexual activity while on duty or in the

14  fire department premises," correct?

15  A.   That's correct.

16  Q.   Now, some of what was reported to you by the firefighters

17  from their personal observations, that appears that was going

18  on in that office that's subject to where the computer was

19  being held, the lieutenants' office, correct?

20  A.   Yes.

21  Q.   And specifically -- well, we'll get to the computer.

22  Finally, it also says under Section B, "No employee of the

23  City of Middlesboro shall use departmental telephone or other

24  equipment or facilities for private enterprise," correct?

25  A.   That's number 7, yes.

1    Q.   The same document also sets forth how standard operating

2    guidelines, if there are changes, should be made.  And that's

3    under Standard Operating Guidelines 101.1 Policy, if you want

4    to turn to it.

5    A.   Where would I find that?  I'm sorry.  Do you know a

6    section or approximate location?

7    Q.   101.1.

8    A.   101.1.

9    Q.   It's approximately four pages after Section B.

10   A.   Okay.  Sorry.

11           MS. REED: If I could tender to the witness a copy of

12   mine.

13           THE WITNESS: I think I just -- I'm getting close.

14   Thank you.

15   BY MS. REED:

16   Q.   If you could look at that document.  Again, we are just

17   in the guidelines that are specific to the fire department.

18   That particular section that was just handed to you outlines,

19   if there is going to be a change in policy or procedure

20   issued, how it's to be issued, correct?

21   A.   Yes.

22   Q.   It required a standard operating procedure number, for

23   example, it's required to be in a particular format that

24   you'll find on the second page; is that correct?

25   A.   Yes.

1    Q.   Defense Exhibit 9, which is the bulletin or the printout

2    that's been provided that says "lieutenants" at the top, does

3    not comply with the procedures set out in the Middlesboro Fire

4    Department Standard Operating Guidelines Manual, does it?

5    A.   No.

6    Q.   It doesn't have a number associated with it according to

7    this manual.  It's not in the correct or proper format

8    according to this manual, correct?

9    A.   That's correct.

10   Q.   It's not even on letterhead which is required, according

11   to the manual, correct?  Or at least from the formatting

12   standard.

13   A.   That's correct, it's not on letterhead.

14   Q.   If I could retrieve that section of the manual.

15   A.   All right.

16   Q.   Now, we talked about Section B, which prohibited the use

17   of the facility's equipment or telephone of the city for

18   private enterprise.

19        Section C, directly after that, specifically states that

20   violations of the rules and regulations which were described

21   in Section B may result in disciplinary action being taken

22   against the employee, correct?

23   A.   Let me look at Section C here.  "Violations of the rules

24   and regulations may result in disciplinary action being taken

25   against the employee per Article 5.4, Section 5 in the City of

1    Middlesboro Personnel Policy."

2    Q.   So that refers us specifically to the overarching City of

3    Middlesboro Personnel Policy, correct?

4    A.   Correct.

5    Q.   And that was another document that was provided in

6    response to your FOIA request in this case?

7    A.   Yes.

8    Q.   And that is another document that applies to fire

9    department personnel --

10   A.   Yes.

11   Q.   -- correct?  I'm going to point your attention to several

12   things in the document I'm about to hand you, which is the

13   Middlesboro Personnel System, Policies and Procedures.  One of

14   which is the scope that the fire department is included as

15   city employees, and the second thing that I would like you to

16   take a look at is on page 21, Section I15.

17       If you could please turn first to pages 7 through 8,

18   which is the scope of the city policy.  It talks about covered

19   employees.

20   A.   And we are going off the handwritten numbers?

21   Q.   Yes.

22   A.   Okay.

23   Q.   Okay.  That specifically lists out that all employees are

24   subject to the personnel manual with the exception of, and

25   then it lists those that are exempt, including, for example,

1    volunteers, correct?

2    A.    Under 1.3, it does say the following municipal employees

3    with the city are expressly exempted from coverage.

4    Q.    And none of those exemptions that are on page 8 would

5    apply to full-time fire department employees, correct?

6    A.    Correct.

7    Q.    So an individual that had the title and responsibilities

8    of the defendant, the city policies that you're currently

9    holding would apply to them, correct?

10    A.    Correct.

11    Q.    If you could go to page 9, the policy speaks to the fact

12    that employees are provided the policy at the time that they

13    begin their employment.

14    A.    Which section is that in specifically, do you --

15    Q.    It's on handwritten page 9.

16    A.    Section 1.6 it says, "Department and office heads will be

17    provided complete copies of these policies and changes thereto

18    and shall be responsible for maintaining complete and current

19    set of policies, for bringing these policies to the attention

20    of all employees in their department."

21    Q.    So the policy is provided to the department head,

22    correct?

23    A.    Correct.

24    Q.    In this case, it would be the chief of the fire

25    department?

1    A.   That's correct.

2    Q.   And it specifically states the chief of the fire

3    department's responsibility to ensure that all employees

4    receive a copy or know of the policies contained in the

5    manual, correct?

6    A.   That's brought to their attention, yes.

7    Q.   If we could go to page 21, specifically to the section

8    that deals with disciplinary action.

9    A.   I'm there.

10   Q.   Specifically states that employees of the City of

11   Middlesboro may face disciplinary action for the personal use

12   of city's property, correct?

13   A.   Yes, under Section B3C.

14   Q.   Additionally, it addresses immoral conduct, correct?

15   A.   Under B4.

16   Q.   And then on the next page, it would be 22, the policy

17   specifically talks about actions that would bring discredit

18   upon the city, correct?

19   A.   Under 14, "Off-duty activities that discredit the

20   individual or organization, causing inefficiency in performing

21   assigned duties."

22   Q.   And it specifically says off duty, correct?

23   A.   Yes.

24   Q.   Would you agree that exposing yourself to a minor off

25   duty would discredit the fire department in the City of

1    Middlesboro?

2    A.   Yes.

3    Q.   Is that covered by the policy?

4    A.   Yes.

5    Q.   And therefore, was that conduct at Walmart work related

6    in the sense that it is specifically covered by not only the

7    fire department guidelines but the overarching city guidelines

8    that govern the defendant's employment?

9    A.   Yes.

10   Q.   And then finally, on page 29, the policy again

11   specifically speaks to the fact that employees are to act

12   appropriately at all times, not only on duty, correct?

13   A.   Under Section A, 5.13A.

14   Q.   That's correct, though, right?

15   A.   That's correct.

16   Q.   All times.  So it's hit multiple times in multiple

17   policies, all which apply to the defendant during his term of

18   employment with the fire department?  Yes?

19   A.   Yes.

20         MS. REED:  The Government moves to admit Prosecution

21   Exhibits 5, 6, and 7.

22         THE COURT:  Objection, Mr. Rossman?

23         MR. ROSSMAN:  No objection, Your Honor.

24         THE COURT:  Okay.  Those will be admitted.

25   BY MS. REED:

*Lambdin - Cross*                                                    48

1   Q.   Now, a forensic analysis was conducted of the subject

2   laptop, correct?

3   A.   That's correct.

4   Q.   And you've had an opportunity to review that analysis,

5   correct?

6   A.   Yes.

7   Q.   You've also had an opportunity to review what I call a

8   mirror image, but a copy of the laptop, correct?

9   A.   I believe I just looked at the reports that were

10  generated.

11  Q.   You were able to see some of the material that was on the

12  computer, correct?

13  A.   Yes.

14  Q.   And in your review of the material contained on that

15  computer, was the vast majority work, fire department,

16  related?

17  A.   I would say yes.

18  Q.   For example, the computer contained policies, correct?

19  A.   That's correct.

20  Q.   Procedures?

21  A.   Yes.

22  Q.   Minutes from the fire department meetings?

23  A.   Yes.

24  Q.   Training material?

25  A.   Yes.

1   Q.   HIPAA information?

2   A.   Yes.

3   Q.   And other documents clearly related to that of the

4   operation of the fire department?

5   A.   You could tell that a lot of fire department work had

6   been done on this computer.

7   Q.   I want to talk about some of the policies that you've

8   touched on briefly in direct that were located on the

9   computer.

10              MR. ROSSMAN:  Your Honor, I would object to these

11   exhibits and any testimony about them, absent some foundation

12   that they were actually enacted as a policy.  They are blank,

13   unsigned drafts and there's no indication that the Middlesboro

14   Fire Department or the City of Middlesboro ever adopted these.

15      It would sort of be like somebody bringing in a bill that

16   Congress considered but did not pass and saying it's law.

17              THE COURT:  Ms. Reed?

18              MS. REED:  Your Honor, they were on the defendant's

19   laptop.  Additionally, he was given the responsibility at the

20   fire department of being the individual that was in charge of

21   drafting and creating computer policies, and it's our

22   understanding that the defense has agreed to stipulate to the

23   fact that the defendant knew these policies were on that

24   laptop.

25              THE COURT:  You can develop those issues on redirect,

*Lambdin - Cross*                                                          50

1     Mr. Rossman.  I'll overrule the objection.

2          Go ahead, Ms. Reed.

3               MS. REED:  Thank you, Your Honor.

4          Handing to the witness what's been marked as Government

5     Exhibit 1.  Actually, I apologize.  I'm going to give you all

6     of these at the same time.

7          Handing to the witness what's been marked Government's

8     Exhibit 1 through 4.

9     BY MS. REED:

10    Q.   If you could look at those documents and look up at me

11    when you're done?

12         And specifically with regards to Government Exhibits 1,

13    3, and 4, were those some of the policies that were recovered

14    from the subject laptop?

15    A.   Yes, they were.

16    Q.   And did it appear, from a review of the laptop, that

17    someone was attempting to create a template or pull material,

18    research, on policies relating to computers and social media

19    usage or internet usage specifically?

20    A.   Yes.

21    Q.   In Government Exhibit 2, was that a firefighter, an

22    employee agreement, contract, that you found for a new

23    employee on the subject laptop?

24    A.   Yes.

25    Q.   And the individual that that was drafted for, Andrew

1    Harris, he was, in fact, one of the newer hires at the time

2    for the fire department?

3    A.   Yes.  I believe it was about six months or less before

4    these events.

5    Q.   And that new firefighter employee agreement specifically

6    directs new employees to the Middlesboro Fire Department

7    Personnel Policy, correct?

8    A.   Correct.

9    Q.   The Middlesboro Fire Department Standard Operating

10   Guidelines, that's the document that we just reviewed,

11   correct?

12   A.   That's correct.

13   Q.   As well as the City of Middlesboro Personnel Policy,

14   which is the second document we've just reviewed, correct?

15   A.   That is correct.

16        MS. REED:  At this time, the government moves to

17   admit Government Exhibits 1 through 4.

18        THE COURT:  Mr. Rossman?

19        MR. ROSSMAN:  I would just renew my same objection

20   for 1, 3, and 4.  No objection to 2.

21        THE COURT:  Okay.  The objections will be overruled.

22   I think it's certainly relevant to know what uses were

23   actually evidenced by what was found on the laptop.  I'll

24   admit those exhibits.

25   BY MS. REED:

1   Q.   Special Agent Lambdin, you kind of gave a generalized

2   statement in response to a defense question that you found no

3   evidence of diminished expectation of privacy in the

4   computer -- or in the city policies or fire department

5   policies.  Do you remember saying that on direct?

6   A.   I believe so, and those were the ones we received in the

7   FOIA, yes.

8   Q.   Now, based on your review, it clearly states in multiple

9   places that an employee is not to use city equipment,

10  facilities, or telecommunication lines for personal use,

11  correct?

12  A.   We did read those in the policy, correct.

13  Q.   And that specifically noted not just in the fire

14  department policy but also in the overarching city policy,

15  correct?

16  A.   Yes.

17  Q.   And in both of those documents that we just reviewed, an

18  employee could be subject to disciplinary action for

19  disregarding that particular regulation, correct?

20  A.   Yes.

21  Q.   You also stated that there was, I believe you said

22  something to the effect of, no evidence of the chief

23  exercising control over the laptop except for the fact that

24  those policies and the mayor stated that he controls city

25  equipment assigned to the fire department, correct?

1   A.   Correct, he decides who uses it.

2   Q.   But you're aware from your investigation and from

3   previous court proceedings that it was the fire chief who

4   assigned those laptops, correct?

5   A.   Correct.  He gave them to the lieutenants at the time.

6   Q.   And according to the policies, he had the authority to do

7   that, correct?

8   A.   Yes.

9   Q.   And he had the authority to reassign them at any time,

10   correct?

11   A.   Yes.

12   Q.   Additionally, he also stated during a previous hearing

13   that he would often find laptops scattered about the

14   firehouse, correct?

15   A.   I don't recall everything that he said during that

16   hearing directly.

17   Q.   But he did note that he would often pick up laptops and

18   put them back into the lieutenants' office; do you recall

19   that?

20   A.   I didn't take notes during the hearing, so I don't

21   recall.

22   Q.   When the defendant took the laptop home, he was taking it

23   back to the chief's residence, correct?

24   A.   He lived with the chief.  My understanding is it was at

25   the chief's residence where he also lived.

1    Q.   You talked a little bit about the urgency with regards to

2    a forensic analysis when something is being deleted, or you

3    suspect something is being deleted from a laptop.  Can you

4    talk a little bit more about that?

5    A.   Well, it's important to preserve the evidence so that it

6    doesn't continue to delete.  So if you were to -- a computer

7    was on at the time you received it, it could be running

8    something in the background, so you would want to make sure

9    that it's secured in a fashion that it won't change.

10   Q.   And when you say something could be running in the

11   background, you mean someone doesn't actually have to be

12   behind the computer.  Once something is initiated, it could

13   continue to delete or clean a computer without human

14   interaction?

15   A.   Correct.  And that could go on for hours.  There are

16   programs that you can run that would clean the white space or

17   the space that is unassigned to current files that haven't

18   been deleted, and those type of things that can run in the

19   background.  You also have other antivirus and

20   cleaning machine -- or software that can do those things.

21   Q.   And there was software that you found installed on this

22   particular computer that was used to scrub or clean the

23   computer, correct?

24   A.   It's a commercial program, yes, named CC Cleaner or

25   CCleaner.

1   Q.   And what does that do?

2   A.   My understanding is you can set it to several different

3   levels where it can delete history, internet history, or clean

4   up files, or automatically delete things from the trash bin,

5   those types of things.  There are -- you can configure it so

6   it's not -- it's a little flexible.

7   Q.   And that was actually on the subject laptop that you

8   recovered, or that was turned over?

9   A.   That is correct.

10  Q.   The images of child pornography that were recovered from

11  the computer, they were in allocated or unallocated space?

12  A.   The initial ones I believe, because he didn't carve,

13  would be located in allocated space at some point.

14          THE COURT:  You're going to have to speak up.

15  A.   I'm sorry.  The initial images that were located in the

16  in -- Mr. Ferraro's first report were in allocated space.

17  They weren't in deleted because he didn't carve for them.

18      When you carve for data is when you're actually looking

19  for items that no longer are in the file allocation table

20  anywhere, and you're actually looking for items that have been

21  removed from the directory of the hard drive but still exist

22  because they haven't been overwritten yet.

23  Q.   And then when he did carve, look in the space that was

24  deleted, were there numerous other child pornography images

25  that were recovered at that time?

*Lambdin - Cross*                                                                56

1    A.   Yes.  Yes.

2    Q.   And were they more voluminous than those that were

3    originally recovered from the allocated space?

4    A.   Yes.

5    Q.   Was there clear evidence that child pornography had been

6    deleted from that laptop?

7    A.   Yes.

8    Q.   Now, programs like CC Cleaner or other cleansing

9    software, is it possible for it to be cleansed to the point

10   where even a forensic review couldn't recover it?

11   A.   It's difficult for them to get everything.  But it is

12   possible, if someone really knew what they were doing, to

13   clean everything.

14   Q.   Is that part of the urgency in getting an electronic

15   device before the program can complete its process of

16   cleaning?

17   A.   Correct.

18           MS. REED:  I have no additional questions, Your

19   Honor.

20           THE COURT:  When you were using the term "he carved,"

21   who were you referring to?

22           THE WITNESS:  Nick Ferraro, he's at the lab for

23   Kentucky State Police.

24           THE COURT:  Mr. Rossman, redirect?

25           MR. ROSSMAN:  Thank you.

1          THE COURT:  You're welcome.

2                    REDIRECT EXAMINATION

3     BY MR. ROSSMAN:

4     Q.   Sir, you began your testimony by discussing about other

5     incidents generally known at the fire department when the

6     laptop was seized, correct?

7     A.   Correct.

8     Q.   And those would include potential hands-on victim, photos

9     of minors in underwear, and similar things you talked about,

10    right?

11    A.   Correct.

12    Q.   Okay.  Would you agree with me that none of those

13    incidents is referenced in any of the consent or memos of the

14    investigation?

15    A.   Correct.

16    Q.   Why is that?

17    A.   I don't believe that the sergeant knew at that time the

18    general knowledge in the fire department.

19    Q.   So the general knowledge in the fire department and these

20    instances you referenced weren't really part of the

21    investigation at that point where the laptop was seized,

22    correct?

23    A.   I don't believe he knew about that.  The investigator did

24    not know about that, so it was not part of his investigation.

25    It would have been in the knowledge of the fireman that

*Lambdin - Redirect*                                                          58

1    reported that, Mr. Farmer.

2    Q.   And would you agree with me that these were basically

3    rumors?

4    A.   Some of the items they specifically saw, the pictures and

5    some of the things on the mountain.  And then there may have

6    been some of the items that were rumors, and some people saw

7    some things and other people didn't see those things.  So I

8    got rumors from some and then what some had directly seen.

9    Q.   Had the defendant been -- other than Walmart, had the

10   defendant been criminally charged with any of these incidents

11   you referenced?

12   A.   There was -- there were charges for misconduct with the

13   youth football league money, but not -- it did not have to do

14   with any sexual inappropriateness.

15   Q.   And you said there was a report that a minor was looking

16   at something on the laptop.  Can you elaborate on that?

17   A.   I know the minor victim was being shown a video on the

18   laptop at that time that purportedly the contact happened.

19   Q.   And was that video inappropriate or illegal in any way?

20   A.   No, the video was fire equipment.

21   Q.   Okay.  So why would that have anything to do with

22   supporting a search of the defendant's laptop?

23   A.   Well, that minor was being shown that while the activity

24   was happening to the minor in the report.  So there may have

25   been grooming or other type of material that was accessed

1    through that computer.  That would be the connection.  It

2    doesn't mean necessarily that that video that was being shown

3    at that moment, but there were minors that had access to the

4    computer, or where the computer was used to show objects to.

5    Q.   Do you have any specific information to suggest there was

6    grooming material, or is that speculation?

7    A.   No, that would be unknown at that time.  I don't -- I did

8    not see -- the child pornography that was identified later

9    could have been used that way.  We don't know.

10   Q.   Okay.  So, speculation?

11   A.   Don't know.

12   Q.   All right.  Moving on.  We talked about some of the

13   standard operating guidelines of the Middlesboro Fire

14   Department and Middlesboro City, including that employees

15   conduct themselves in good order, obey the law, not impair

16   efficiency, et cetera.  Do you recall that?

17   A.   Yes.

18   Q.   So, is it your position that failing to obey the law

19   outside of work gives rise to a reason to search his laptop?

20   A.   No.  It would give rise for the city to look at

21   disciplinary action, and I don't know what that would all

22   encompass under those policies specifically.

23   Q.   You would agree with me that if he got a speeding ticket,

24   that would be a violation of the law, correct?

25   A.   That is correct.

1    Q.   So if he got a speeding ticket, could Middlesboro City

2    Police Department go search his laptop?

3    A.   I don't think that would be a reason to search his

4    laptop.

5    Q.   Okay.  Was there ever any disciplinary investigation or

6    action taken against the defendant for any violation of any

7    Middlesboro city or fire department policy?

8    A.   I don't know.  Over time, you know, from the point that

9    he was started or not, I don't know, because I didn't talk to

10    the chief.

11    Q.   Let me ask you this:  As of June 23, 2018 when the laptop

12    was seized --

13    A.   Uh-huh.

14    Q.   -- was there any investigation or action against the

15    defendant for violation of the standard operating guidelines

16    or policies that you contend support the search of his laptop?

17    A.   I don't know of any internal investigation by the city

18    administratively, not outside of the law enforcement aspect.

19    Q.   Are you aware of any conclusion or justification for the

20    search that someone said he's accused of the Walmart incident,

21    that violates the city policy; therefore, search?

22    A.   I'm not aware of that.

23    Q.   Did the actions of the defendant -- alleged actions of

24    the defendant at Walmart impair the efficiency of the fire

25    department in any way?

1    A.   I think it affected, and I've been -- I was told that the

2    morale and other things at the fire department, they knew what

3    was going on.  The rumors were going around in the fire

4    department.  It caused issues within it socially.  So from

5    that standpoint, I could see that that would affect, but I

6    wasn't there, so I don't know if there was a true effect on

7    efficiency or not caused by that.

8    Q.   Moving on to Defense Exhibit 9, I believe you testified

9    that that memo was not in the correct format per the

10   regulations and standard operating guidelines, correct?

11   A.   Per the official policy that was listed, correct.

12   Q.   Okay.  Did anyone ever challenge that memo as improperly

13   enacted?

14   A.   I don't think anyone ever challenged the memo.  They were

15   unhappy with it, but I don't think they formally challenged

16   it.

17   Q.   Did the mayor or a court or any authority strike down

18   that memo as being unlawfully enacted?

19   A.   No.

20   Q.   Did you find any policies from the Middlesboro Fire

21   Department that were enacted in conformity with the standard

22   operating guidelines?

23   A.   In their SOG that was properly in conforming to the

24   guidelines, and their SOG was all laid out with that, but I

25   didn't review it for that purpose.

*Lambdin - Redirect*                                                          62

1    Q.   Now, we've heard a lot about use of city property for

2    personal purposes.  Was that investigation part -- was there

3    an investigation of the defendant for that?

4    A.   Specifically for personal use, no.

5    Q.   Was any sort of violation of a city policy or practice

6    prohibiting personal use of property specifically part of the

7    investigation or justification for the search?

8    A.   Not that I'm aware of.

9    Q.   And I'll refer you back, do you still have that in front

10   of you?

11   A.   Which?

12   Q.   The personnel policies and procedures, where on page 21

13   it talks about personal use of city property.

14   A.   I have the standard operating guidelines and the --

15   Q.   I think it was Exhibit 7.  It may have been 6.

16   A.   Here is 7 and 6.  I have 7 and 6.

17   Q.   Seven.

18   A.   I have 7 here.

19   Q.   Okay.  If you would turn to page 21 by the handwriting,

20   I15 by the top, or by the typewritten numbers at the bottom.

21   A.   Wrong one.  Okay.

22   Q.   And Section 5.4B.

23   A.   Yes.

24   Q.   Just read the first part of that to the comma, the first

25   eight words.

1  A.   "An employee or employees may be disciplined for."

2  Q.   Okay.  Would you agree with me that says "may" and not

3  "shall"?

4  A.   It does say may.

5  Q.   And it does not prohibit all use for personal purposes of

6  city property, correct?

7  A.   I don't see specifically where there's an exception, but

8  there might be one.

9  Q.   There's no regulation or standard operating guideline

10  that says thou shalt not use city owned property for personal

11  purposes at all, ever, under any circumstance?

12  A.   It just says dishonesty, personal use of the city's

13  property.

14  Q.   And continuing to the portion after the comma, "but not

15  limited to," would you agree with me it says, "The following

16  when substantiated with or by bonafide proof."  Do you see

17  that?

18  A.   I do see that.

19  Q.   At the time the laptop was seized, was there bonafide

20  proof that the defendant had used it for personal -- for

21  personal purposes in violation of a policy?

22  A.   No.

23  Q.   Moving on, you would agree with me that nothing in here

24  says that any violation of these policies diminishes an

25  expectation of privacy in a laptop, correct?

1    A.   I don't think the city policies address the laptops; so

2    no, you're correct.

3    Q.   And nothing in here says that we can conduct a routine

4    search or other search if we believe there's been a violation

5    of the policy?

6    A.   I don't recall anything about searches specifically.

7    Q.   Now, we talked about Walmart, and you said that the

8    alleged Walmart incident violated city policies, correct?

9    A.   Correct.  By the social aspect and how it badly reflected

10    under that main policy.

11    Q.   So it was just the fact that it caused rumors to fly that

12    violated city policy?

13    A.   It would be a criminal act that would bring problems for

14    the city fire department, perhaps lack of trust, that type of

15    thing.

16    Q.   So if the defendant had been accused of crime X and

17    people talked at the fire department about crime X, would he

18    be in violation of city policy?

19    A.   I think -- I don't know.  I'm not an expert on at what

20    point in time the city policy would apply.  I just don't know.

21    Q.   Nobody has ever said to you we seized this laptop because

22    we were investigating a violation of city policy or some

23    standard on breaking that?

24    A.   No one mentioned a violation of city policy to me.

25    Q.   We talked about how downloading child pornography or

1   receiving child pornography would violate city policy,

2   correct?

3   A.   That's correct.

4   Q.   But violating -- receiving child pornography would

5   violate a whole plethora of laws, correct?

6   A.   Correct.

7   Q.   We don't need the City of Middlesboro to tell us that,

8   right?

9   A.   That's correct.

10  Q.   And the City of Middlesboro can't grant a license to

11  someone to receive child pornography, can they?

12  A.   No, they cannot.

13  Q.   And you testified earlier that the investigation for

14  child pornography began on September 18, 2018, right?

15  A.   I believe, yes.  When the police department received that

16  report is when they started looking into child pornography.

17  Q.   Okay.  We talked a lot about Government Exhibits 1, 3,

18  and 4, purported policies enacted by the City of Middlesboro.

19  Do you have those in front of you?

20  A.   Yes, I do.

21  Q.   And I would ask you to look at the header in the top

22  left- and right-hand corner on most of those documents, some

23  it's just the top right-hand.  Tell us what that header says.

24  A.   By header, you mean --

25  Q.   Where it says the seal.

1     A.   The seal is Legal and Liability Risk Management

2     Institute.

3     Q.   Okay.  Do you see anything about the City of Middlesboro

4     or Middlesboro Fire Department?

5     A.   No.

6     Q.   Do you have any information or evidence that would

7     suggest that the City of Middlesboro or the Middlesboro Fire

8     Department ever enacted these documents as policies or

9     guidelines?

10    A.   I don't have any information as to whether they were

11    enacted or not.

12    Q.   Do you have any information that would suggest that the

13    defendant ever signed one of these documents or agreed to be

14    bound by one of these documents?

15    A.   No.

16    Q.   Isn't it true, sir, that these documents are just blank

17    legal forms?

18    A.   They are, I would say, legal go-bys is what it kind of

19    looks like.  Something to be used for policy or you could

20    adopt it or not adopt it.

21    Q.   But you have no evidence to suggest that they ever were

22    adopted?

23    A.   I have no information regarding whether they were or not.

24    Q.   They weren't included in the policies and standard

25    operating guidelines you received in response to your FOIA

*Lambdin - Redirect*                                                      67

1   response, correct?

2   A.   They were not in those.

3   Q.   You said that the fire chief had the authority to assign

4   the laptops, correct?

5   A.   That's correct.

6   Q.   And did he ever, in fact, reassign the laptops?

7   A.   I think they stayed with the people he originally

8   assigned them.  One of the persons was promoted to captain and

9   he still had the laptop that he was given as a lieutenant.

10  Q.   Did anyone, including the fire chief, do anything to try

11  to diminish the defendant's control over the laptop prior to

12  the seizure?

13  A.   Prior to the fire chief going and getting it?  No.

14  Q.   Now, it talks some about the urgency to search the

15  laptop, correct?

16  A.   The urgency to seize the laptop, yes.

17  Q.   To seize the laptop.  Okay.  When the laptop was seized,

18  was it on or off?

19  A.   That I don't know.

20  Q.   Do you know if, at some point subsequent to the seizure,

21  it was turned off?

22  A.   At some point in time it either ran out of power or was

23  turned off.  I don't know the sequence of that.

24  Q.   Okay.  Would you agree with me that it's important, if

25  you're concerned about deletion of things from a laptop, that

1   you would turn it off as soon as you seize it?

2   A.   There are reasons not to turn it off immediately, if you

3   have some tools to use, but it would be prudent, if you don't,

4   to turn it off unless it were in a state that there was a

5   password preventing you from keeping it, and in which case you

6   want to make sure that you could re-access it.  But I don't

7   know what was done.

8   Q.   And those tools weren't used in this instance, were they?

9   A.   Not that I'm aware of.

10  Q.   The laptop, isn't it true, it was seized in June and the

11  forensic workup and investigation began in September, correct?

12  A.   I know it was taken to the lab on 6/29, and then some

13  time between there and 9/18 the lab did its forensic review.

14  Q.   So for at least six days it was sitting somewhere in

15  Middlesboro and hadn't gone to the lab, correct?

16  A.   Yes.

17  Q.   And isn't it true that if there had truly been a concern

18  about a remote wiping attempt or destruction of evidence that

19  someone would have taken it to the lab sooner?

20  A.   They couldn't have remotely wiped it even at the evidence

21  room at the police department because there is no connection

22  to anything.

23  Q.   I'm talking about the defendant remotely wiping.

24  A.   Oh, the defendant would not have remotely wiped it, no.

25  Q.   Okay.  And could CCleaner, could he have somehow used

1   CCleaner when the laptop was in police custody to delete

2   something?

3   A.   If the laptop were on, the CCleaner could run during that

4   time.

5   Q.   And if the laptop were off, could it?

6   A.   No.

7   Q.   And isn't it true that images were recovered despite the

8   presence of CCleaner on the laptop?

9   A.   Yes.

10  Q.   Did the defendant have access to the laptop in any way

11  after police seized it?

12  A.   Not that I know of, no.

13  Q.   Now you said some images were found in allocated space,

14  correct?

15  A.   Yes, in cache locations.

16  Q.   Okay.  Isn't it true that the cache is unallocated space?

17  A.   Well, unallocated space is space that is not being used,

18  not actively used.  Allocated space is where things that can

19  be accessed by the operating system, not necessarily the user,

20  but the operating system, in different programs that know what

21  to look for could use those.

22  Q.   Isn't it true that all of the images found on the laptop

23  would not have been accessible to a user of the laptop without

24  some sort of forensic tool?

25  A.   I would say that's accurate at the time that they were

1    recovered.

2    Q.   You didn't find a file on the desktop or in a folder?

3    A.   No.  No.  And it would not be something that standard,

4    you know, programs would be able to access.

5    Q.   And then just one final follow-up question about these

6    legal management risk forms.  Other than the fact that those

7    were found on the defendant's laptop, do you have any

8    information that would suggest that he read these and was

9    aware of their contents?

10   A.   The only thing that I understand is that he worked on

11   policy for the fire department, so I don't know if he actually

12   read them or not.

13   Q.   Okay.  Thank you.

14            THE COURT:  Okay.  Recross, Ms. Reed?

15            MS. REED:  Yes, Your Honor.

16                         RECROSS-EXAMINATION

17   BY MS. REED:

18   Q.   Special Agent Lambdin, I'm going to hand you part two of

19   that standard operating guideline for the Middlesboro Fire

20   Department, and it's marked as Government Exhibit 8.

21       If you could turn to the page that's marked in response

22   to your FOIA request, you, in fact, received multiple memos

23   that made adjustments to policies, procedures, regulations by

24   a fire chief, correct?

25   A.   I see some in here, yes.

1   Q.   And those are in the standard format that was mentioned

2   in the previous document or part one, I believe, Government

3   Exhibit 6.  They are on letterhead, correct?

4   A.   The one I'm looking at dated September 9 does not have

5   letterhead.  There may be others.

6   Q.   They are specifically attached to and included in the

7   standard operating guidelines of the fire department, correct?

8   A.   Correct, and there are several on letterhead here.

9   Q.   They address things like shift trading, equipment,

10  vacation, sick time.  Are you seeing all these memos in there?

11  A.   Shift trading, equipment, vacation, yes.

12  Q.   Did you -- so understanding that you've received these

13  memos, it looks like some from 2004, 2002, 1997.  Do you see

14  those dates?

15  A.   Yes.

16  Q.   Did you ever find this letterhead list, alleged memo that

17  was typed out with regards to the lieutenants' office,

18  Defendant's Exhibit 9, in response to your FOIA request?

19  A.   I did not receive that in the FOIA request.

20  Q.   So this was not enclosed as part of the standard

21  operating guidelines of the fire department like all those

22  other memos that were enclosed as part of your FOIA request

23  return?

24  A.   I did not see it in there.

25          MS. REED:  At this time, the government moves to

1    admit Government Exhibit 8.

2              MR. ROSSMAN:  No objection, Your Honor.

3              THE COURT:  That will be admitted.  Is it marked?

4              MS. REED:  Yes, Your Honor.

5    BY MS. REED:

6    Q.   We talked with regards -- on redirect, you talked about

7    the expectation of the defendant to privacy in this computer

8    and whether or not at any point anyone else ever exercised

9    control.

10        In the entirety of your investigation, having interviewed

11   approximately -- how many firefighters did you interview

12   during that time frame?

13   A.   I believe I got to everyone that had been employed during

14   that time.  I don't have the exact number, but 20, 25, 30,

15   somewhere.

16   Q.   So you interviewed everyone that was employed during the

17   relevant time frame?

18   A.   I think there was one guy that had left I could not find.

19   Q.   Was there a stark difference between the way the

20   defendant treated the laptop that was assigned to him and the

21   other two lieutenants treated their laptops assigned to them?

22   A.   Yes.

23   Q.   And the other laptops that were assigned out, other

24   people were allowed to use those laptops?

25   A.   Yes.  Troy Perry's laptop, he left in place to be used.

1  I believe Captain Rick Evans, he asked that -- they asked him
2  to use his.

3      And I think the last time that I was here, I got two of
4  the captains' testimonies kind of commingled there and I want
5  to make sure you guys knew that.

6      Captain Scott Earl and Captain Rick Evans shared the same
7  office, and Scott Earl had a private computer, did not have an
8  issued computer, and he never used the issued computers.  And
9  then Rick Evans had an issued computer that he did use at
10 work.

11     I just want to make sure that I think I might have
12 commingled those two captains' testimonies.

13 Q.  Thank you for that clarification.  And with regard to the
14 lieutenant office generally, was there a stark difference in
15 the investigation as to how the defendant treated that office
16 versus all the other lieutenants?

17 A.  Yes.

18 Q.  And all the other lieutenants would keep that office
19 open, correct?

20 A.  Yes.  They were told not to, but they tended not to
21 follow that as much.

22 Q.  Well, your investigation revealed that specifically no
23 one really followed that Defense Exhibit 9 except for the
24 defendant, correct?

25 A.  Correct.

*Lambdin - Recross*                                                                    74

1   Q.   And it was disregarded in the norms and customs of the

2   firehouse with the exception of the defendant?

3   A.   Yes.   There were times that the fire chief would tell

4   them to adhere by that, and -- but otherwise, they didn't like

5   the policy.

6   Q.   They didn't like the policy, but they didn't follow the

7   policy, correct?

8   A.   They tended not to follow the policy, correct.

9   Q.   Additionally, your investigation revealed that at least

10  five to seven people had a key to that lieutenants' office

11  where the laptops were supposed to be maintained, correct?

12  A.   The captains, fire chief and the lieutenants had keys.

13  Q.   All to that particular office?

14  A.   Yes.

15  Q.   Where the laptops were supposed to be, according to the

16  memorandum, maintained, or according to the chief?

17  A.   I don't know if he had a requirement that they be

18  maintained in the office.   I don't recall.

19          MS. REED:   I have no additional questions.   Thank

20  you.

21          THE COURT:   Okay.   Sure.

22      Special Agent Lambdin, one of the first answers you gave

23  was that the laptop you've been discussing was assigned to the

24  defendant in February of 2018; is that correct?

25          THE WITNESS:   I think it was earlier.   I think it was

1    2017.  It was when he became a lieutenant.  And I think he

2    became a lieutenant -- I've got the date.  It was shortly

3    after that.

4            THE COURT:  I'm wondering if that was a misstatement

5    by counsel.  The charge in Count 4 is based on -- that's the

6    possession of a laptop computer containing visual depictions,

7    the date range in that charge is April 2017 to June 23rd,

8    2018.

9            MR. ROSSMAN:  Your Honor, if I may clarify, I believe

10   he's correct that the laptop was assigned when he was promoted

11   to lieutenant April 2017.  The reason the February 2018 date

12   may have creeped in is Exhibit 9, which is the memo about

13   staying out of the office, was dated February 2018.

14           THE COURT:  The question, though, was:  Was the

15   laptop assigned in February 2018, and the answer was yes.

16           MR. ROSSMAN:  I think we both may have been confused.

17           THE COURT:  Okay.  So do you know when the laptop was

18   assigned to the defendant, approximately?

19           THE WITNESS:  I've got my timeline, it will take me

20   just a second.

21           THE COURT:  That's fine.

22           THE WITNESS:  The promotion date was 4/20 of 2017.

23           THE COURT:  And is it your testimony that the laptop

24   was assigned to the defendant around that time?

25           THE WITNESS:  It would be shortly after that, yes.

*Lambdin - Further Redirect*

1      THE COURT:  Okay.  That's the only matter I wanted to

2  cover, but I'll certainly allow for follow-up questions to

3  mine.

4      Mr. Rossman?

5      MR. ROSSMAN:  Your Honor, I don't think I have any

6  follow-up questions for that.  The government did introduce a

7  new exhibit and I would briefly like to ask him a question

8  about that.

9      THE COURT:  With the shifting burdens, it's fine if

10  you want to go ahead and ask questions about that.

11      MR. ROSSMAN:  I'll be very brief.

12      THE COURT:  We are not in a hurry.

13                  FURTHER REDIRECT EXAMINATION

14  BY MR. ROSSMAN:

15  Q.   Sir, I want to refer you back to Government's Exhibit 8

16  and then the other exhibits produced in response to the FOIA

17  request.

18  A.   Yes.

19  Q.   Can you tell me when those were last updated?

20  A.   No.  We can look at the last entry on them.  I don't know

21  if that will be accurate as to when -- unless you know where

22  that is, you could point me to that.

23  Q.   Isn't it true that most of them came from the '90s and I

24  think around 2005?

25  A.   There are many very old policies in here.

1   Q.   Other than the minutes that came in response to the FOIA

2   request, is there anything from 2005 forward?

3   A.   I'm not seeing anything in the ones I have in front of

4   me.

5   Q.   And would you agree that the policies prohibit the

6   disclosure of confidential information?

7   A.   I'm sure there are references in the fire department SOP

8   about HIPAA.  At least I believe there are.

9   Q.   And wouldn't you agree that the people who allegedly made

10  their laptops available to anyone were violating a policy in

11  doing so?

12  A.   Dependent on whether HIPAA type information was on there

13  or not.  I don't know if it was or not.  I didn't ask.

14  Q.   Now, you talked about how five to seven people had keys

15  to the office.  Isn't it true that the defendant routinely

16  took the laptop home with him when he left his office?

17  A.   Yes, he did.

18  Q.   Did anyone anywhere ever tell you that he left the laptop

19  in his office where five to seven other people could access

20  with a key unattended?

21  A.   I think when the fire chief testified he said that other

22  people could get into the office and have access to the

23  computer.

24  Q.   Other than the fire chief and Captain Dan Sanders, has

25  anyone told you that?

1    A.   No.

2           MR. ROSSMAN:  Okay.  That's all I have.

3           THE COURT:  Ms. Reed?  Follow-up questions, ma'am?

4           MS. REED:  Yes, Your Honor.

5           THE COURT:  We won't do this with every witness, but

6    with the shifting burden of proof, it's fine.  Go ahead.

7           MS. REED:  Thank you, Your Honor.

8           THE COURT:  You're welcome.

9                    FURTHER RECROSS-EXAMINATION

10   BY MS. REED:

11   Q.   With regards to your FOIA request, did you request a

12   specific time frame or did you request the up-to-date policies

13   and manuals and regulations and procedures from the city and

14   the fire department?

15   A.   I requested the up-to-date ones that would be in effect

16   at the time that this incident took place.

17   Q.   And the person who collected those documents from the

18   fire department was the defendant's father, the fire chief,

19   correct?

20   A.   That is my understanding from talking with the city

21   attorney that -- who would have provided those.

22   Q.   And according to the city and the fire chief, the

23   defendant's father, you were provided all of the relevant

24   enacted policies, regulations, and procedures that were

25   requested per your FOIA request?

1    A.   Correct.

2    Q.   And did you ever receive Defense Exhibit 9, which is that

3    typed out memo that says "lieutenant" at the top?

4    A.   No, I do not believe that was there.

5    Q.   With regards to the defendant leaving the laptop

6    unattended overnight in the office of which people had five to

7    seven keys to, the chief, the defendant's father, specifically

8    told investigators when he dropped off the laptop that his son

9    would leave it at the fire department, correct, sometimes?

10   A.   I have to review that.

11   Q.   I'll find the defense exhibit.

12        THE COURT:  It's 14, right?

13        MS. REED:  Yes, Your Honor, that's one of them.

14   BY MS. REED:

15   Q.   Do you have Defense Exhibit 14?

16   A.   I do have 14.  It is there.

17   Q.   Could you follow along with me.  Does it say, Quote,

18   Chief England immediately agreed to release the laptop and he

19   also signed a consent to search form of the laptop that was

20   witnessed by myself and Officer Jeremiah Johnson.

21        Do you see that?

22   A.   I see that.

23   Q.   And then it continues:  "Chief England stated that

24   although the laptop belongs to the City of Middlesboro,

25   employee, Robert Christopher England, takes the laptop home to

*Lambdin - Further Recross*                                                    80

1    use it," correct?

2    A.   That's correct.

3    Q.   And then he continues:  "Chief England stated that

4    employee Mr. Robert Christopher England sometimes forget" --

5    I'm assuming it's supposed to be forgets, "the laptop at work,

6    but most of the time he takes it home."

7    A.   That is correct.

8    Q.   So at the time the laptop was turned over by the fire

9    chief, he specifically informed investigators that it was left

10   sometimes in the lieutenants' office, of which five to seven

11   people have a key to?

12   A.   True.

13            MS. REED:  If I could have just one moment.

14       I have no additional questions, Your Honor.

15            THE COURT:  Okay.  Do you have any documents up there

16   that were not admitted as exhibits, Special Agent?

17            THE WITNESS:  I don't know.

18            THE COURT:  Your notes probably.

19            THE WITNESS:  Just my notes is the only thing I have.

20   Everything else looks like it has a sticker on it.

21            THE COURT:  Let's get those all to Sheila, please.

22   You can return to counsel table.

23            THE WITNESS:  Thank you.

24            THE COURT:  Sure.

25       Mr. Rossman, do you want to try to get another witness in

1    before the lunch break, or what's your preference?

2              MR. ROSSMAN:  Your Honor, I'm happy either way.

3              THE COURT:  How long do you think your next witness

4    will take?

5              MR. ROSSMAN:  I don't think he will be long.  Yeah, I

6    think we can do it in, well, 45 minutes or less, hopefully.

7              THE COURT:  Okay.  Sure.  Unless any court staff or

8    anybody needs a break, call your next witness, please.

9              MR. ROSSMAN:  We would call Andrew Harris.

10             THE COURT:  Okay.  We'll get Mr. Harris in the

11   courtroom, please.

12             ANDREW HARRIS, DEFENSE WITNESS, SWORN

13             THE COURT:  Take a seat right over here for us, sir.

14   Good morning to you, sir.

15             THE WITNESS:  Good morning.

16             THE COURT:  Would you state your full name, please.

17             THE WITNESS:  Andrew Harris.

18             THE COURT:  Do you have a middle name?

19             THE WITNESS:  Jarrett.

20             THE COURT:  Spell the middle name, please.

21             THE WITNESS:  J-A-R-R-E-T-T.

22             THE COURT:  Okay.  It's a little awkward.  The chair

23   does not move forward or back.  The microphone will slide

24   closer to you and you can adjust it up and down.  It will

25   slide across that table too, if that makes you more

1   comfortable.  There's some water there as well.

2       Speak up, speak clearly into the microphone in response

3   to the questions you'll be asked today.

4       Go ahead please, Mr. Rossman.

5           MR. ROSSMAN:  Thank you, Your Honor.

6                       DIRECT EXAMINATION

7   BY MR. ROSSMAN:

8   Q.   Good morning, sir.  I would like to ask you questions

9   about your work at the Middlesboro Fire Department.  Can you

10  tell us the dates that you worked there?

11  A.   I began on July the -- I was hired on July 10th, 2017,

12  and my first date was July 11th, 2017.

13  Q.   And do you still work there presently?

14  A.   Yes.

15  Q.   Have you worked there continuously since July 11th, 2017?

16  A.   No.

17  Q.   When did you not work there?

18  A.   I left Middlesboro Fire Department March 26, 2019 and

19  returned on May the 7th, 2019.

20  Q.   Okay.  Do you recall working with the defendant?

21  A.   Yes.

22  Q.   And tell us about how frequently you worked with the

23  defendant.

24  A.   He was on my shift.  He was the lieutenant on my shift,

25  on B shift.  I worked with him every day that I was on shift.

*Harris - Direct*                                                                 83

1    Q.   Isn't it true that he trained you?

2    A.   Yes.

3    Q.   Can you elaborate on what happened during that training?

4    A.   He was the lieutenant on our shift.  Captain assigned me

5    to train with him, sometimes with a group and sometimes

6    privately.

7    Q.   And did your training involve the use of a laptop?

8    A.   There was a laptop in the room sometimes, but I was

9    never -- I mean, he used it for PowerPoints.

10          MR. ROSSMAN:  Okay.  I would like to show the witness

11   Defense Exhibit 6.

12          THE COURT:  That can be shown to the witness.

13   BY MR. ROSSMAN:

14   Q.   Sir, do you recognize what's in that photograph?

15   A.   It looks familiar because I guess it was -- the laptops,

16   they had their names on top of them.  I'm guessing that's what

17   it is.

18   Q.   So was that the sticker that was on the defendant's

19   laptop?

20   A.   I'm assuming.

21   Q.   Was that there the whole time that you worked there?

22   A.   I do not know.

23   Q.   Was it there when you saw the laptop?

24   A.   I was --

25   Q.   Let me ask it a different way.

*Harris - Direct*                                                    84

1    A.   Okay.

2    Q.   Did you ever see the defendant's laptop without that

3    sticker on it?

4    A.   I'm not sure.  I don't know.

5    Q.   Let's move on to Defense Exhibit 8, please.  I would ask

6    you to take a moment to look at that and review it and let us

7    know when you're ready.

8    A.   Okay.

9    Q.   On the third paragraph, first sentence, it states:

10   "Harris was asked if he used England's computer at any time

11   and he advised that he had not."  Is that true?

12   A.   Yes.

13   Q.   Have you ever seen anyone other than the defendant use

14   the defendant's laptop?

15   A.   No.

16   Q.   And are you aware of any policy or procedure that would

17   have prevented other people from using his laptop?

18   A.   No.

19            MR. ROSSMAN:  I would like to show the witness what's

20   been marked and admitted as Defense Exhibit 9.

21   BY MR. ROSSMAN:

22   Q.   And sir, I would ask you if you've ever seen that

23   document before.

24   A.   Yes.

25   Q.   Tell us about that document.

1  A.  It was posted on the walls at the station as a memo.  It

2  was put in the memo box which was located in the front of the

3  station and, you know, just like any other memo, told to abide

4  by it, so...

5  Q.  And the date of that, February 8, 2018, does that appear

6  to be correct to you?

7  A.  I'm not good with dates.  I'm not sure.  It might have

8  been.  I mean, I don't really remember.

9  Q.  Let me ask you this:  Did you see this document before

10  the police came on June 23, 2018, to seize the laptop?

11  A.  Yes.

12  Q.  Okay.  And was this document generally known and

13  recognized throughout the fire department?

14  A.  As far as I know.

15  Q.  Okay.  And you referenced in your testimony other memos.

16  Tell us about other memos that were generated at the fire

17  department.

18  A.  There's a memo really about anything that needs to be

19  said.

20  Q.  Did all of these memos have the same general appearance?

21  A.  Some of them said "memo" at the top.

22  Q.  Were any of the memos done on Middlesboro Fire Department

23  header?

24  A.  I can't recall.

25  Q.  Do you remember seeing anything that said Middlesboro

*Harris - Direct*                                                    86

1    City Policy or anything like that on any of the memos?

2    A.   I can't recall.

3    Q.   Would it be fair to say that the memos you remember, most

4    of them were typed up informally and signed by the chief like

5    Exhibit 9, correct?

6    A.   Yes.

7    Q.   Okay.  Coming back to your statement, Exhibit 8, I would

8    just ask you to read out loud paragraph 4 for us, please.

9    A.   I don't have it yet.

10   Q.   Okay.  When you get it, where it says:  "England stayed

11   in the lieutenants' office," if you could just read that for

12   us, please.

13   A.   "England stayed in the lieutenants' office almost 20

14   hours a day with lights out and the door closed or ajar.

15   There was even a memo about the door being kept locked due to

16   confidential information" --

17            COURT REPORTER:  Can you slow down, please?  Due to

18   confidential information...

19            THE COURT:  She needs to hear you better, slow down a

20   bit for us, please.

21   A.   "Due to confidential information.  Harris does not know

22   what kind of confidential information might be in the room.

23   No one can answer that question.  Harris cannot say the door

24   was locked or not every time England left the room, but the

25   door was definitely shut when England left the room."

1    Q.   Okay.  And does that paragraph accurately reflect your

2    statement?

3    A.   Yes.

4    Q.   Is there any additional information that you can give us

5    on the defendant maintaining control of his laptop?

6    A.   No.

7    Q.   Did you ever see anyone other than the defendant use his

8    laptop?

9    A.   No.

10   Q.   Was the policy or the memo we talked about, Defendant's

11   Exhibit 9, is that the memo that's referenced in this

12   paragraph?

13   A.   Can I see the Exhibit?

14            THE COURT:  Yes, you can.  We'll get it to you.  Good

15   question.

16   A.   Yes, that's the memo I was speaking of.

17   Q.   Okay.  So was it generally understood that that memo and

18   the custom at the fire department was stay off of the

19   defendant's computer?

20   A.   I took it as to stay out of the lieutenants' office and

21   whatever was in there, unless asked to go in there.

22   Q.   Did you ever see the defendant's laptop outside of the

23   lieutenants' office?

24   A.   No, not that I can remember.

25   Q.   If you had gone to the chief and said, I would like to

1   use that laptop, what would his response have been?

2   A.   I don't know.

3   Q.   Let's go to the next paragraph, paragraph 5, where it

4   says, "Harris was asked if," and can you read that out loud

5   for us, please?

6   A.   "Harris was asked if he thought there was any chance that

7   a stranger off the street could come into the station and get

8   on to England's or any other computer at the station.  Harris

9   said he honestly did not think there was any way this could

10  happen.  Harris never saw an outsider at the computer, or even

11  sit alone in any of the offices at the station."

12  Q.   And does that accurately reflect your statement to the

13  FBI?

14  A.   Yes.

15  Q.   And then in the last paragraph, it looks like it's the

16  third sentence that starts capital letters, "England," if you

17  could read that for us.

18  A.   Which one?  Sorry.

19  Q.   "England took the computer home."

20  A.   You mean start there?

21  Q.   Yes, please.  Just read that sentence.

22  A.   "England took the computer home in a wheeled duffle or

23  briefcase."

24  Q.   Okay.  And does that accurately reflect your statement to

25  the FBI?

*Harris - Direct*                                                                89

1    A.    Yes.

2    Q.    Next page, first full paragraph, if you could read that

3    paragraph for us, please.

4              MS. REED:  Objection, Your Honor.

5              THE COURT:  The nature of the objection?

6              MS. REED:  Cumulative.  The witness is simply --

7              THE COURT:  Go ahead.

8              MS. REED:  -- simply reading the exhibit that's in

9    evidence, unless I'm missing something.  If the Government

10   asked the witness a question and wants -- or wants to rely on

11   this document, do we have to have the witnesses read all these

12   documents to the Court?

13             THE COURT:  You don't, but I don't mind being drawn

14   to a particular portion of the document.  If it's in evidence,

15   it's in evidence.  And if there's post-hearing briefing you

16   can cite to certain portions to rely on.  They're in evidence,

17   but I don't mind being called to certain portions.  Now, I

18   don't -- there is no need for any exhibit to be read in total

19   just to have it read into the record.

20        Go ahead, Mr. Rossman.

21   BY MR. ROSSMAN:

22   Q.    Could you please read the first full paragraph on the

23   second page for us, please.

24   A.    "There is a bathroom in the lieutenants' office and the

25   guys were not allowed to use it.  When Harris was mopping

1    areas of the station, England did not even want Harris to mop

2    the bathroom.  England would tell Harris to leave the mop and

3    bucket in the hall and England would take care of it himself."

4    Q.   Does that accurately reflect your statement?

5    A.   Yes.

6    Q.   And is all the information we've heard so far true?

7    A.   Yes.

8    Q.   Okay.  Is there anything about the use or the customs

9    concerning the defendant's laptop that you've not testified

10   about here today that you know?

11   A.   Can you repeat the question?  Sorry.

12   Q.   Is there anything about the policies or practices or

13   customs or usage of the defendant's laptop, him maintaining

14   sole exclusive use and possession, anything about that that

15   you know that you've not told us here today?

16   A.   No.

17   Q.   Okay.  Are you aware of any policy in effect at the

18   Middlesboro Fire Department that would permit routine searches

19   of computers?

20   A.   No.

21   Q.   Are you aware of any policy or notice in effect at the

22   Middlesboro Fire Department that reduces an employee's

23   expectation of privacy in computers?

24   A.   No.

25   Q.   Are you aware of any investigation or discipline of the

*Harris - Direct*                                                                91

1    defendant for use of city property in violation of policy or

2    procedure?

3    A.   Can you explain that better?

4    Q.   Let me ask you this way:  To your knowledge, was the

5    defendant ever investigated or disciplined for using city

6    property for personal purposes?

7    A.   Not that I'm aware of.

8    Q.   Was he ever investigated or disciplined for violating any

9    Middlesboro Fire Department policy?

10   A.   No.

11   Q.   Now, were you present when the defendant left work on

12   June 23, 2018, with the laptop?

13   A.   I don't know if I was at work that day.  Can you -- do

14   you have any clues to the day of what would --

15   Q.   The day that the police received the tip that the

16   defendant might be deleting things.

17   A.   I believe we were on shift that day.

18   Q.   What do you know about those events?

19   A.   I know that we were at work that day.  A police officer

20   come over and, you know, asked if Mr. England was there.  We

21   were all standing out front and, you know, as they asked,

22   yeah, they went inside, come out.  That's all I know.  And

23   then there was just talk of them coming back for the computer.

24   I don't know anything else about it.  I just heard the talk of

25   it.

1    Q.   Did you see the defendant using that computer that day?

2    A.   I mean, like normal business days, the computer was up.

3    I guess I don't -- I can't really recall.

4    Q.   Did you see him deleting things from the computer that

5    day?

6    A.   No.

7    Q.   Did you see his computer screen that day?

8    A.   No.   That I can recall.   I mean, that was almost a year

9    ago.   Not that I can recall.

10   Q.   Have you -- do you have any knowledge of the tip that led

11   to the seizure of the laptop?

12   A.   I heard talks about it afterwards.

13   Q.   And what did you hear?

14   A.   I just heard that somebody had called a friend.   That was

15   it.

16   Q.   Did you ever discuss that matter directly with Jonathan

17   Farmer?

18   A.   No.   I mean, I was -- he, I guess he said something about

19   it out in population with other people, but I never really

20   talked to him about it.

21   Q.   Okay.   Do you know anything about the consent to search

22   signed by the mayor and the fire chief?

23   A.   No.

24   Q.   Were you present when anyone was asked to consent to a

25   search of the laptop?

1    A.   No.

2    Q.   Have you heard any discussion of those events at the fire

3    station?

4    A.   Not that I'm aware of.  Not that I can recall.

5    Q.   Now, we've heard some discussion that there were rumors

6    about -- or information floating around the fire department

7    about an incident at Walmart.  So I want to ask you what you

8    knew on June 23, 2018, or prior to that about that incident.

9    A.   I just heard what everybody else had heard, that there

10   had been something happen at Walmart.  Didn't really know no

11   details.  I just heard there was an incident that happened at

12   Walmart.

13   Q.   And without naming anybody that may have been involved,

14   were you aware of information going around the fire department

15   that the defendant had engaged on a hands-on offense with a

16   child?

17   A.   No, I hadn't heard that.

18   Q.   Had you heard that the defendant had taken photographs of

19   a minor in his underwear?

20   A.   Yes.

21   Q.   Did you ever see those pictures?

22   A.   I seen a glimpse one time.

23   Q.   And what did you see?

24   A.   There was a -- we was in the -- well, I don't know what

25   you call it, the dining room in the firehouse, and something

*Harris - Direct*                                                                   94

1    about on a mountain in the snow, they could get in the snow

2    and do snow angels, something about in their underwear.  I

3    can't really recall.

4    Q.   Were the children in that picture nude?

5    A.   No, not that I can recall.

6    Q.   Was there -- did that picture strike you as

7    inappropriate?

8    A.   I didn't really -- I mean, I didn't think no more of it.

9    I just, quick five second glance and then no more.

10   Q.   Was -- same time frame, was there information that you

11   were aware of at the fire department that the defendant had

12   been discussing children's pubic hair?

13   A.   No, not that I know -- not that I know of.

14   Q.   Was there information that the defendant had been showing

15   children videos on a laptop?

16   A.   No, not that I know of.

17   Q.   You've never seen that or heard that?

18   A.   Can you re -- can you say the question again so I make

19   sure I understand you?

20   Q.   That the defendant was showing children videos on his

21   laptop?

22   A.   Of what?

23   Q.   Anything.

24   A.   No, not that I know of.

25   Q.   Was there information that the defendant was staying in

*Harris - Direct*                                                95

1    his office with the door closed with children in his office?

2    A.   I mean, his -- just like everybody else's family, kids

3    would come down there and, I mean, his boys would come down

4    there, but I don't really know if the door was closed with

5    them in there.  I mean, just like everybody else's family,

6    kids come down there all the time, so they may be in his

7    office.

8    Q.   You're not aware of any kind of information that would

9    suggest he was doing something inappropriate in there?

10   A.   No.

11   Q.   Were you aware of any statements made by the defendant

12   that he liked to go in his office to do sexting and that he

13   had a boner?

14   A.   Yes, he did make a remark to me during training one time.

15   He laughed about it and said that -- I walked in, I sat on the

16   opposite side of the desk and he said something about having a

17   boner and then laughed and said something about sexting.

18   Q.   Okay.  And was that inappropriate, or was that consistent

19   with the tenor of locker room talk at the fire department?

20   A.   I don't -- I don't know.  I just sort of shunned it off,

21   just because we were doing training, just, you know, maybe

22   something that was mentioned.  I don't know.

23   Q.   You didn't report it to anybody?

24   A.   I mean, I told my captain.  I said something about it,

25   but not really.  I don't know.  I don't know how to explain

*Harris - Direct*                                                    96

1    it.  I told my captain about it.

2    Q.  No action was taken?

3    A.  No.

4    Q.  Let me show you Defense Exhibit 11, all of those

5    pictures.  And I would ask you to take a moment and flip

6    through those photographs and tell me when you're ready.

7    A.  Okay.

8    Q.  Okay.  Can you tell us generally what is depicted in

9    these photographs, please?

10   A.  The lieutenants' office.

11   Q.  Okay.  And I would refer you to Exhibit 11H toward the

12   end.  Tell me when you're there.

13   A.  All right.

14   Q.  And do you see those two windows there?

15   A.  Yes.

16   Q.  Are those the only windows into the lieutenants' office?

17   A.  No.

18   Q.  Is there another one?

19   A.  Yes.

20   Q.  Can you show us on which exhibit it would be?

21   A.  11E.

22   Q.  Okay.  So there's three windows into the lieutenants'

23   office, correct?

24   A.  Yes.

25   Q.  And have you ever been able to look through those windows

*Harris - Direct*                                                    97

1    and see the screen of the defendant's computer?

2    A.    I've never looked through the window to see somebody's

3    screen, so I wouldn't know.

4    Q.    And in the custom and practice of the Middlesboro Fire

5    Department, is personal use of city property absolutely

6    forbidden?

7    A.    Not that I'm aware of.

8    Q.    Did people get on some of the department laptops to do

9    e-mail and other personal things?

10   A.    I'm assuming.

11   Q.    Did you?

12   A.    I've been on Captain Rick Evans' computer before to do

13   something personal.

14   Q.    Okay.  And do people watch personal television shows on

15   the TV there?

16   A.    Yes.

17   Q.    Okay.  Has anyone ever been disciplined for that sort of

18   thing?

19   A.    No.

20   Q.    Are you aware of any allegation by anyone that that usage

21   would violate a policy?

22   A.    No.

23            MR. ROSSMAN:  That's all I have.

24       ///

25       ///

*Harris - Cross*                                                                  98

1          THE COURT:  Okay.  Ms. Reed, cross-examination?

2                      CROSS-EXAMINATION

3    BY MS. REED:

4    Q.   Good afternoon.

5    A.   Hi.  Can I have a drink of water, please?

6          THE COURT:  Right in front of you.  Take your time.

7          THE WITNESS:  I'm good.

8    BY MS. REED:

9    Q.   The computers that the lieutenants used during your time

10   working there, they are all identical, correct?

11   A.   Yes, as far as I know, yes.

12   Q.   So when the defense was asking you questions with regards

13   to whose computer you saw other individuals using, could you

14   tell which computer was which?

15   A.   Yes, because of just, you know, the sticker on the top.

16   I know Captain Evans has his name up top, and then it was

17   known that the one computer had a sticker on it and that was,

18   at the time, Lieutenant Perry's computer.  So, I mean, we

19   know -- we knew them two computers.

20   Q.   And so you would have to be close enough to see the

21   sticker to know who was using which computers?

22   A.   Yes.

23   Q.   Now, there are certain policies with regards to the city

24   and the fire department, correct?

25   A.   As far as I know, yes.

1    Q.   And when you started with the fire department, you had to

2    sign an employment contract, correct?

3    A.   Yes.

4    Q.   Some paperwork?  And that contract specifically referred

5    you to certain policies, correct?

6    A.   I'm assuming it did.

7          MS. REED:  Showing the defendant [sic] what's been

8    marked as Government Exhibit 2.

9          THE COURT:  Has that already been admitted?

10          THE CLERK:  Yes.

11          THE COURT:  Okay.  Give access to the witness,

12   please.  Thank you.

13   BY MS. REED:

14   Q.   If you could just look at that document and look up at me

15   when you're done.

16          If you could turn to the back page there.  Do you

17   recognize this document as the employee agreement that you

18   would have signed when you came on as a probationary

19   firefighter?

20   A.   Yes.

21   Q.   And does it look similar or the same as the one you would

22   have actually signed?

23   A.   As far as I'm concerned, yes, it looks like it.

24   Q.   And I direct your attention to the last sentence of the

25   very first paragraph.  It states that additional

*Harris - Cross*                                                                 100

1    responsibilities may be found in the Middlesboro Fire

2    Department Personnel Policy, correct?

3    A.    Uh-huh.

4    Q.    Middlesboro Fire Department Standard Operating

5    Guidelines, correct?

6    A.    Yes.

7    Q.    And the City of Middlesboro Personnel Policy, correct?

8    A.    Yes.

9    Q.    So those were all policies that, according to your

10   contract, you were supposed to be aware of or familiar with in

11   some way, correct?

12   A.    Yes.

13   Q.    Would it surprise you that both the Standard Operating

14   Guidelines and the City Personnel Policy state that city

15   equipment is not to be used for personal use?

16   A.    No, it wouldn't surprise me, but I haven't really read

17   them, I guess, to the full extent.

18   Q.    You didn't read the entirety of all the policies?

19   A.    Correct.

20   Q.    Now, you said that you had done some training with the

21   defendant when you first came on with the fire department.

22   A.    Yes.

23   Q.    And some of that training was conducted, not you

24   personally using the computer, but the computer was used to

25   conduct some of your training, correct?

1    A.   Yes.

2    Q.   And I think you specifically pointed out that he had used

3    PowerPoints on there to conduct part of your training?

4    A.   Yes.

5    Q.   Additionally, you used Lieutenant Perry's, and what was

6    the other lieutenant's name?  Evans?

7    A.   Yes.

8    Q.   You used Lieutenant Perry's and Lieutenant Evans'

9    computers during that time?

10   A.   I've used them before, not necessarily just during that

11   time.

12   Q.   Okay.  So you used them during that time and potentially

13   before or after?

14   A.   Yes.

15   Q.   And that was for work related as well as some personal

16   items, correct?

17   A.   Yes.

18   Q.   Do you know if those computers are password protected?

19   A.   No.

20   Q.   You don't know or they were not?

21   A.   The two that I was on were not.

22   Q.   Okay.  So there's no password on them.  You could just

23   jump on and use them?

24   A.   Yes.

25   Q.   Is it fair to say that Lieutenant Perry and Lieutenant

1    Evans treated their computers very differently than the

2    defendant?

3    A.   Yes.

4    Q.   And how so?

5    A.   Lieutenant Perry's sat on the desk all the time.  And if

6    you asked him to use the computer, he would say it's not my

7    computer, it's everybody's computer.

8         Captain Evans or, at the time, Lieutenant Evans' computer

9    sit back in the shift commander's office.  It set over to the

10   side, not right in front of you.  But if you asked him, hey, I

11   need to look at something, he would say go ahead.

12   Q.   And what about the lieutenant office in general.  Did the

13   defendant treat that office very differently than the other

14   lieutenants that you observed?

15   A.   Yes.

16   Q.   And explain that.

17   A.   On our shift, you know, he was always in there.  That

18   room was, you know, the door was, like I said in my statement,

19   the door was shut, sometimes ajar, sometimes the lights were

20   out.  Nobody really went in there.  And at times whenever he

21   wasn't in there, the door was closed.

22        On other shifts, like when Lieutenant Perry was on a

23   shift, the door was just always open.  You could just go in.

24   You know, it was just, the door was mostly opened up in the

25   morning times and it would stay open, as far as I remember.

1    And then I don't think the other shift at the time had a

2    lieutenant, so I'm not really for sure.  We were short, I

3    think.

4    Q.    Now, you talked a little bit about cleaning the office

5    and one particular time the defendant stopped you from

6    cleaning.  It's part of the guidelines and policies that the

7    firehouse is cleaned regularly, correct?

8    A.    Every day.

9    Q.    Every day.  Including all of the office space, correct?

10   A.    Yes.

11   Q.    And the other lieutenants, they allow that process to

12   happen as it would normally happen with that office and all

13   the other offices?

14   A.    I can't really answer that, you know, a yes or no because

15   I don't really recall mopping on other shifts.  I would

16   probably be doing a different duty.

17   Q.    Has anyone else ever stopped you from going into that

18   office other than the defendant?

19   A.    No.

20   Q.    And the memo that you referenced before and talked about

21   with the defense, it's Defense Exhibit 9, I don't know if you

22   still have it.

23   A.    I do.

24   Q.    Does that say anything about laptops or computers?

25   A.    No.

1    Q.   And were you ever told, hey, this memo also applies to
2    laptops or computers?
3    A.   No.
4    Q.   Okay.  So that memo is in reference to the lieutenants'
5    office, correct?
6    A.   Yes.
7    Q.   Before the defendant's laptop was turned over, before the
8    day that officers arrived, I want to talk about some of your
9    observations and things that you communicated to other
10   firefighters and the captain.
11   A.   Okay.
12   Q.   One you've already talked about.  It was the photograph
13   of the two minors in their underwear on the mountain, correct?
14   A.   Yes.  I can't recall who was there.  I just recall taking
15   a quick glance, but yes.
16   Q.   And if I could refer you to your statement in Defense
17   Exhibit 8.
18   A.   Okay.
19   Q.   I'm just going to read this for you so you're not reading
20   the whole thing, and then you can tell me if it's correct.
21   A.   Okay.
22   Q.   You stated that you "saw something strange once regarding
23   England when it was cold outside and the ponds were iced over.
24   England showed the guys a picture of two boys on a mountain he
25   had taken.  Harris recalls England laughed, ha, ha, ha, I told

1    them they could get out on the ice if they got in their

2    underwear.  Harris is very sensitive regarding inappropriate

3    behavior, and this stood out to Harris."  Is that correct?

4    A.   Yes.

5    Q.   So this stood out as something inappropriate to you?

6    A.   I guess it did at the time.  Sorry.  I'm nervous right

7    now.

8    Q.   That's completely okay.  If you need to take a break, you

9    just let us know.

10   A.   I'm good.

11   Q.   Were there other people standing around when this

12   conversation occurred?

13   A.   Yes.

14   Q.   It wasn't just you that saw and overheard this?

15   A.   No.

16   Q.   You then go on to identify the individuals in the

17   photograph, and you say that you know them, quote, because the

18   boys would come in and England would let the boys play video

19   games in England's office; is that correct?

20   A.   Yeah, they would go in there, and I know they had an XBox

21   in there.

22   Q.   In the lieutenants' office?

23   A.   Yes.

24   Q.   So these are members of the public that are not

25   firefighter personnel?

1    A.   Yes, they are family.

2    Q.   Did you ever see other family members in that office?

3    A.   I know --

4         THE COURT:  Hang on just a second.  I don't want you

5    to reveal the names of any minors.

6         THE WITNESS:  I won't.

7    BY MS. REED:

8    Q.   Yes, I apologize.  Without naming names, just yes or no.

9    Did you see other members of the public, other family members,

10   non-employees that came and inside that office?

11   A.   Yes, with somebody with them.

12   Q.   Now, I want to talk about the second to last paragraph.

13   Again, I'm not going to ask you to read this, but make sure I

14   have it right.

15        "One time Harris had entered England's office and England

16   was on his cell phone.  England told Harris that England was

17   sexting and that England had a boner."

18        Do you recall that incident?

19   A.   Yes.

20   Q.   And you were going in there for training at that time?

21   A.   Yes.

22   Q.   Did that make you uncomfortable?

23   A.   It did.  But I just laughed it off so it -- you know, can

24   do training.

25   Q.   And you said you reported it to your captain, correct?

*Harris - Cross*                                                            107

1    A.    Absolutely.

2    Q.    Captain who?

3    A.    Evans.

4    Q.    Captain Evans.  Who was the fire chief at that time above

5    Captain Evans?

6    A.    Chief England.

7    Q.    Is that the defendant's father?

8    A.    Yes.

9    Q.    After you reported that comment about sexting and having

10   a boner, did anything happen to the defendant?

11   A.    No.

12   Q.    The other firefighters learn of or know about that?

13   A.    I mean, it was talked about in front of them.

14   Q.    You continue and say, "Another time Harris and Chris Webb

15   were in the ambulance bay.  England came up and put his arm

16   around Harris and said when they got back, England is going to

17   make love to Harris and stick his tongue down his throat."

18        Do you recall that incident?

19   A.    Yes.  But to that statement, it was England and Chris

20   Webb's run, and he wasn't the only one out there.  So I just

21   want to make that clear.

22   Q.    So there was other people that observed this in addition

23   to Chris Webb?

24   A.    Yes, he was outside.  And I think it might be worded a

25   little bit wrong.  It was -- there was actually more than just

1    me and Chris Webb outside, so just make that clear.

2    Q.   Thank you.  Did anything happen with regards to that

3    incident?

4    A.   No.

5    Q.   And then finally, you stated that, "95 percent of every

6    conversation England had was about junior football league.

7    England was referred to by others as the Bear Bryant of youth

8    football -- of the youth football league."

9    A.   Yes.

10   Q.   Is that correct?

11   A.   Yes.

12   Q.   And this was all prior to the computer being turned over,

13   correct?

14   A.   Yes.

15          MS. REED:  I have no additional questions.

16          THE COURT:  Mr. Rossman?

17                         REDIRECT EXAMINATION

18   BY MR. ROSSMAN:

19   Q.   Sir, I would like you to go back to Exhibit 2, your

20   firefighter employer agreement.

21   A.   Okay.

22   Q.   Did you sign that document?

23   A.   I did.

24          MR. ROSSMAN:  Okay.  I would like to show the witness

25   Government's Exhibits 6, 7, and 8.  I believe that should be

1    the FOIA policies and guidelines.

2          THE COURT:  We'll get those to the witness.

3    BY MR. ROSSMAN:

4    Q.   I would ask you to just kind of thumb through those.  You

5    don't -- obviously, we don't have time for you to read it all,

6    but just kind of look through it and see if you've seen those

7    documents before.

8    A.   Okay.

9    Q.   Have you ever seen those documents before?

10   A.   Yes.

11   Q.   Okay.  When did you see them?

12   A.   I seen them around the station.  They are on the shelves

13   or I guess if you want to look at them, personnel policy is

14   there.  I just, I've seen them all at one time or another.

15   Q.   Have you ever read them?

16   A.   I skimmed through them, not read them in their entirety.

17   Q.   Okay.  You said the firehouse was cleaned every day,

18   correct?

19   A.   Yes.

20   Q.   When the defendant was in the lieutenants' office, who

21   cleaned the lieutenants' office?

22   A.   He did.

23   Q.   You talked about Defense Exhibit 9, the memo from the

24   chief.  Do you have that?

25   A.   Yes.

1    Q.   And you would agree with me that that only references the

2    lieutenants' office and not the laptop, correct?

3    A.   Yes.

4    Q.   But the defendant's laptop was routinely kept in the

5    lieutenants' office, correct?

6    A.   Yes.

7    Q.   Was that memo and the policy it embodied generally

8    understood to apply to the defendant's laptop?

9    A.   No, I just thought it was the office.

10   Q.   Okay.  But you knew there was a custom that you don't get

11   on his laptop without anybody knowing about it?

12   A.   Yes.

13   Q.   You talked about the XBox in the lieutenants' office.

14   Was there ever any allegation that the defendant did anything

15   inappropriate with children who were playing the XBox?

16   A.   No.

17   Q.   And other people could bring their families in, and did,

18   to play on the XBox, correct?

19   A.   I don't think that I never seen any other family play on

20   XBox because I think that was his personal XBox that he

21   brought in.  I don't recall that.  But yes, other family

22   members come into the station all the time.

23   Q.   And they come into the lieutenants' office when the

24   defendant is not on duty, correct?

25   A.   If they were the lieutenant's family.

1    Q.   Okay.

2    A.   And they were in there with them.  I mean, they were --

3    the lieutenant, whoever was on duty, was always with them.

4    Q.   They supervised their family?

5    A.   I guess, sort of.  Family don't really sit off by

6    themselves.  They usually stay with their family.

7    Q.   So even when the defendant is not there, people don't go

8    into the lieutenants' office unsupervised?

9    A.   Employees or family or outsiders?

10   Q.   Tell me both.

11   A.   I mean, I guess employees can go in there.  Like I said,

12   family don't go, really, from my personal account, my family

13   don't go anywhere that I'm not.  They stay with me.  If I go

14   outside, they go outside.  If I'm inside, they are inside.

15   Q.   But members of the public don't wander in the

16   lieutenants' office unsupervised?

17   A.   I've never seen somebody I don't know in there.

18   Q.   You talked about comments about sexting and boner and

19   tongue down his throat.  Would you agree with me that at the

20   fire department, there was a lot of talk generally among the

21   men there about sexual topics?

22   A.   Sometimes stuff was talked about, but I had never had

23   anybody make that kind of remark towards me before.

24   Q.   Okay.  Go ahead.

25   A.   Go ahead.

1  Q.   When the remark was made about the tongue down the

2  throat, was that made in a joking manner or serious manner?

3  A.   I don't know.

4  Q.   Okay.  And you talked about Bear Bryant of the youth

5  football league.  Other than the accusation that he stole

6  money, was there ever any allegation of misconduct against the

7  defendant relating to the youth football league?

8  A.   No.

9       MR. ROSSMAN:  That's all I have.

10      THE COURT:  Okay.  Any recross, Ms. Reed?

11      MS. REED:  Just --

12      THE COURT:  Limited to the subjects covered already.

13      MS. REED:  Yes, Your Honor.

14                       RECROSS-EXAMINATION

15  BY MS. REED:

16  Q.   We talked about the Xbox a little bit.  Were you aware

17  that the defendant was using that XBox to play Live with

18  members of the youth football league while on duty in the

19  office?

20  A.   No.

21      MS. REED:  No additional questions.

22      THE COURT:  Okay.  Would both counsel approach,

23  please.

24       (Sidebar conference.)

25      THE COURT:  Just a reminder really, that topic that

1    we discussed at the beginning of the first hearing, that the

2    defendant's mother's presence might be intimidating to some of

3    the witnesses.  And instead of excluding her, I want to

4    suggest, because issues were developed on cross-examination,

5    it's just a reminder and I may do some of that questioning

6    myself at times if counsel don't, okay?

7             MS. REED:  Okay.

8             MR. ROSSMAN:  Okay.

9             THE COURT:  And as we move forward, let's focus on

10   the issues raised by the motion and the response we've gotten.

11   I understand why the testimony has come in the way it has, but

12   let's keep our eyes on the ball of what the real issues are,

13   okay?

14            MR. ROSSMAN:  Okay.

15            THE COURT:  Okay.  Thank you.

16            MR. ROSSMAN:  Thank you.

17        (Sidebar concluded.)

18            THE COURT:  Sir, I've got a couple quick questions

19   for you.

20        You stated before that you're nervous, and that's very

21   common.  Can you tell me why you're nervous today?

22            THE WITNESS:  Because I'm 23 years old and I'm

23   sitting in federal court.

24            MS. REED:  Your Honor, may I approach?

25            THE COURT:  Yes.  Can Mr. Rossman come up as well?

1          MS. REED:  Yes, Your Honor.

2       (The following portion is sealed and contained under

3    separate cover.)

1        **(The preceding portion was sealed and contained under**

2    **separate cover.)**

3            THE COURT:  Sir, let me ask the question in a

4    different way.  You're still employed as a firefighter with

5    the fire department, correct.

6            THE WITNESS:  Yes.

7            THE COURT:  Has that status affected in any way your

8    testimony today?

9            THE WITNESS:  No.

10           THE COURT:  Okay.  That's all I have.  Thank you.

11       Can this witness be finally excused, Ms. Reed?

12           MS. REED:  Yes, Your Honor.

13           THE COURT:  Mr. Rossman?

14           MR. ROSSMAN:  Yes, Your Honor.

15           THE COURT:  Thank you for your testimony, sir.

16    You're free to go.  You can leave those documents there, we'll

17    retrieve them in a second.

18       Let's take our lunch break.  1:15 we'll resume,

19    Mr. Rossman.

20           MR. ROSSMAN:  Yes, Your Honor, that sounds great.

21           THE COURT:  Okay.  Ms. Reed?

22           MS. REED:  Yes, Your Honor.

23           THE CLERK:  I have exhibit questions for Ms. Reed.

24           THE COURT:  Okay.  And congratulations for, gosh, I

25    can probably count the number of times this has happened on

1    certainly less than one hand, a lawyer's prediction of the

2    amount of time was correct, and both sides get credit for

3    that.  So congratulations.

4        All right.  Anything before the recess, Mr. Rossman?

5        MR. ROSSMAN:  I just want to make sure Defense

6    Exhibits 1 through 17 were all the admitted.

7        THE CLERK:  Yes.  I have all your exhibits.

8        Jenna, your Exhibit 5, I have one sheet marked Exhibit 5

9    and this with nothing, no marking.

10        MS. REED:  I think that is a duplicate that was just

11   used with the witness.

12        THE CLERK:  So Exhibit 5 is a single page?

13        MS. REED:  Correct.  Thank you.

14        THE CLERK:  Thank you.

15        THE COURT:  Okay.  Anything else, Ms. Reed?

16        MS. REED:  No, Your Honor.  Thank you.

17        THE COURT:  You're welcome.  We'll resume at 1:15.

18   Thank you all.

19        (Recess at 12:11 p.m. until 1:15 p.m.)

20        THE COURT:  Thank you.  We are back on the record.

21        Unless there's an issue that needs to be addressed, you

22   can call your next witness, Mr. Rossman.

23        MR. ROSSMAN:  Thank you.  The defense calls Joseph

24   Josh Cheek.

25        THE COURT:  Okay.  Come on forward, please, sir.

1          JOSEPH FRANKLIN CHEEK, DEFENSE WITNESS, SWORN

2              THE COURT:  Good afternoon, sir.  Would you state

3     your full name, please.

4              THE WITNESS:  Joseph Franklin Cheek.

5              THE COURT:  Okay.  It's a little awkward.  That chair

6     doesn't move forward or back, but the microphone will slide a

7     little closer to you, if that makes you more comfortable.

8     Speak up, speak clearly in that microphone for me in response

9     to the questions this afternoon.

10         Go ahead, please, Mr. Rossman.

11             MR. ROSSMAN:  Thank you, Your Honor.

12                         DIRECT EXAMINATION

13    BY MR. ROSSMAN:

14    Q.   Good afternoon, sir.  Could you tell us a little bit

15    about your work history at the Middlesboro Fire Department,

16    please?

17    A.   I've been there four years.  September four years ago was

18    hired, was on shift with Chris for a year-and-a-half.  I hurt

19    my knee, got changed to a different shift after that.

20    Q.   Have you worked at the Middlesboro Fire Department

21    continuously during that time?

22    A.   Yes.

23    Q.   And can you be more specific about the year-and-a-half

24    that you were on shift with the defendant?

25    A.   He was in the leadership role back then, even though he

1    hadn't been promoted, and I was under them as the new guy.

2    Q.    Do you remember the time frame of the year-and-a-half

3    that you were on shift with him?

4    A.    It was September of '15 'til July of '17.

5    Q.    And after July 2017, how frequently did you work with

6    him?

7    A.    I don't know the exact time.

8    Q.    You did work with him some after July 2017, correct?

9    A.    Yeah.  It would be short.  They would mandate you to work

10   or volunteer or whatever, so there was times I worked on his

11   shift, he worked on my shift.

12   Q.    Was that overtime?

13   A.    Yes.

14   Q.    Okay.  I would like to show you what's already been

15   introduced as Defense Exhibit 7.  And I would like you to take

16   a look at that for a minute and tell me if that accurately

17   reflects your statement to the FBI.

18   A.    Yes.

19   Q.    Okay.  I would like you to read the third full paragraph

20   beginning, "England was weird."

21   A.    "England was weird about locking his office.  If England

22   left the office for any reason, to go to the refrigerator for

23   a Coke or to use the bathroom, he would lock the door.

24   England always took his computer with him when he left for the

25   day.

1    England is the only person to use his computer.  The

2    other lieutenants did not behave this way.  Three lieutenants

3    shared this office, but only one was typically in the office

4    at a time as their shifts were different."

5    Q.    Okay.  Is all that information true?

6    A.    Yes.

7    Q.    Do you know anything more that's not stated in there

8    about the defendant exclusively using the laptop at issue

9    here?

10   A.    No.

11   Q.    Did you ever see anybody else use the laptop at issue?

12   A.    His laptop?

13   Q.    Yes.

14   A.    No.

15   Q.    I refer you to what's been introduced as Defense

16   Exhibit 6, and I would ask you if you could tell us what that

17   is.

18   A.    That is a name tag that had been put on the computer, a

19   laptop.

20   Q.    Was it put on the defendant's computer?

21   A.    Yes.

22   Q.    Do you know when it was put on there?

23   A.    Whenever they were given the computers.  Whenever him and

24   the other two were promoted.

25   Q.    Would April 2017 refresh your memory?

*Cheek - Direct*                                                          121

1    A.   It was around that time, yes.

2    Q.   At any point between April 2017 and June 2018, did you

3    see that computer without that sticker?

4    A.   No.

5    Q.   Now, isn't it true that England often slept in his

6    office?

7    A.   Yes.

8    Q.   And he snored, right, so they didn't want him in the

9    bunks?

10   A.   I ain't going to say we didn't want him there, but that's

11   just where he slept.

12   Q.   Okay.  And when he slept in the office, did he keep his

13   laptop with him?

14   A.   Yes.

15   Q.   Now, are you aware of any policy in effect at the

16   Middlesboro Fire Department reducing your privacy expectation

17   in computers or personal devices?

18   A.   Can you explain that one more time?

19   Q.   Are you -- is there any policies in effect at the

20   Middlesboro Fire Department that says you have a reduced

21   expectation of privacy in a computer or in electronics

22   generally?

23   A.   Not that I'm aware of.

24   Q.   Are you aware of any policy at the Middlesboro Fire

25   Department that would permit routine searches of property?

*Cheek - Direct*                                                        122

1    A.   No.

2    Q.   To your knowledge, has anyone ever conducted a routine

3    search on any of the laptops?

4    A.   No.

5    Q.   Do you know anything about -- let me back up.

6         MR. ROSSMAN:  I would like to show the witness what's

7    been introduced as Government Exhibits 1, 3, and 4.

8         THE COURT:  Those can be provided.

9    BY MR. ROSSMAN:

10   Q.   Sir, I would ask you to take a quick look at those and

11   let me know when you're ready.

12   A.   Okay.

13   Q.   Have you ever seen those documents before today?

14   A.   Nope.

15   Q.   Have you heard any discussion at the fire station about

16   those documents?

17   A.   Nope.

18        MR. ROSSMAN:  Okay.  Now, I would like to pass to the

19   witness Government's Exhibit 6, 7, and 8.

20        THE COURT:  And those can be provided.

21   BY MR. ROSSMAN:

22   Q.   And I'll ask you to take a quick look at those.  I know

23   they are pretty long, kind of let us know when you're ready.

24   A.   Okay.

25   Q.   Have you ever seen those documents before?

*Cheek - Direct*                                                          123

1    A.   I have seen this one, the Standard Operating Guidelines.

2    I don't know -- 7, I have seen that one.

3    Q.   But the others you haven't seen?

4    A.   No.

5    Q.   And tell us about when you saw 7.

6    A.   Just looking through to we were talking about hose

7    testing down there one afternoon, and we got the book out to

8    look at it to see what it said about it, so I seen some of

9    this stuff in there.

10   Q.   Okay.  Are you generally familiar with the allegations

11   against the defendant related to the Walmart incident?

12   A.   Vaguely.

13   Q.   Okay.  Have you ever heard of any investigation from the

14   fire department concerning any violation of any policy, fire

15   department policy, related to the Walmart incident?

16   A.   No.

17   Q.   Was he disciplined by the fire department or the city for

18   the alleged Walmart incident?

19   A.   No.

20   Q.   On or about June 23, 2018, the police seized the

21   defendant's laptop.  Do you know anything about those events?

22   A.   No.  I wasn't there.

23   Q.   Okay.  Was that during the time frame you were out?

24   A.   No.  I had been back to work, but I was either not

25   working that day or I was in North Carolina at school,

*Cheek - Direct*                                                                    124

1   college, that weekend.

2   Q.   Did you discuss those events with Jonathan Farmer?

3   A.   Not that I recall.

4   Q.   Did you discuss those events with anyone else?

5   A.   When I got back -- when I got back to work, after that,

6   we talked about it.

7   Q.   Who is "we"?

8   A.   Just the shift in general, the guys on the shift.

9   Q.   And what did you learn about it?

10  A.   Just that they had called to talk to him, and he went

11  over and came back.

12  Q.   Okay.  Did anyone say anything about seeing him deleting

13  things from his laptop?

14  A.   Not that day, no.

15  Q.   Did they do it some other day?

16  A.   Not that I recall.

17  Q.   Do you know anything about the purported consents to

18  search the laptop that were signed in this case by the mayor

19  and the fire chief?

20  A.   No.

21  Q.   Were you present when those were executed?

22  A.   No.

23  Q.   Did you discuss them with anyone?

24  A.   No.

25              MR. ROSSMAN:  That's all I have for this witness,

*Cheek - Cross*                                                            125

1    Your Honor.

2              THE COURT:  Cross, Ms. Reed?

3                        CROSS-EXAMINATION

4    BY MS. REED:

5    Q.   Sir, it's fair to say that the way that the defendant

6    treated his -- or the city's laptop that he was allowed to use

7    was starkly different than the way the other lieutenants

8    treated their laptops, correct?

9    A.   Yes.

10   Q.   The other lieutenants would allow other firefighters to

11   use the laptops, other firefighters to use them to complete

12   fire department related tasks?

13   A.   Yes.

14   Q.   The other laptops had no password on them, correct?

15   A.   No.

16   Q.   So you could just jump on there, click user, which was

17   open, and then do whatever you wanted to do?

18   A.   Yes.

19   Q.   And you have done that before in the past, correct?

20   A.   Yes.

21   Q.   And this was the norm and the custom for all of the

22   equipment with the exception of whatever the defendant did

23   with that laptop that he used?

24   A.   Yes.

25   Q.   What about the lieutenants' office?  He also treated that

1    differently than anybody else, correct?

2    A.   Yes.

3    Q.   It was left open for the most part when the other

4    lieutenants were there --

5    A.   Yes.

6    Q.   -- officers using it?  At one point, it was even used as

7    kind of the public bathroom if people were coming to visit?

8    A.   Yes.

9    Q.   Who all had access to that room via key; do you know?

10    A.   The lieutenants, the chief, and the captains.

11    Q.   So even if it was locked, there was at least six plus

12    individuals that could access that room with a key?

13    A.   Yes.

14    Q.   Did you understand during the course of your employment

15    that you could not use city property for personal use?

16    A.   Yes.

17    Q.   Were you aware at one point that Captain Evans had to

18    tell the defendant to stop treating the office in the way he

19    was treating it?

20    A.   No.

21    Q.   In Defense Exhibit 7, you talk about an incident in which

22    the defendant was bragging one day about a local child, and

23    without identifying who that is, having a photograph of that

24    individual in his underwear?

25    A.   Uh-huh.

1          MR. ROSSMAN:  Objection, Your Honor.  I think we are

2     getting off topic again.

3          THE COURT:  Ms. Reed, your response?

4          MS. REED:  Your Honor, we could stick to the first

5     prong, which is the expectation of privacy, but then we are

6     just going to have to recall all the witnesses once we get

7     into the third and fourth and fifth prongs of the analysis,

8     which I think this goes to the workplace exception and what

9     was generally known at the time with regards to the defendant.

10    And it's lower than probable cause.  It's just a reasonable

11    suspicion that that laptop was used inappropriately.

12          THE COURT:  Mr. Rossman?

13          MR. ROSSMAN:  I don't think it is plausibly connected

14    to work related misconduct.  There's not been any allegation

15    that he was disciplined or investigated for it.  The

16    investigation was for Walmart, I think the evidence has

17    overwhelmingly shown that, and I just think we are getting far

18    afield.

19          THE COURT:  I'll allow it.  I'll allow you all to

20    develop the record fully on that.

21       Go ahead, Ms. Reed.

22    BY MS. REED:

23    Q.  And do you have Defense Exhibit 7 in front of you, your

24    statement?

25    A.  Uh-huh.

*Cheek - Cross*                                                                    128

1    Q.    Okay.  I'm going to read a portion of this.  "England was

2    bragging one day about a local kid, maybe 10 or 11 years old.

3    The kid had gone up to one of the mountains with England and

4    made snow angels in his underwear.  England showed Cheeks a

5    picture of the kid in his underwear in the snow."

6         Do you recall that?

7    A.    Yes.

8    Q.    And that was prior to the laptop being provided to the

9    police department, correct?

10   A.    Yes.

11   Q.    You provided a second statement to the FBI in this case,

12   correct, in addition to this one?  I could refresh your memory

13   with a copy of it.

14   A.    Uh-huh.

15        THE COURT:  That can be shown to the witness.

16   BY MS. REED:

17   Q.    Please just look up at me when you're done.  Thank you.

18   If I could get the document back, I'm going to ask you some

19   questions about that statement, but I do not want you to

20   disclose the minor's name.

21   A.    Okay.

22   Q.    Prior to the laptop being turned over, you became aware

23   that the defendant potentially had inappropriate conduct with

24   a minor in the fire station, correct?

25   A.    Are you asking -- what are you asking exactly?

1  Q.   I'm asking if someone told you that the defendant had

2  inappropriate contact with their child in the fire station.

3  A.   Yes, someone told me that.

4  Q.   And that that allegedly occurred within the firehouse,

5  correct?

6  A.   Yes.

7  Q.   And that occurred prior to the laptop being taken by the

8  police department, correct?

9  A.   Yes.

10  Q.   And that was known by you and at least one other

11  firefighter at that time, correct?

12  A.   Yes.

13  Q.   And do you have any knowledge if it was known by other

14  individuals that that incident had occurred?

15  A.   Not to my knowledge.

16  Q.   Additionally, the defendant volunteered in his official

17  capacity as a firefighter to do educational programs with

18  children, correct?

19  A.   Yes.

20  Q.   And such as school programs within local schools based on

21  firefighter safety?

22  A.   Yes.

23  Q.   And this was all leading up to when the laptop was taken,

24  correct?

25  A.   Yes.

*Cheek - Redirect*                                                        130

1    Q.   And that was known by pretty much everybody that he was

2    volunteering and participating in these programs in which he

3    was having direct access to children?

4    A.   Yes.

5           MS. REED:   I have no additional questions, Your

6    Honor.

7           THE COURT:   Redirect, Mr. Rossman.

8                        REDIRECT EXAMINATION

9    BY MR. ROSSMAN:

10   Q.   Sir, you testified that the defendant treated his office

11   differently from the other lieutenants, correct?

12   A.   Yes.

13          MR. ROSSMAN:   I would like to show the witness

14   Exhibit 9, please.

15          THE COURT:   That can be shown to the witness.

16   BY MR. ROSSMAN:

17   Q.   Now, just ask you to take a look at that and tell us if

18   you've ever seen that document before.

19   A.   Yes.

20   Q.   Okay.  And tell us what you know about that document.

21   A.   It's just a document that the chief -- a memo that he

22   hung up after the lieutenants were promoted and that office

23   became what it was.

24   Q.   And tell us your understanding of what that memo means.

25   A.   That the lieutenants only was in that office.

1   Q.   Okay.  And now you testified that the lieutenant, the

2   captains and chief had a key to the office, correct?

3   A.   Yes.

4   Q.   So this was the senior leadership of the department,

5   correct?

6   A.   Yes.

7   Q.   Rank and file firefighters did not have a key to that

8   office?

9   A.   No.

10  Q.   Members of the public did not have a key to that office?

11  A.   No.

12  Q.   The mayor didn't have a key to that office?

13  A.   Not to my knowledge.

14  Q.   Now, you testified that you can't use city property for

15  personal use, correct?

16  A.   Right.

17  Q.   Did you ever see anybody use any of the laptops for

18  e-mail or other personal business?

19  A.   Not personal, no.

20  Q.   So you never saw anybody use any of the laptops to do

21  anything unrelated to work?

22  A.   I never saw, no.

23  Q.   Okay.  Are you aware that people did that?

24  A.   Not to my knowledge.

25  Q.   Okay.  Have you ever heard anybody being disciplined for

*Cheek - Redirect*                                                                132

1    using city property for personal use?

2    A.   No.

3    Q.   Did you see, I think we referred to it as the snow angel

4    picture.  Do you know what I'm talking about?

5    A.   Yes.

6    Q.   Have you seen it?

7    A.   Yes.

8    Q.   Were the children nude?

9    A.   I don't know.  I didn't pay that close attention to it.

10   Q.   Okay.  When you saw it, did you think it was

11   inappropriate?

12   A.   I did.

13   Q.   Now, you testified about inappropriate hands-on contact

14   the defendant had at the fire department.  You have no

15   personal knowledge of that, correct?

16   A.   No.

17   Q.   You didn't see it?

18   A.   No.

19   Q.   You just heard it in the rumor mill?

20   A.   Yep.

21   Q.   And you testified that the defendant was involved in

22   volunteer work in the schools and the community.  Did you ever

23   learn any allegation of misconduct relating to the defendant

24   in that work?

25   A.   With the kids?

133

1    Q.   His volunteer work in the community and the schools, was

2    there ever any allegation made against him in connection with

3    that?

4    A.   No.

5    Q.   Just you said no?

6    A.   No.

7            MR. ROSSMAN:  Okay.  That's all I have.

8            THE COURT:  Redirect?

9            MS. REED:  No, Your Honor.

10           THE COURT:  Okay.  Sir, you're still employed by the

11   fire department; is that correct?

12           THE WITNESS:  Yes, sir.

13           THE COURT:  Does that status -- let me restate that.

14   Does your employment status affect in any way the truthfulness

15   of your testimony today?

16           THE WITNESS:  No, sir.

17           THE COURT:  Okay.  Can the witness be excused,

18   Ms. Reed?

19           MS. REED:  Yes, Your Honor.

20           THE COURT:  Mr. Rossman?

21           MR. ROSSMAN:  Yes, Your Honor.

22           THE COURT:  You can be excused, sir.  Thank you for

23   your testimony.  You're free to go.  You can leave those right

24   there.  That would be fine.

25           MR. ROSSMAN:  We'll call Jonathan Farmer.

*Farmer - Direct*                                                        134

1          THE COURT:  Okay.  Could we get Mr. Farmer into the

2    courtroom, please?

3              JONATHAN FARMER, DEFENSE WITNESS, SWORN

4          THE COURT:  Good afternoon, sir.  State your full

5    name, please.

6          THE WITNESS:  Jonathan W. Farmer.

7          THE COURT:  Do you have a middle name?

8          THE WITNESS:  Wesley.

9          THE COURT:  Can you spell that, please.

10          THE WITNESS:  W-E-S-L-E-Y.

11          THE COURT:  Okay.  Thank you.  Can you spell your

12    first name, if you don't mind.

13          THE WITNESS:  J-O-N-A-T-H-A-N.

14          THE COURT:  Thank you.  It's a little awkward how

15    that is laid out.  The chair doesn't move but the microphone

16    will slide closer to you, if that makes you comfortable.  Just

17    speak up, speak clearly into the microphone in response to the

18    question, for me, please.

19          THE WITNESS:  Okay.

20          THE COURT:  Go ahead, Mr. Rossman.

21          MR. ROSSMAN:  Thank you.

22                         DIRECT EXAMINATION

23    BY MR. ROSSMAN:

24    Q.   Sir, could you tell us about your employment at the

25    Middlesboro Fire Department.

*Farmer - Direct*                                                                     135

1    A.   I come as a -- employed as a paramedic.  I was paramedic

2    only.  I took care of the sick and injured, pretty much.

3    Q.   When did you begin your employment with Middlesboro Fire

4    Department?

5    A.   I'm really bad with dates, I think it was maybe around

6    '12, maybe.

7    Q.   2012?

8    A.   I think.  I'm really bad with dates.

9    Q.   Prior to 2017, though?

10   A.   Yes.

11   Q.   Are you still employed there today?

12   A.   No.

13   Q.   When did you leave?

14   A.   I left first of the year this year.

15   Q.   Early 2019?

16   A.   Yes.

17   Q.   So from 2012 approximately to early 2019, were you

18   employed there continuously?

19   A.   Yes.

20   Q.   Okay.  And during your employment there, did you work

21   with the defendant?

22   A.   Yes.

23   Q.   Tell us about how often you worked with him.

24   A.   I would work 24- or 48-hour shifts.  We work 24-hour

25   shifts together.

1    Q.   What was your relationship like with the defendant?

2    A.   Just co-worker.

3    Q.   Did you have any sort of animus against him?

4    A.   Any sort of what?

5    Q.   Did you dislike him?

6    A.   I have no beef with him.

7         MR. ROSSMAN:   Okay.   I would like to show the witness

8    what's been introduced as Defense Exhibit 10.

9         THE COURT:   That can be tendered to him.

10   BY MR. ROSSMAN:

11   Q.   I would ask you to just take a look at that document.

12   And when you're ready, tell us if it appears to be a true and

13   correct reflection of your statement to the FBI.

14   A.   Yes.

15   Q.   Okay.   And do you recall the laptop at issue being

16   assigned to the defendant in around April 2017?

17   A.   I don't know specific dates; but yeah, those three

18   laptops was assigned to the officers.

19   Q.   And after it was assigned to the defendant, did he pretty

20   much use it and maintain control of it exclusively?

21   A.   As far as my knowledge, yes.

22   Q.   Did you ever see anybody using the laptop without the

23   defendant around?

24   A.   No.

25   Q.   Did he take it home with him?

*Farmer - Direct*                                                          137

1    A.   Yes.

2    Q.   And what about the office, the lieutenants' office.   When

3    he was there, did he maintain exclusive control over it when

4    he was there?

5    A.   Yes.  He was the only one I noticed in it most of the

6    time.

7    Q.   Did the other lieutenants treat their office and the

8    laptops the same?

9    A.   No.  Theirs was always left open, left out.

10   Q.   But the defendant didn't do that?

11   A.   To the best of my knowledge, no.

12   Q.   Okay.  I want to go to your statement on Exhibit 10, and

13   let's go to the second full paragraph, and you see where it

14   looks like it's the third full sentence, "there is a window

15   through."  Can you read that for us?

16   A.   Are you talking about it says --

17        THE COURT:  We all need to hear you better.

18   A.   Oh, I'm sorry.  The paragraph in question is the one that

19   said, "England acted strange."

20   Q.   The first -- the second paragraph starts:  Farmer

21   recalls.

22   A.   Okay.

23   Q.   And then the third sentence, "There is a window."  If you

24   could read that for me, please.

25   A.   "There's a window through which you can see into the

*Farmer - Direct*                                                                138

1    office.  Farmer saw England go straight to his computer.

2    Farmer felt England was deleting things off the computer.

3    After a couple minutes, England got up, packed his stuff and

4    left, taking the computer with him.  Farmer thought this was

5    important to call Trooper Howard."

6         It wasn't a call.  It was a text message.

7    Q.   Okay.  Other than that discrepancy, is this information

8    accurate?

9    A.   Yes.

10   Q.   Okay.  Tell me about what you saw through the window.

11   A.   Well, I -- what had happened was when I went out to

12   spit -- I was actually chewing fake tobacco.  It's fake

13   tobacco.  I have been quit for a little while, and I still

14   chew it.  I always go outside and spit.  And when I turned

15   around and walked back in, I seen him at his computer.

16        MR. ROSSMAN:  Okay.  And I would like to hand the

17   witness Defendant's Exhibit 11.  And just to save time, let's

18   go ahead and do 12, too.

19        THE COURT:  Okay.  Those can be provided.

20   BY MR. ROSSMAN:

21   Q.   I would ask you to take a look at the photographs in

22   Exhibit 11 and tell me if you recognize what we are looking

23   at.

24   A.   I recognize a desk, a chair, a laptop, the doorway

25   entering into the office from the hallway.

*Farmer - Direct*                                                    139

1    Q.   Is that the lieutenants' office?

2    A.   Yes.

3    Q.   Okay.  And you can see the windows best, I think, in

4    Exhibits 11E and the other two in 11H.  Can you take a look at

5    those and tell us which window you were looking through?

6    A.   The window in 11E.

7    Q.   Okay.  And that's the window next to the restroom,

8    correct?

9    A.   Yes, that is the window from the main front door coming

10   into the kitchen area.

11   Q.   And at that time you looked through it, were the blinds

12   open?

13   A.   Yes.

14   Q.   Okay.  And tell us exactly what you saw.

15   A.   What I seen was he -- that when he come in from the

16   police department, as I was walking back through, he was

17   standing at the computer, kind of looked frantic.  To me kind

18   of looked like he -- like a frantic look, and was putting

19   stuff in his bag and on the computer.

20   Q.   Did you see the computer screen?

21   A.   No, I did not.

22   Q.   What made you think that he was deleting things?

23   A.   It just seemed to have made sense to me, the allegations

24   and rumors that was happening at the time.

25   Q.   And what were those allegations that made you think that?

*Farmer - Direct*                                                        140

1    A.   The allegations that it was he shook his stuff at a kid

2    in Walmart and that he had pictures on his phone of kids in

3    their underwear, and that was about it.

4    Q.   Okay.  Did you see --

5    A.   Playing with the Little League.

6    Q.   Did you see the picture on the phone?

7    A.   No, I did not.

8    Q.   Okay.  So is it fair to say you were speculating that he

9    was deleting things?

10   A.   That's fair to say that.

11   Q.   Okay.  And when you saw him, was he typing on the

12   keyboard?  Did he have a mouse?  What exactly were his hands

13   doing?

14   A.   It was on the keyboard of the computer.  That's all I can

15   tell you.

16   Q.   Okay.  So you couldn't see if he was clicking on a mouse

17   pad or had a mouse?

18   A.   No.  That's been so long ago that I wouldn't be able to

19   remember that sort of detail anyway.

20   Q.   How long did you observe him when he was on the computer?

21   A.   Fifteen seconds, max.

22   Q.   So you stood there and watched him for a minute.  Right?

23   A.   I seen him and I watched him.  It wasn't a minute it was

24   a few seconds.

25   Q.   When he had his -- when you were watching him, did he

*Farmer - Direct*                                                               141

1    have his hands on the keyboard the whole time, or did he do

2    anything else?

3    A.   He was putting stuff into a bag, too.

4    Q.   Would that suggest to you that he was going home?

5    A.   I didn't know he was leaving.  I mean, I didn't know what

6    to think.

7    Q.   Let's go to Exhibit 12, and I'll ask you to take a look

8    at that real quick and see if that accurately reflects your

9    statement to the FBI.

10   A.   Yes, it does.

11   Q.   Okay.  And you see a reference in there to a computer bag

12   that he would use to take the computer?  I'll help you.  It's

13   the last sentence, paragraph two.

14   A.   I believe -- I don't remember saying the roll, but I do

15   remember the computer bag.

16   Q.   Did you see the computer bag during the 15 seconds that

17   you observed him?

18   A.   I wouldn't swear that it was the same bag.

19   Q.   You did or did not see it?  I'm sorry.

20   A.   I seen a bag.  I wouldn't swear to you that it was the

21   same computer bag.

22   Q.   Did you see him putting things into the bag?

23   A.   Yeah, but I can't tell you what it was.

24   Q.   Did you see him put the computer into the bag?

25   A.   No, I did not.

*Farmer - Direct*                                                                    142

1    Q.   So after the 15 seconds passes that you observed him,

2    what do you do next?

3    A.   I walked into the kitchen, and I think I told Captain

4    Evans and a few people at the table what I had seen.

5    Q.   Did anyone else see what you saw?

6    A.   No.

7    Q.   And what did they say?

8    A.   Really nothing.

9    Q.   Okay.  And at some point, did you contact a state

10   trooper?

11   A.   Yes.

12   Q.   And who was that?

13   A.   Huh?

14   Q.   What was his name?

15   A.   His name is George Howard.

16        MR. ROSSMAN:   I would like to pass the witness

17   Defendant's Exhibit 15, please.

18        THE COURT:   That can be shown to him.

19   BY MR. ROSSMAN:

20   Q.   And I would ask you to take a look at this and see if

21   this accurately reflects the text message conversation that

22   you had with Trooper Howard concerning what you saw here in

23   those 15 seconds.

24   A.   Yes.

25   Q.   Okay.  Let's go down on the first page.  It's the last

*Farmer - Direct*                                                            143

1    full message there in green, the last sentence.  You say:

2    "I'm pretty sure he's erasing kiddie porn."  Do you see that?

3    A.   Uh-huh.

4    Q.   And what made you say that?

5    A.   Just a hunch.

6    Q.   Did you see child porn?

7    A.   No.

8    Q.   Did you see him doing anything differently on his laptop

9    than he routinely did during that 15 seconds?

10   A.   Well, it just looked suspicious.  Nothing that different

11   than what you would do if you was typing on the laptop, no.

12   Q.   So it appeared he was typing?

13   A.   I mean, I did not say that his hands was on the keyboard.

14   Q.   Can you demonstrate for us how his hands were?

15   A.   Like this.

16   Q.   Okay.  And --

17   A.   But I was standing.

18   Q.   Is the position of his hands, are you familiar with how

19   you delete things from a laptop?

20   A.   Not really.  I mean, I know how to delete some things,

21   but as far as I don't know what it takes on that specific

22   model or specific --

23   Q.   Isn't it true that if you were going to delete something

24   from the laptop you would probably either use a mouse or a

25   mouse pad and not put your hands on the keyboard?

*Farmer - Direct*                                                    144

1    A.   You could.

2    Q.   Okay.

3    A.   But I don't think you have to have a mouse.

4    Q.   Okay.  Have you ever been able to delete something from

5    your laptop by typing?

6    A.   Well, I mean, if that is what -- if that is what he was

7    doing.

8    Q.   I don't understand your answer.  Can you explain?

9    A.   I can't tell you that he was typing.  Only thing I seen

10   was his hands on the computer.  I can't tell you if he was

11   typing or wasn't typing.  I couldn't see if he was having a

12   mouse or using the mouse pad on the bottom of the laptop.

13   Q.   Was his back turned to you?

14   A.   Side profile.

15   Q.   Side profile?

16   A.   Uh-huh.

17   Q.   And was any part of the laptop obscured while you were

18   watching him?

19   A.   To the best of my knowledge, no.

20   Q.   Okay.  Are there legitimate reasons to delete something

21   from a laptop?

22   A.   Not that I can think of, not unless you was hiding

23   something.

24   Q.   If someone said I'm going to delete something from my

25   laptop, would that necessarily suggest to you child

*Farmer - Direct*                                                                 145

1   pornography?

2   A.   No, it wouldn't suggest that at all.

3   Q.   At the time that this occurred, was the defendant under

4   investigation or being disciplined for anything that he had

5   done on the job at the Middlesboro Fire Department?

6   A.   Had done on the job?

7   Q.   Yes.

8   A.   I don't know.  Not that I know of.

9   Q.   Isn't it true that what he was under investigation for

10  was the Walmart incident and stealing from the football

11  league?

12  A.   To the best of my knowledge, yes.

13  Q.   And are you aware of any connection with those instances

14  to his job?

15  A.   No.

16  Q.   When you were looking through the window, was there any

17  glare on it?

18  A.   Did I what?

19  Q.   Was there any glare on the window?

20  A.   I'm sure there was.

21  Q.   You don't recall specifically?

22  A.   I don't recall.  It's too long ago.

23  Q.   Do you have Defense Exhibit 6 in front of you?

24            THE COURT:  Defense 6?

25            MR. ROSSMAN:  Yes.  I don't think he has it.

*Farmer - Direct*                                                                 146

1          THE COURT:  That can be passed to him.

2          MR. ROSSMAN:  And let's do 5, too.

3    BY MR. ROSSMAN:

4    Q.   Can you -- do you know what we are looking at here,

5    Defense Exhibits 5 and 6?

6    A.   5 is a front shot of an Acer laptop, and 6 is a shot of

7    Chris England, looks like, or typed on a sticker.

8    Q.   Do you recognize that as the defendant's laptop?

9    A.   I can't tell you that was his laptop.  I mean, I can tell

10   you that's a front shot of an Acer computer with a name tag,

11   looks like right there, but I can't read it.

12   Q.   The sticker on Defense Exhibit 6 with his name, had you

13   ever seen that before?

14   A.   I don't think I've ever seen the front of that one, no.

15   Q.   You've never seen that name sticker, though.  You've

16   never seen that?

17   A.   Huh-uh, no.  It looks like it's on the inside of the

18   laptop, and I never was on his laptop.

19   Q.   When you observed the defendant for 15 seconds, could you

20   see that sticker?

21   A.   No, I didn't.  I was too far away.

22   Q.   How far away would you estimate you were?

23   A.   Maybe to you.

24   Q.   Do you have any vision problems?

25   A.   Yeah.  I'm nearsighted.

*Farmer - Direct*                                                           147

1   Q.   And what's your diagnosis for that?

2   A.   I can't tell you.  It's been too long since I've had my

3   eyes checked.

4   Q.   At the time you observed the defendant, were you wearing

5   your glasses?

6   A.   Yes.

7   Q.   How long had you been awake?

8   A.   Huh?

9   Q.   How long had you been awake?

10  A.   How long had I been awake?

11  Q.   Yes.

12  A.   All morning.

13  Q.   Did you work an overnight shift the night before?

14  A.   I can't recollect that far.

15  Q.   Do you recall feeling tired?

16  A.   That morning?  No, not really.

17  Q.   Okay.  Is there anything else about your observation of

18  the defendant that you recall that you haven't told us?

19  A.   No, I don't think so, no.

20  Q.   Let me ask this, I guess.  Was he behaving frantically?

21  Was he, like, in a hurry?

22  A.   Looked scared.

23  Q.   He looked scared?

24  A.   Uh-huh.

25  Q.   And he had just been questioned by the Middlesboro PD?

*Farmer - Direct*                                                                 148

1    A.    Uh-huh.

2    Q.    So you don't know if he looked scared because he had just

3    been questioned or for some other reason?

4    A.    I don't know any other reason, no.

5    Q.    And just so we are clear, at no point in that 15 seconds

6    that you observed him did he try to pack up the laptop?

7    A.    No point in that 15 seconds did I try to -- observe him

8    pack the laptop?  I seen him putting things into the bag, but

9    I don't know what they was.

10   Q.    Did you see him leave that day?

11   A.    No, I did not see him leave.  I was told he left.

12   Q.    Okay.  Do you know what time he left?

13   A.    It was shortly after that.

14   Q.    Okay.

15   A.    I can't tell you a time, no.

16   Q.    Okay.  Are you aware of any policy in effect that the

17   Middlesboro Police Department -- or, I'm sorry, fire

18   department that would put employees on notice that they have a

19   reduced expectation of privacy in computers or electronics?

20   A.    Huh-uh.

21   Q.    Is that no?

22   A.    No.  No, sir.

23   Q.    And are you aware of any policy in effect at the

24   Middlesboro Fire Department that would permit a routine search

25   of a computer or other electronic device?

*Farmer - Cross*                                                        149

1    A.   I'm not aware of any policies.  I know there's SOPs but I

2    never seen them.

3    Q.   And are you aware of any routine search that ever

4    occurred at the Middlesboro Fire Department?

5    A.   Not when I was there, no.

6    Q.   Okay.  Were you present for any of the consent to

7    searches that were signed in this case?

8    A.   No.

9    Q.   After you contacted the trooper, do you know what --

10   anything about what happened after that?

11   A.   No.

12   Q.   Did you ever give a follow-up interview to Middlesboro

13   Police Department?

14   A.   No.

15   Q.   Did you ever -- strike that.

16        Is there anything else about the events of June 23, 2018,

17   that you recall that you haven't testified to already?

18   A.   No, not to the best of my knowledge, no.

19             MR. ROSSMAN:  That's all.

20             THE COURT:  Okay.  Ms. Reed, your cross, ma'am.

21             MS. REED:  Yes, sir.

22                        CROSS-EXAMINATION

23   BY MS. REED:

24   Q.   Sir, you left the fire department on January 1st, 2019,

25   correct?

*Farmer - Cross*                                                                 150

1     A.    Yeah, around about that time.

2     Q.    It was definitely January of 2019, right?

3     A.    I'm pretty sure that's when I left, yeah.

4     Q.    And it was uncomfortable for you to continue working in

5     the fire department with the defendant's father being the

6     chief, correct?

7     A.    Correct.

8     Q.    And where are you currently employed?

9     A.    Appalachian Regional Healthcare in Middlesboro, and Knox

10    County Mercy Medical Services.

11    Q.    And you currently have to work with the defendant's

12    mother, correct?

13    A.    Correct.

14    Q.    And she is in the courtroom today, correct?

15    A.    Correct.

16    Q.    And you voiced concern multiple times about being

17    uncomfortable testifying with her being here, correct?

18    A.    Correct.

19    Q.    I want to talk about the events leading up to June 2018.

20    You stated that the laptops, the fire department laptops

21    generally were left out in the open for people to use,

22    correct?

23    A.    Correct.

24    Q.    And that other people, in fact, used the laptops, the

25    fire department laptops, correct?

1   A.   Correct.

2   Q.   That they do not have passwords on them, correct?

3   A.   Best of my knowledge, no.

4   Q.   And that people would use them for certificates or

5   training or whatever you need to do with the fire department,

6   right?

7   A.   Correct.

8   Q.   And that the defendant clearly treated the laptop that he

9   was allowed to use very differently from the standard; is that

10  right?

11  A.   Yes.

12  Q.   Same thing with the office.  That office was originally

13  open.  Everyone could use it.  Firefighters, paramedics often

14  went in there to use the restroom, correct?

15  A.   Yes.

16  Q.   And one specific day you went in there to use the

17  restroom when the defendant was on shift; is that right?

18  A.   Yes.

19  Q.   And the two of you apparently got into some sort of an

20  argument about he didn't want you using the restroom anymore,

21  right?

22  A.   Yes.  I was told it was for officers and guests.

23  Q.   It was for officers and guests only?

24  A.   Yes.

25  Q.   And soon after that --

*Farmer - Cross*                                                        152

1      THE COURT:  Hang on just a second.  The chair doesn't

2 move.  If you want to move that microphone closer to you, that

3 will help.  There you go.

4      Sorry, Ms. Reed.  Go ahead.

5 BY MS. REED:

6 Q.   Soon after that, the memo came out from the defendant's

7 father, correct?

8 A.   Correct.

9 Q.   And that memo stated nothing about laptops, right?

10 A.   No.

11 Q.   Just about the lieutenants' office?

12 A.   Correct.

13 Q.   And you got -- you talked to somebody about the memo; is

14 that right?

15 A.   I didn't talk to somebody in particular.  They knew I was

16 kind of upset about it.

17 Q.   Okay.  And everyone disregarded that memo with the

18 exception of the defendant, right?

19 A.   Correct.

20 Q.   So the other lieutenants, multiple people had keys,

21 access to that office, they would leave the office open during

22 their shift?

23 A.   Right.

24      THE COURT:  I need you to speak up, sir.

25      THE WITNESS:  Correct.

*Farmer - Cross*                                                        153

1          THE COURT:  Thank you.

2    BY MS. REED:

3    Q.   And eventually, about one to two weeks later, that memo

4    got taken down, right?

5    A.   I can't remember the time, but it was shortly after.

6    Q.   Shortly after it went up, it came down?

7    A.   Right.

8    Q.   In part because only one person was abiding by the memo?

9    A.   Correct.

10   Q.   I want to talk about the things that you observed, heard,

11   or knew prior to sending those text messages, okay?

12   A.   Correct.  Or -- sorry.

13   Q.   You made a comment that you knew that the defendant had,

14   quote, been shaking his junk at a boy in Walmart, correct?

15   A.   Correct.

16   Q.   And by "shaking his junk," you're referring to his penis,

17   correct?

18   A.   Correct.

19   Q.   And this was information that you had prior to sending

20   that text message?

21   A.   Yeah, I had heard the rumors.

22   Q.   Okay.  You also had heard about a photograph that the

23   defendant had of boys in their underwear in the snow, correct?

24   A.   Correct.

25   Q.   And did you find that to be inappropriate or odd?

1   A.   I did.

2   Q.   And what about the Walmart information you had.  Did you

3   find that to be inappropriate?

4   A.   Of course.

5   Q.   You also knew about lewd, inappropriate comments that he

6   had made to a firefighter by the name of Harris, correct?

7   A.   I heard about them, but I didn't know exactly what was

8   said.

9   Q.   You didn't have the exact context, but you knew that they

10  were sexually charged and inappropriate?

11  A.   Right.

12  Q.   Did you know that the defendant was volunteering for

13  school programs, that he was doing a lot of community

14  education with kids during this time?

15  A.   Yes.  Yes, ma'am.

16  Q.   Okay.  And you were also present for numerous

17  conversations in which the defendant would discuss youth

18  football and minors, correct?

19  A.   Right.

20  Q.   In fact, the majority of his conversations appeared to

21  revolve around children, correct?

22  A.   Correct.

23  Q.   And you found this to be, in your own words, creepy,

24  correct?

25  A.   Correct.

1    Q.   And this is all information that you had prior to the

2    text message?

3    A.   Yes, ma'am.

4    Q.   Were you aware that the defendant had a gaming system, an

5    XBox in that office?

6    A.   I had seen it, yes.

7    Q.   Were you aware that he had used that XBox to play games

8    like Live with kids from the youth football league in that

9    office?

10   A.   I had never seen him play it, I just knew it was there.

11   Q.   Had you ever observed the defendant have children in that

12   office, including his own children?

13   A.   I seen his own children in there.

14   Q.   So, on the day in June when you sent these text messages

15   to Trooper Howard, did you see law enforcement come over and

16   request to speak to the defendant?

17   A.   I did not see the law enforcement come over.  I think it

18   was a phone call.

19   Q.   Okay.

20   A.   I mean, I can't --

21   Q.   You were aware that he was called over to the police

22   station?

23   A.   Yes, ma'am.

24   Q.   And you were aware that he was specifically called over

25   to the police station with regards to exposing himself to a

*Farmer - Cross*                                                              156

1    child in Walmart?

2    A.   Yes, ma'am.

3    Q.   And you personally observed him return from the police

4    station?

5    A.   Yes, ma'am.

6    Q.   And to be clear, the police station is right across the

7    street from the fire department, right?

8    A.   Yes, ma'am.

9    Q.   Okay.  So you see him come back and he goes straight to

10   the lieutenants' office, correct?

11   A.   Yes, ma'am.

12   Q.   And you personally observe him get behind the laptop?

13   A.   Yes, ma'am.

14   Q.   And he doesn't sit, he stays standing?

15   A.   Yes, ma'am.

16   Q.   What does his face look like when you're looking in the

17   big bay window?

18   A.   Scared.

19   Q.   And why do you say that?

20   A.   I don't know.  He's just frantic looking.  It's hard to

21   explain.  Just a scared look.

22   Q.   Does he ever sit down during the time that he's working

23   on the laptop or putting things into the bag?

24   A.   Not that I observed.

25   Q.   And to be clear, you stated that it appeared like he was

*Farmer - Cross*                                                                 157

1    deleting something?

2    A.   Yes, ma'am.

3    Q.   And you said that based on the way he was at the

4    keyboard, coupled with his frantic attitude generally?

5    A.   Yes, ma'am.

6    Q.   Now, he's also, at the same time, putting things into the

7    bag?

8    A.   I seen him put a couple things into the bag.

9    Q.   Now, you observed him for about 15 seconds you said?

10   A.   Yeah, thereabouts.

11   Q.   And then you realized within minutes that he had left the

12   fire department?

13   A.   They told me that he had left.

14   Q.   They told you he left?

15   A.   Yes, ma'am.

16   Q.   Was it the end of his shift?

17   A.   No, ma'am.

18   Q.   So he was on duty as an active duty firefighter and he

19   just left his shift?

20   A.   To the best of my knowledge, yes, ma'am.

21   Q.   So you texted Trooper Howard, correct?

22   A.   Yes, ma'am.

23   Q.   And who is Trooper Howard?  Who does he work for?

24   A.   He's a good friend of mine.

25   Q.   Who does he work for?

*Farmer - Cross*                                                                    158

1    A.   Who does he work for?

2    Q.   Correct.

3    A.   Kentucky State Police.

4    Q.   Did you know that when you texted him?

5    A.   Yes, ma'am.

6    Q.   Now, you texted Trooper Howard:  "They called him over

7    for an interview a while ago.  He come back and went straight

8    to him computer.  I'm pretty sure he's erasing kiddie porn."

9    Correct?

10   A.   Yes, ma'am.

11   Q.   I need to understand what is going through your mind and

12   the calculation of why you have this concern about child

13   pornography.

14   A.   Yes, ma'am.

15   Q.   Can you explain that to us?

16   A.   Just what we already known and just the way he was

17   acting, I just had a hunch.

18   Q.   Did your -- do you have any children?

19   A.   Yes, ma'am.

20   Q.   Did your children ever come to the fire station?

21   A.   Yes, ma'am.

22   Q.   Did you have any concerns about them coming when the

23   defendant was on shift?

24   A.   After I found out the rumors, yes, ma'am.

25   Q.   So after all the information we previously talked about,

*Farmer - Cross*                                                                159

1    you had concerns.  And what were those concerns?

2    A.   I was worried about maybe cameras being up or pictures

3    being out there of my kids.

4    Q.   And is that based on the totality of your interactions

5    with the defendant as well as all the other information you

6    had learned?

7    A.   Yes, ma'am.

8    Q.   Now, you knew whose case it was.  How did you know it was

9    Floyd's investigation?

10   A.   Huh?

11   Q.   You stated it's Floyd's investigation, Floyd Patterson.

12   How did you know that?

13   A.   We heard that -- we had heard that's who had the case.

14   Q.   The firefighters had heard it?

15   A.   Yes, ma'am.

16   Q.   Now, you didn't stop at just texting Trooper Howard who

17   you knew to be a trooper with Kentucky State Police.  You also

18   went to the captain who was on shift that day, correct?

19   A.   Yes, ma'am.

20   Q.   You went to Captain Evans and you relayed to him exactly

21   what you saw and your suspicions, correct?

22   A.   Yes, ma'am.

23   Q.   And what did Captain Evans do with that information?

24   A.   I don't know what he did with it.  He didn't say much

25   about it.

*Farmer - Redirect*                                              160

1    Q.   Did he acknowledge that he heard what you just told him?

2    A.   Yes, ma'am.

3    Q.   And did you tell him something to the same effect of what

4    you told Trooper Howard?

5    A.   Pretty much the same thing, yeah.

6    Q.   Who was Captain Evans' boss at that time?

7    A.   Robby, Robert England.

8    Q.   Is that the defendant's father?

9    A.   Yes, ma'am.

10   Q.   You said that you never reviewed the standard operating

11   guidelines but you knew that they existed, correct?

12   A.   I knew there was some, yes.

13   Q.   And that they governed the fire department as well as the

14   city?

15   A.   Yes, ma'am.

16   Q.   Would it surprise you to know that city property was not

17   to be used for personal use?

18   A.   I never read them, ma'am.

19          MS. REED:  I have no additional questions, Your

20   Honor.

21          THE COURT:  Mr. Rossman?

22                      REDIRECT EXAMINATION

23   BY MR. ROSSMAN:

24   Q.   Why did you contact the state trooper instead of the

25   Middlesboro Police Department?

1    A.   Because the trooper is a good friend of mine.

2    Q.   Okay.  But you knew Floyd Patterson had the investigation

3    and he's across the street, right?

4    A.   Uh-huh.

5    Q.   So why not call him?

6         THE COURT:  Hang on a second.  Yes or no.  When you

7    say "uh-huh," it doesn't translate very well for the record.

8    So the question was:  But you knew Floyd Patterson had the

9    investigation and he's across the street, right?

10        So, yes or no, and then we'll get to the next question.

11   A.   Yes, I knew he was across the street.

12   Q.   So why didn't you contact him?

13   A.   Because I had a private conversation with a friend.  I

14   wasn't reporting anything.

15   Q.   So you say private conversation and you're not reporting

16   anything.  What does that mean to you?

17   A.   That means that I was having a private conversation with

18   a friend of mine and he contacted Floyd.

19   Q.   Okay.  Now, you say you left the Middlesboro Police

20   Department because of Chief England, right?

21   A.   Because of what?

22   Q.   Chief England?

23   A.   I left?  No, I left because I found a better job.

24   Q.   Isn't it true you left because you got sued?

25   A.   I got what?

*Farmer - Redirect*                                                    162

1    Q.   The lawsuit?

2    A.   What lawsuit?

3    Q.   It's a yes or no question.

4    A.   Excuse me?

5    Q.   Okay.  Are you aware of any lawsuit?  Was there any

6    lawsuit that caused you to leave the Middlesboro Fire

7    Department?

8    A.   No, sir.

9    Q.   Okay.  Now, were you able to hear any sounds coming from

10   the room when you observed him?

11   A.   No, sir.

12   Q.   The memo you referenced, do you have Defense Exhibit 9?

13        THE CLERK:  He does not.

14   Q.   They are passing it up to you, sir.

15        In your testimony on cross, you referenced a memo.  I'm

16   showing you Defense Exhibit 9.  Is that the memo you were

17   referencing?

18   A.   Yeah, that's the memo.

19   Q.   Okay.  And have you seen this memo prior to June 23,

20   2018?

21   A.   Had I seen this memo prior to June 23 of '18, is that

22   what you said?

23   Q.   Yes.

24   A.   And that's the date of the occurrence, right?

25   Q.   That's the date that you contacted the trooper.

*Farmer - Redirect*                                                            163

1   A.   Yeah, I had seen it prior to this because it's dated

2   2/18/18.

3   Q.   And what did you understand this memo to mean?

4   A.   That pretty much that I took it as nobody except

5   lieutenants was allowed in there.

6   Q.   Okay.  Wouldn't it be fair to say that if someone is

7   questioned by the police about an allegation of sexual

8   misconduct, that they might be upset?

9   A.   Fair to say, yes.

10  Q.   And if they are upset because of that, they might want to

11  leave work early and go home, correct?

12  A.   Right.

13  Q.   But you didn't draw that inference, did you?

14  A.   No, sir.

15  Q.   Did it ever occur to you that he might have just had a

16  really bad day and wanted to go home?

17  A.   It's possible.

18  Q.   But at the time you were observing him, did that occur to

19  you?

20  A.   Nope.

21  Q.   You went straight to speculating that it was child porn

22  without thinking about anything?

23  A.   In a private conversation between me and another person.

24  Q.   Okay.  You keep saying private conversation.  What's the

25  significance of private conversation?

*Farmer - Redirect*                                                         164

1    A.   Well, the significance was that I texted a friend about

2    what I seen.   I didn't know he was going to call Floyd

3    Patterson.

4    Q.   Okay.   So you didn't intend for this to be reported to

5    Floyd Patterson; is that fair to say?

6    A.   At the time, no.

7    Q.   Okay.   Would it be fair to say that if you intended to

8    delete child porn from your computer you probably wouldn't

9    leave the blinds open to your office?

10   A.   I don't know what he was thinking at the time.

11   Q.   Did that thought ever occur to you?

12   A.   No, sir.

13   Q.   Do you know if the door to the office was closed or

14   opened when you observed him?

15   A.   I didn't know.   I was on the other side of the wall.

16   Q.   What about the other windows in the office, were they

17   open?

18   A.   I didn't notice.

19   Q.   Okay.   Was there anybody in the office with him when you

20   observed him?

21   A.   Not that I know of, no.   I did not observe anybody.

22            MR. ROSSMAN:   That's all I have.

23            THE COURT:   Any redirect -- I'm sorry, any recross?

24            MS. REED:   No, Your Honor.   Thank you.

25            THE COURT:   Sir, you, I think, testified that you had

165

1    either concern or discomfort about testifying in the presence

2    of the defendant's mother; is that correct?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Did that affect in any way the

5    truthfulness of your testimony this afternoon?

6              THE WITNESS:  No, sir.

7              THE COURT:  Okay.  Has anybody tried to influence

8    your testimony today?

9              THE WITNESS:  No, sir.

10             THE COURT:  Okay.  Can the witness be finally

11   excused, Mr. Rossman?

12             MR. ROSSMAN:  Yes, Your Honor.

13             THE COURT:  Ms. Reed?

14             MS. REED:  Yes, Your Honor.

15             THE COURT:  Sir, you can step down, you're finally

16   excused.  Thank you for your testimony this afternoon.

17             THE WITNESS:  So I don't have to return for the other

18   two days?

19             THE COURT:  You do not -- let me just make sure.  He

20   does not need to come back?  He was subpoenaed for today,

21   Friday, and possibly Monday, is that how -- but is he excused?

22             MS. REED:  He's excused as far as the government is

23   concerned.

24             MR. ROSSMAN:  Same for the defense.

25             THE COURT:  Okay.  Yes, you don't need to reappear

166

1    unless you get some other process served.

2              THE WITNESS:  Thank you, Your Honor.

3              THE COURT:  You're welcome.

4         Do you want to take a moment?  Do you need to check?

5              MS. REED:  Yes, please, Your Honor.

6              THE COURT:  Sure.  You can take your time.

7              MR. ROSSMAN:  Your Honor, I believe it would make

8    sense to call a witness out of order.

9              THE COURT:  Okay.

10             MR. ROSSMAN:  And to allow the government to call the

11   trooper.

12             MS. REED:  The government --

13             THE COURT:  Sure.

14             MS. REED:  -- would call Trooper George Howard to the

15   stand.

16             THE COURT:  Okay.  We'll get Trooper Howard in,

17   please.

18             GEORGE W. HOWARD, GOVERNMENT'S WITNESS, SWORN

19             THE COURT:  Good afternoon, sir.

20             THE WITNESS:  Your Honor.

21             THE COURT:  Thank you.  Would you state your full

22   name, please?

23             THE WITNESS:  Trooper George Howard.

24             THE COURT:  Do you have a middle name?

25             THE WITNESS:  George W. Howard.

*Howard - Direct*                                                            167

1          THE COURT:  Can you tell me your full middle name.

2          THE WITNESS:  George Washington Howard.  I'm sorry.

3          THE COURT:  No worries.  It's a little awkward.  That

4    chair doesn't move forward or back, but the microphone will

5    slide closer to you if that makes you more comfortable.  Speak

6    up, and speak clearly into the microphone for me this

7    afternoon.  It will slide closer if that makes you more

8    comfortable.

9        Go ahead, Ms. Reed.

10          MS. REED:  Thank you, Your Honor.

11          THE COURT:  You're welcome.

12                          DIRECT EXAMINATION

13   BY MS. REED:

14   Q.  Good afternoon, sir.

15   A.  Ma'am.

16   Q.  Sir, did you receive a text message from Mr. Farmer on

17   June -- late June 2018?

18   A.  Yes, ma'am.

19   Q.  And do you recall the content of that message?

20   A.  Yes, ma'am.  He text me and advised me that the client

21   here that you got here today had come in the fire department

22   and was acting real squirrelly and nervous and possibly

23   deleting stuff off his computer.

24   Q.  I'm going to go ahead and give you a copy of the Defense

25   Exhibit 17 that's been admitted into evidence.  If you could

*Howard - Direct*                                                             168

1    just look through that and look up at me whenever you're done.

2    A.   Okay.

3    Q.   Do you recognize that chain as the chain between

4    Paramedic Farmer and yourself?

5    A.   I do.

6    Q.   And that would have been from June 23rd, 2018.  Does that

7    sound about right?

8    A.   That sounds about right.

9    Q.   Now, prior to Paramedic Farmer reaching out to you, were

10   you aware that the defendant was being investigated for

11   anything?

12   A.   I didn't know he was investigated.  I just heard -- just

13   heard the talk as far as going in Walmart and that such thing.

14   Q.   So you had -- you were aware that there was an allegation

15   that he had gone into Walmart and exposed himself to a minor,

16   correct?

17   A.   Yes, ma'am.  Yes, ma'am.

18   Q.   And how did you become aware of that?  Was that through

19   someone at Walmart?

20   A.   That was someone at Walmart, the loss prevention person.

21   Her name was Mary Charles.

22   Q.   So you were actually approached by an employee at

23   Walmart?

24   A.   Yes, ma'am.

25   Q.   And what did she tell you specifically?

*Howard - Direct*                                                              169

1    A.   We had our kid playing around.  She came by and she told

2    me, you might want to pick her up because there was somebody

3    came here exposing themselves to children.

4    Q.   And you found out that was the defendant she was talking

5    about?

6    A.   Yes, later.

7    Q.   On that same -- in that same line of questioning, you

8    work for the state, correct?

9    A.   Yes, ma'am.

10   Q.   Are you aware of policies for the -- actually, strike

11   that.  I apologize.

12        So you're aware of the Walmart investigation and then you

13   get this text from Paramedic Farmer, what do you do with this

14   information?

15   A.   I found out who the case officer was that questioned him

16   and immediately called Mr. -- Officer Patterson and advised

17   him of what I was told.

18   Q.   And specifically, you advised him that the defendant went

19   back to the fire station and appeared to be deleting something

20   off the laptop?

21   A.   Yes, ma'am.  Yes, ma'am.

22   Q.   Did you tell him where you learned that information from?

23   A.   Yes, ma'am.

24   Q.   What did he say in response to you?

25   A.   He would look into it.

1    Q.   Did you have any other part in this investigation?

2    A.   No, ma'am.

3    Q.   Now, in response to Paramedic Farmer telling you that he

4    was, quote, stalking some little boy in Walmart, shook his

5    dick at him in the bathroom, you responded to that, correct?

6    A.   Yes, ma'am.

7    Q.   And you said:  "It's been going on for months."

8    A.   That's what -- from what I gathered, yeah, it had been

9    going on for a little while.

10   Q.   Is that what you gathered from the community?

11   A.   No, that's what I gathered from the -- talking with the

12   loss prevention officer at Walmart.

13   Q.   Okay.  That's what you gathered from talking to Walmart

14   employees?

15   A.   Yes, ma'am.

16   Q.   Now, you make a statement after that that he needs to be

17   took out and hung, correct?

18   A.   Yes, ma'am.

19   Q.   Okay.  Do you believe that to be -- did that -- did you

20   relay that in any way to the investigator that was actually

21   conducting the investigation?

22   A.   As far as?

23   Q.   That sentiment.

24   A.   No.

25   Q.   Okay.  So when you called Sergeant Patterson, you simply

*Howard - Cross*                                                                171

1    relayed the fact that --

2    A.   Yes, ma'am.

3    Q.   -- Paramedic Farmer relayed to you?

4    A.   Yes, ma'am.

5           MS. REED:  I have no additional questions, Your

6    Honor.

7           THE COURT:  Okay.  Mr. Rossman?

8                    CROSS-EXAMINATION

9    BY MR. ROSSMAN:

10   Q.   Sir, have you ever met the defendant?

11   A.   Sir, I don't think so.  If I did, I can't recall.

12   Q.   Do you have any kind of personal bias against him?

13   A.   No.

14   Q.   Yet you think he needs to be took out and hung?

15   A.   That's as far as he needs to be punished for whatever he

16   done.  Yes, I do.

17   Q.   Okay.  Now, you said you heard things from Walmart

18   employees about the allegations, correct?

19   A.   Yes.

20   Q.   And then when Farmer texts you and says he thinks MPD is

21   getting ready to drop the hammer, you respond:  "What did he

22   do?"

23   A.   I mean, asked what did he do.  I didn't know what had

24   happened at that point.  If they were dropping the hammer,

25   what are they dropping it on?

1  Q.   So you didn't know that was in specific reference to the

2  Walmart?

3  A.   Right.

4  Q.   But you heard about Walmart before?

5  A.   Right.

6  Q.   So when he says:  "Stalking some little boy in Walmart,"

7  and then what follows, you already knew that?

8  A.   Yeah.

9  Q.   Okay.  Now, at the bottom where Farmer texts you, he

10 says:  "I'm pretty sure he's erasing kiddie porn."  Do you see

11 that?

12         THE COURT:  It's not at the bottom of the second --

13 he's looking at the single.

14 BY MR. ROSSMAN:

15 Q.   First page, yeah.  The big green blurb, the last complete

16 one.

17 A.   Yes, I see it.

18 Q.   He doesn't say, I saw him delete kiddie porn, right?

19 A.   He doesn't say he saw it, no.

20 Q.   In your mind, did you think you needed to ask follow-up

21 questions about what he saw?

22 A.   Yes, considering the other investigation that was ongoing

23 and his activity that was explained to me, yes.

24 Q.   Did you ever have a conversation with Farmer about these

25 allegations that are not referenced in the text message?

1    A.   I can't recall.

2    Q.   You don't recall if you picked up the phone and called

3    him?

4    A.   I can't recall as far as if I made any phone calls other

5    than Officer Patterson.

6    Q.   Okay.  And in your mind, did Farmer's information give

7    rise to probable cause?

8    A.   Yes.

9    Q.   Did you --

10        THE COURT:  Speak up for me, please.

11   A.   Yes, sir.

12   Q.   Did you attempt to get a search warrant?

13   A.   I didn't.  I passed it along to the investigating

14   officer.

15   Q.   Do you know if anybody ever attempted to get a search

16   warrant?

17   A.   I don't have anything else to do with it other than --

18   Q.   So, no?

19   A.   No.

20   Q.   Okay.  Did you ever see the laptop at issue?

21   A.   No, I sure didn't.

22   Q.   So, did you talk with Farmer about him allegedly deleting

23   things off the computer?

24   A.   That day, no, just other than the text message we shot

25   back and forth.

174

1    Q.   Did you talk to him later about him deleting things off?

2    A.   No, not that I can recall.

3    Q.   So after you called Officer Patterson, you've not had any

4    involvement in securing consents to search or anything like

5    that, right?

6    A.   No, sir.  No, sir.

7    Q.   So when the mayor and the fire chief signed consents, you

8    weren't present?

9    A.   No, sir.

10   Q.   Don't know anything about that?

11   A.   No, sir.

12   Q.   Have you had any follow-up conversations with Sergeant

13   Patterson about this case?

14   A.   No, sir.

15   Q.   No?

16   A.   No.

17   Q.   Is there anything else about your communication with

18   Mr. Farmer that you've not told us here today that you

19   remember?

20   A.   No, sir, not that I can recall.

21              MR. ROSSMAN:  That's all I have.

22              THE COURT:  Redirect, Ms. Reed?

23              MS. REED:  No, Your Honor.

24              THE COURT:  Okay.  Can the witness be finally

25   excused?

175

1           MS. REED:  Yes, Your Honor.

2           MR. ROSSMAN:  Yes, Your Honor.

3           THE COURT:  Okay.  Thank you for your testimony.  You

4    can be excused.

5           THE WITNESS:  Thank you, Your Honor.

6           THE COURT:  Leave that exhibit for us up here.

7           THE WITNESS:  Okay.

8           THE COURT:  Thank you.  Back to the regular order?

9           MR. ROSSMAN:  Your Honor, I think it might make sense

10   to take a brief break.

11          THE COURT:  Okay.  How much time?

12          MR. ROSSMAN:  Fifteen minutes?  10, 15 minutes?

13          THE COURT:  Okay.  Yeah, we'll take a 15-minute

14   recess.

15       (Recess at 2:35 p.m. until 2:46 p.m.)

16          THE COURT:  Back on the record.

17       Mr. Rossman, your next witness.

18          MR. ROSSMAN:  We would call Sergeant Floyd Patterson.

19          THE COURT:  Okay.  If you would approach to be sworn,

20   please, sir.

21            FLOYD PATTERSON, DEFENSE WITNESS, SWORN

22          THE COURT:  Good afternoon, sir.  Would you state

23   your full name, please.

24          THE WITNESS:  My name is Floyd Thomas Patterson.

25          THE COURT:  Okay.  It's a little awkward.  The chair

*Patterson - Direct*                                                     176

1    doesn't move backwards or forwards, but that microphone will

2    slide closer to you if that makes you more comfortable, sir.

3         All right.  Mr. Rossman, go ahead, sir.

4                        DIRECT EXAMINATION

5    BY MR. ROSSMAN:

6    Q.   Thank you.  Sir, could you tell us how you're employed?

7    A.   I'm a lieutenant at Middlesboro Police Department.

8    Q.   Lieutenant, okay.  I had you as sergeant.  I think I

9    demoted you.  Sorry.

10   A.   That's okay.

11   Q.   Can you tell us, are you personally acquainted with the

12   defendant?

13   A.   No.  I know him.

14   Q.   You know him?

15   A.   I know him, yes.

16   Q.   Okay.  And can you tell us how you know him?

17   A.   Just through work.

18   Q.   Okay.

19   A.   Over the years.

20   Q.   The police station is right next to the fire department,

21   right?

22   A.   That is correct.

23   Q.   Okay.  Prior to your involvement in this investigation,

24   do you have any knowledge of his use of the laptop at issue?

25   A.   No.

1  Q.   Do you have any knowledge of Middlesboro Fire

2  Department's policies and procedures concerning laptops?

3  A.   No, not at all.

4  Q.   Prior to getting involved in this investigation, did you

5  know anything at all about the defendant's laptop?

6  A.   No.

7  Q.   Okay.  Now, at some point, you become involved in an

8  investigation of the Walmart incident, right?

9  A.   Yes.

10 Q.   Can you tell us about that?

11 A.   Yeah.  We received a lobby call of a ten-year old boy

12 stating that someone exposed their genitals to him in the

13 restroom.  And upon getting that video, suspect that they

14 described, I recognized it being as Mr. England.  And before I

15 could interview him, I had to go away for training.  And then

16 when I got back, I interviewed him over those allegations, and

17 that's what led us to the laptop.

18 Q.   Okay.  Was that interview on or about June 23, 2018?

19 A.   Yes.

20 Q.   Okay.  And tell us what happens next in the investigation

21 after the interview.

22 A.   After I interviewed him, I received a call approximately

23 20 minutes after stating that Mr. England went to the fire

24 department and grabbed the laptop and it looked like he might

25 have been deleting some items.  And at that point, I had one

1    of our officers contact Chief England and get the laptop.

2    Q.   Now, at that point, is your investigation over Walmart or

3    something else?

4    A.   It's Walmart, indecent exposure.

5    Q.   Okay.  At that point, were you investigating the

6    defendant for child pornography?

7    A.   No.

8    Q.   At that point, were you --

9    A.   Well, indecent exposure with him being ten, so...

10   Q.   Okay.  So indecent exposure only?

11   A.   Yes.

12   Q.   Were you investigating him for any work related

13   misconduct?

14   A.   No.

15   Q.   So, you get the call from Trooper Howard about

16   information that would suggest that he was deleting things

17   from his computer, correct?

18   A.   That's correct.

19   Q.   Did that call mention anything about child porn?

20   A.   No.

21   Q.   Okay.  Now, is it illegal to delete something from your

22   computer?

23   A.   No.

24   Q.   Why does the information that he might be deleting

25   something from his computer lead you to seize the laptop?

1   A.   Well, when I just interviewed him for the indecent

2   exposure and he -- they advised he had been acting suspicious.

3   And if it was pertaining to my case, I was wanting to seize

4   it.

5   Q.   Did you think there might be evidence relating to the

6   Walmart incident on the laptop?

7   A.   At that point, I did not know.

8   Q.   Okay.  So if you could just sum it up for us, why did you

9   want to seize the laptop?

10   A.   Like I said, if it was pertaining to my indecency

11   exposure, with him deleting immediately after I interviewed

12   him, that's what led me to ask Chief England to seize it for

13   us.

14   Q.   You asked Chief England to seize it for you?

15   A.   Well, I asked Officer Johnson to contact Chief England.

16   Approximately 30 minutes to an hour after that conversation,

17   Chief England brought the laptop to the station.  I explained

18   to him that I was interviewing -- I interviewed Chris and he

19   was -- allegation of indecent exposure, and he did sign it

20   over to us.

21   Q.   Okay.  So, Chief England brought the laptop from his home

22   to Middlesboro Police Department at the request of Middlesboro

23   PD, correct?

24   A.   Yes.

25   Q.   And did you consult the defendant about whether he

*Patterson - Direct*                                                      180

1    consented to that?

2    A.   No, I did not talk to Mr. England about that.

3    Q.   Did you ever seek a consent from the defendant?

4    A.   No.

5    Q.   Did you ever seek a search warrant?

6    A.   No.

7    Q.   Why not?

8    A.   I contacted -- when I found out the laptop belonged to

9    the city, we got a letter from the mayor stating that we

10   can -- we have all rights to have it sent off.

11   Q.   Okay.  Now, did your investigation reveal anything about

12   the defendant's use of the laptop?

13   A.   No.

14   Q.   Did people tell you that he used it exclusively and kept

15   it with him the whole time?

16   A.   I'm not aware of all that.  Only thing is his -- Chief

17   England advised me that his son does use it and he takes it

18   home with him, and he said sometimes he forgets it and leaves

19   it at the fire department.

20   Q.   Okay.  And was that before you seized the laptop?

21   A.   It was during.  It was during.

22   Q.   During?

23   A.   Uh-huh.

24   Q.   Okay.  I would like to show you what's been admitted as

25   Defense Exhibits 5 and 6.

1     THE COURT:  Sheila has them.  They can be provided to

2  the witness.

3  BY MR. ROSSMAN:

4  Q.   I would ask you if you recognize what you're looking at.

5  A.   It looks like an Acer laptop.

6  Q.   Is that the laptop that you obtained from Chief England?

7  A.   I'm not sure on that without knowing the serial number

8  and model number.

9  Q.   Does it appear consistent with the laptop you seized?

10 A.   Yeah, it looks like it, but I'm not sure 100 percent by

11 looking at this.

12 Q.   When you obtained the laptop, did it have this sticker in

13 Exhibit 6 on it?

14 A.   I don't recall the sticker.

15 Q.   You don't ever remember seeing that sticker?

16 A.   No.  I didn't power it on or anything like that.  I put

17 it straight into evidence and it was sent to KSP lab.

18 Q.   When it came to you, was it folded closed?

19 A.   It was.

20 Q.   And did you ever open it?

21 A.   No.  We just got the model number off the back, and

22 that's how we logged it into evidence.

23 Q.   Okay.  And did you ever think that you might need to get

24 a consent from the defendant?

25 A.   No, I didn't, because it belonged to the city.

1  Q.   And so the only thing that made you believe the mayor and

2  the chief could consent was the fact that it belonged to the

3  city, correct?

4  A.   City purchased it, yes.

5  Q.   So you didn't have any information that the mayor used

6  it, correct?

7  A.   No.  No, I didn't.

8  Q.   And you didn't have any information that would suggest

9  the chief used it, correct?

10  A.   No information at all.

11  Q.   Did you have any information that suggested anyone other

12  than the chief, the mayor, or the defendant used it?

13  A.   No.

14          MR. ROSSMAN:  Okay.  To save time, I would like to

15  hand the witness Defense Exhibits 11 and 13 through 17.

16  BY MR. ROSSMAN:

17  Q.   And sir, I would like you to look at Defense Exhibit 11,

18  it should be some photographs, and tell me if you recognize

19  what we are looking at there.

20  A.   Well, I know what I'm looking at but I don't know where

21  it's at.  Where this --

22  Q.   Do you recognize that as part of the Middlesboro Fire

23  Department?

24  A.   I'm not sure.

25  Q.   Okay.  Now, you were aware of the tip that ultimately

*Patterson - Direct*                                                           183

1    came from Jonathan Farmer that the defendant was deleting

2    things from his laptop, correct?

3    A.   Yes.

4    Q.   Did you investigate what exactly Farmer saw or where he

5    was?

6    A.   No.

7    Q.   Did you talk to Jonathan Farmer at all?

8    A.   I did not talk to Jonathan Farmer.

9    Q.   Why not?

10   A.   I just didn't.  There wasn't no need for me to talk to

11   him, I was just wanting to find out about my indecent exposure

12   case.

13   Q.   This was all about indecent exposure?

14   A.   Yeah.  That's the only thing I knew at that time.

15   Q.   Was there anything about the indecent exposure case that

16   happened at the Middlesboro Fire Department?

17   A.   No.

18   Q.   Was that in any way related to his work hours or anything

19   he did while in uniform?

20   A.   Not that I'm aware of, no.

21   Q.   Okay.  So he's just a private citizen when he's at

22   Walmart?

23   A.   Yes.

24   Q.   Okay.  Let's go on to Defense Exhibit 13, and I would

25   just ask you if you could tell us what we are looking at.

*Patterson - Direct*                                                184

1    What is 13?

2    A.   This is a statement that I typed up.

3    Q.   Okay.  Would you kind of tell us about the circumstances

4    of its creation?

5    A.   Yeah.  This was just a statement that I typed up stating

6    what happened and just -- it's what I explained earlier about

7    20 minutes after interviewing Mr. England for indecent

8    exposure allegations, that's when I received a call from

9    Trooper Howard.

10   Q.   So does this reflect that you seized the laptop because

11   someone stated that England was possibly deleting things, and

12   this was part of your investigation for indecent exposure?

13   A.   That's correct.

14   Q.   And Jeremiah Johnson actually obtained the laptop from

15   the chief, correct?

16   A.   No.  He made the call, and Chief England brought it to

17   the police department, and myself and Officer Johnson were

18   there together.

19   Q.   Okay.  Was the defendant there when Chief England brought

20   it?

21   A.   No.

22   Q.   Let's move on to Defense Exhibit 14.  And take a look at

23   that document and tell us about what it is.

24   A.   This is just a document stating what I seized, Acer, the

25   model number, serial number, and it belonged to the City of

1    Middlesboro, and that Chris was under a criminal investigation

2    for indecent exposure, and Officer Jeremiah Johnson seized it,

3    and the statement Chief England made to me stating that the

4    laptop does belong to the city, that Chris does take it home

5    at times, and sometimes he forgets the laptop, but most of the

6    time he takes it home with him.

7    Q.   Okay.  And would you agree with me that this memorandum

8    references a criminal investigation only into indecent

9    exposure?

10   A.   I don't know about "only," but that's what the initial

11   was.

12   Q.   There's no suggestion that you're investigating something

13   else here, right?

14   A.   Not at that point.

15   Q.   Okay.  Now, let's move on to Exhibit 15.  And can you

16   tell us what we are looking at there?

17   A.   That's just our department consent to search that I

18   filled out in front of Mr. -- Chief England and Officer

19   Jeremiah Johnson, and Chief England signed it stating that he

20   does give permission to search the laptop.

21   Q.   Okay.  And down where it says towards the middle of the

22   page, "who are conducting an investigation concerning,"

23   there's a word there that looks to be scratched out at the

24   beginning, can you tell us what that is?

25   A.   Yeah.  That is scratched out with my initial, and I was

*Patterson - Direct*                                                          186

1    going to put "indecent exposure" there.

2    Q.    Why did you change it from indecent exposure to criminal

3    investigation?

4    A.    Criminal investigation is what I put.  I'm not

5    100 percent sure why I scribbled it out, but --

6    Q.    Isn't it true the only crime you were investigating was

7    indecent exposure at Walmart?

8    A.    At that point, that's what it was that I was

9    investigating.

10   Q.    Okay.  And later on, did you investigate something else?

11   A.    No, I didn't.  No.  That's the only thing I was

12   investigating.

13   Q.    Okay.  Now, at some point, there was a child pornography

14   investigation of the defendant, correct?

15   A.    Later, once it was, I think, reviewed by KSP, yes.

16   Q.    And do you know when that began?

17   A.    No.  I just know when I sent it off.

18   Q.    On June 23rd, 2018, though, there's no child pornography

19   investigation?

20   A.    On what's the date you say?

21   Q.    June 23, 2018, the date that you signed Exhibit 15.

22   A.    No.  No.

23   Q.    There's no investigation for child pornography, correct?

24   A.    No, it's -- no.

25   Q.    There's no investigation?

*Patterson - Direct*                                                      187

1    A.   Right.

2    Q.   Right.  Okay.  Good.  And let's go on to Defense

3    Exhibit 16, and I would ask you to tell me what we are looking

4    at here.

5    A.   This is a letter from the mayor at the time, Mayor Bill

6    Kelley, Mayor of Middlesboro, giving -- just stating that the

7    laptop was purchased through the fire department and does

8    belong to the city for official use, and personal use is not

9    authorized.  And that they do give me permission to conduct an

10   investigation of alleged sexual misconduct of a minor in the

11   computer, and give KSP full access to check it, search it.

12   Q.   When was this document created?

13   A.   I'm not sure -- 100 percent sure on that.  My Lieutenant

14   Busic is the one who obtained this, so I can't give you a date

15   on that.  I don't know.

16   Q.   Would it have been created after Defense Exhibit 15, the

17   consent signed by the chief?

18   A.   Yes, it would have been after that.

19   Q.   But you don't know how much longer?

20   A.   No, I don't.

21   Q.   Did you remain involved in the investigation of the

22   Walmart incident after June 23, 2018?

23   A.   Yes.

24   Q.   Okay.  Now, were you aware of any policy or procedure

25   from the City of Middlesboro or the fire department that would

*Patterson - Direct*                                                          188

1    permit a routine search of the defendant's laptop?

2    A.   No, I'm not aware of it.

3    Q.   Okay.  So, we are not claiming that this was part of some

4    routine search that the city does on its own property,

5    correct?

6    A.   Correct.

7    Q.   This was seized because somebody thought he might be

8    deleting things, correct?

9    A.   That's correct.

10   Q.   Okay.  And are you aware of any policy that reduces the

11   expectation of privacy that city employees have in computers

12   or electronic devices?

13   A.   No, I'm not aware of that.

14   Q.   Okay.  Now, are you aware of any exigent circumstance

15   that would suggest evidence on the computer was being

16   destroyed?

17   A.   No.

18   Q.   When the computer came to you, was it on or off?

19   A.   It was off.

20   Q.   Okay.  Did you ever turn the computer on?

21   A.   Never.  No.

22   Q.   Were you concerned that somebody might be able to access

23   it remotely and wipe evidence off of it?

24   A.   No, I wasn't concerned about that.

25   Q.   Did the defendant ever have access to it after it was

*Patterson - Cross*                                                              189

1    seized?

2    A.   No.

3    Q.   Now, you would agree with me that a landlord cannot

4    consent to the search of a tenant's property, correct?

5    A.   That is correct.

6    Q.   How is it any different with the mayor and the chief

7    consenting to the search of this laptop?

8    A.   Because it does not belong to Mr. England.

9    Q.   Anything else you have to say about that?

10   A.   No.

11   Q.   Okay.  Let's move on to Defense Exhibit 17, and I would

12   just ask you if you've ever seen that document before.

13   A.   No.

14   Q.   Is there any fact about the seizure of the laptop or the

15   consents you obtained that we have not discussed?

16   A.   No.

17             MR. ROSSMAN:  That's all I have.

18             THE COURT:  Ms. Reed?

19             MS. REED:  Thank you, Your Honor.

20             THE COURT:  You're welcome.

21                         CROSS-EXAMINATION

22   BY MS. REED:

23   Q.   Sir, on the day in question, June 23rd, 2018, you

24   conducted an interview with the defendant, correct?

25   A.   That is correct.

1   Q.   With regards to him exposing himself to a minor in the

2   Walmart, correct?

3   A.   Yes.

4   Q.   And the police station is located directly across the

5   street from the firehouse, correct?

6   A.   That is correct.

7   Q.   So, to obtain the defendant's presence, you went over to

8   the firehouse and asked if he could come across the street,

9   correct?

10   A.   Yes.  I spoke to his supervisor.

11   Q.   You spoke to the captain that was on shift that day?

12   A.   Yes.

13   Q.   Do you recall his name?

14   A.   I think it was Rick Evans.

15   Q.   Rick Evans.  And so the defendant was working that day?

16   A.   Yes.

17   Q.   The defendant comes over to the police station, correct?

18   A.   That is correct.

19   Q.   Sits down with you, correct?

20   A.   Yes.

21   Q.   And you discuss vaguely some of the evidence against him

22   in the indecent exposure case involving that minor, correct?

23   A.   Yes.

24   Q.   At some point, the defendant gets up and walks back

25   across the street to the fire department, right?

1    A.   That is correct.

2    Q.   Before you even have the opportunity to leave the parking

3    lot of the police department, you receive a call, correct?

4    A.   That is correct.

5    Q.   And this is pretty close in time to the conclusion of

6    your interview?

7    A.   Yes.

8    Q.   Probably less than 20 minutes, you would estimate?

9    A.   Yes.

10   Q.   And that call is from Trooper Howard?

11   A.   That is correct.

12   Q.   Trooper Howard informs you that he received a call from

13   someone inside the fire department, correct?

14   A.   Yes.

15   Q.   A person that personally observed the defendant return

16   from your interview, correct?

17   A.   Yes.

18   Q.   And he states that this eye witness saw the defendant

19   come back and immediately start deleting things off of a

20   laptop?

21   A.   That is correct.

22   Q.   And that the defendant looked nervous, correct?

23   A.   Yes.

24   Q.   You then go back to the fire department, right?

25   A.   Yes.  I was pulling out and stuff behind the station,

Patterson - Cross                                                          192

1    yes.

2    Q.   So you just go straight across the street?

3    A.   Yes.

4    Q.   And you talk to the firefighters about where is this

5    laptop that he just came back and started immediately deleting

6    things off of, right?

7    A.   That is correct.

8    Q.   And what were you told?

9    A.   I was told that he came over after -- excuse me.  After I

10   interviewed him, he was really nervous and he grabbed the

11   laptop and started possibly deleting some items, and he left

12   with them, and that's when I called Officer Johnson.

13   Q.   Did they also tell you that that laptop was a fire

14   department laptop?

15   A.   That is correct.  I did ask them if it was his or not,

16   and they said it belonged to the city.

17   Q.   So at that time, you called lieutenant -- I'm sorry,

18   Sergeant Johnson?

19   A.   Officer Johnson.

20   Q.   Officer Johnson.

21   A.   Yes.

22   Q.   I apologize.  You called Officer Johnson.  He was a

23   subordinate working under you on the shift that day, correct?

24   A.   Yes.

25   Q.   And you told him to ask the chief of the fire department

*Patterson - Cross*                                                                193

1    if he would bring back the laptop, correct?

2    A.   That is correct.

3    Q.   Did anyone -- did you instruct Officer Johnson to order

4    the chief to do anything?

5    A.   No.

6    Q.   After that call was made to Officer Johnson,

7    approximately how long did it take for you to have contact

8    with the chief again?

9    A.   It took approximately 30 minutes to an hour before Chief

10   England brought the laptop to the station.

11   Q.   So he came to the station voluntarily?

12   A.   Yes.

13   Q.   And where did you meet him?

14   A.   Behind the police station.

15   Q.   Who was there?

16   A.   Myself, Chief England, and Officer Johnson.

17   Q.   And was Officer Johnson there as a witness to the

18   consent?

19   A.   Yes.

20   Q.   Did you explain the consent form to Chief England?

21   A.   I did.  I explained to him that Chris was under

22   investigation for indecent exposure, and Chief England stated

23   to me that the only thing we would possibly find on there is

24   some sites, maybe they went to look at ARs, I'm assuming

25   automatic rifles, and that's the statement he made to me.

1   Q.   So he specifically told you you're not going to find

2   anything on there, correct?

3   A.   Yes.  Yes, that is correct.

4   Q.   And he also made a point to tell you that sometimes the

5   defendant leaves that laptop at the firehouse overnight,

6   correct?

7   A.   That is correct.

8   Q.   Did you ask him about that?

9   A.   No.

10   Q.   That was just volunteered?

11   A.   Yeah, just us talking in general.

12   Q.   At any point did he appear -- did he ask you if he had to

13   sign the consent?

14   A.   No, he did not ask me if he had to sign.  I just asked

15   him was he willing to give consent.

16   Q.   Did you handle it just like you would a normal consent?

17   A.   That is correct.

18   Q.   Now, at one point did Chief England become upset?

19   A.   Yeah.  He was wanting to know how did I find out about

20   Chris leaving the fire department with the laptop.

21   Q.   So at one point, in fact, he became extremely upset

22   because you wouldn't tell him who the anonymous tip was from,

23   correct?

24   A.   That is correct.

25   Q.   And he was more concerned about who had called from the

1   fire department to tell you that the defendant left with that

2   laptop?

3   A.   That is correct.

4   Q.   And that's what he wanted to know during that

5   conversation?

6   A.   That's what he wanted to know.

7   Q.   Did you provide him that information?

8   A.   I did not.

9   Q.   Why not?

10  A.   At that point I just didn't -- I just wanted to keep it

11  anonymous, and it was still under investigation.

12  Q.   Why is it important to seize -- or to get an electronic

13  in this situation by consent if you know someone is deleting

14  things off of it?

15  A.   It might be deleting important information that I might

16  need pertaining to my case.

17  Q.   So when you said before you weren't aware of any evidence

18  that was being destroyed, the specific information you

19  received was that potentially evidence was being destroyed,

20  correct?

21  A.   Yes.

22          MS. REED:   I have no additional questions, Your

23  Honor.

24      ///

25      ///

1        THE COURT:  Mr. Rossman, redirect?

2                   REDIRECT EXAMINATION

3    BY MR. ROSSMAN:

4    Q.   When Defendant England left the interview with you, what

5    was his demeanor like?

6    A.   Like I said, I've known Chris a long time, and we talked,

7    and he was like, Floyd, this is some serious stuff, and I

8    said, yes, it is.  And he did seem upset and, you know, he

9    said he's got a lot going on right now and he's wanting to

10   talk to a lawyer.

11   Q.   Were his hands shaking?

12   A.   I don't know.

13   Q.   Was he sweating?

14   A.   I don't know.  I didn't notice anything.  He was not mad,

15   no.

16   Q.   Did he seem agitated?

17   A.   No, he just, like I said, he said he had a lot going on.

18   I could tell he was wanting to talk to a lawyer.

19   Q.   His voice crackled in the interview, didn't it?

20   A.   I don't recall.

21   Q.   Okay.  So, would you agree with me that when he went back

22   to the fire department after the interview, he might appear to

23   be upset or flustered?

24   A.   I don't know.  I mean, I can just tell you from us

25   talking and when I interviewed him, I just told you how he

1    was.

2    Q.   You would agree with me that if you interview somebody

3    over an allegation of child sex abuse, that might leave them

4    upset, correct?

5    A.   I would think so.

6    Q.   And when they get back to the office, they might want to

7    go home early, right?

8    A.   I don't know.

9    Q.   Okay.  You would agree with me it's a bad idea, if you're

10   going to delete your child porn collection, that you leave the

11   blinds open, right?

12   A.   I don't know.

13   Q.   When was the computer sent off for a forensic evaluation?

14   A.   Approximately three days after I seized it, it was

15   transported to KSP lab.

16   Q.   So June 26, 2018?

17   A.   I can look here, give you the exact date.  It was sent to

18   the lab June the 29th, 2018.

19   Q.   Okay.  So six days after?

20   A.   Yeah.

21   Q.   Okay.  And you talked about keeping it anonymous when you

22   talked to the chief.  When you talked to the chief, did you

23   know it was Jonathan Farmer that was the source of

24   information?

25   A.   No, I just knew that Trooper Howard called me and said

1    that someone called him and provided him that information.

2    Q.   And Trooper Howard, did he provide you any information

3    about his source?

4    A.   No.  At that point, no.

5    Q.   Did he say it was somebody who was reliable?

6    A.   I didn't ask him.  I didn't ask him anything like that.

7    Q.   Did he provide any corroborating details?

8    A.   No, he just said possibly deleting some items.

9    Q.   Okay.  Now, you said that the information you got was

10   that evidence was being destroyed, right?

11   A.   Possibly evidence, yes, that pertained to my case, yes.

12   Q.   But isn't it actually true that the information you got

13   was that he might be deleting something?

14   A.   Might be deleting something.

15   Q.   And it would just be pure speculation to get from might

16   be deleting something to deleting evidence about your case?

17   A.   I don't know.  I just wanted to seize it to -- in case it

18   was -- he was deleting something pertaining to my case.

19   Q.   Okay.  In addition to might be deleting something, was

20   there any fact that led you to conclude that he was or could

21   be deleting evidence about your case?

22   A.   At that point, no, because I had no idea what he was

23   deleting.

24   Q.   Okay.  And ultimately, was there any -- and when we say

25   your case, we are talking about indecent exposure only,

*Patterson - Recross*                                                    199

1    correct?

2    A.   Right.

3    Q.   Okay.  And ultimately was there any evidence found on the

4    laptop concerning the indecent exposure case?

5    A.   No, not that I'm aware of.

6            MR. ROSSMAN:  Okay.  That's all.

7            THE COURT:  Recross, Ms. Reed?

8                     RECROSS-EXAMINATION

9    BY MS. REED:

10   Q.   The defense asked you if the information you received

11   from Trooper Howard was confirmed in any way.  When you went

12   to the fire department immediately upon hanging up the phone

13   with him, did the firefighters themselves confirm what Trooper

14   Howard had provided you?

15   A.   Yes.  Yes, they did.

16   Q.   And did you also confirm through Chief England that the

17   defendant had, in fact, left with that laptop?

18   A.   That is correct.

19   Q.   And he confirmed that again when he showed up with the

20   laptop, correct?

21   A.   Yes.

22           MS. REED:  I have no additional questions, Your

23   Honor.

24           THE COURT:  Can this witness be excused, Mr. Rossman?

25           MR. ROSSMAN:  Yes, Your Honor.

Patterson - Recross                                              200

1              THE COURT:  Ms. Reed?

2              MS. REED:  Yes, Your Honor.

3              THE COURT:  Thank you for your testimony, sir.  Any

4    Court exhibits you need to leave up there, but you brought

5    some documents of your own and those weren't admitted, so you

6    can take those with you and you can be excused from further

7    testimony.

8              THE WITNESS:  Okay.  Thank you.

9              THE COURT:  You're welcome.

10        Next witness, Mr. Rossman.

11             MR. ROSSMAN:  We would call Chief Robert England.

12             THE COURT:  Okay.  Get Chief England in.

13             MR. FOLEY:  May I have permission to come to the bar?

14             THE COURT:  Yes.  Are you representing Chief England?

15             MR. FOLEY:  Yes, Your Honor, I am.

16             THE COURT:  Okay.  So I recognize Mr. Foley.  Your

17   role is to monitor his testimony?

18             MR. FOLEY:  That's correct, Your Honor.  I've been

19   privately retained to represent him for his testimony.

20             THE COURT:  Any objection to him sitting in front of

21   the bar, Mr. Rossman?

22             MR. ROSSMAN:  No, Your Honor.

23             THE COURT:  Ms. Reed?

24             MS. REED:  No, Your Honor.

25             MR. FOLEY:  Okay if I sit here?

1          THE COURT:  Wherever you're comfortable back here.

2               ROBERT S. ENGLAND, DEFENSE WITNESS, SWORN

3          THE COURT:  Good afternoon to you, sir.  Would you

4     state your full name, please.

5          THE WITNESS:  Robert Steven England.

6          THE COURT:  Okay.  You testified here before,

7     correct?

8          THE WITNESS:  Yes.

9          THE COURT:  You may remember, that chair doesn't

10    move.

11         THE WITNESS:  Yeah.

12         THE COURT:  It's awkward, but you can slide the

13    microphone closer to you, and you may need to do that because

14    I need you to speak up, speak clearly into that microphone in

15    response to the questions, please.

16        And just as a caution, I know there may be questions

17    about your family from time to time.  Obviously, don't reveal

18    the name of any minor, okay, sir?

19         THE WITNESS:  Yes, sir.

20         THE COURT:  Okay.  Go ahead, Mr. Rossman.

21         MR. ROSSMAN:  Thank you.

22                      DIRECT EXAMINATION

23    BY MR. ROSSMAN:

24    Q.   Sir, could you tell us how you're employed.

25    A.   The Chief of Middlesboro Fire Department.

*England - Direct*                                                              202

1    Q.   Can you tell us a little bit about your history of

2    employment with the Middlesboro Fire Department?

3    A.   Yes, sir.  I've been with the Middlesboro Fire Department

4    since 1998.  Served just as rank and file firefighter up until

5    2013, I believe in that area; and received rank as lieutenant

6    2015, I believe it was, and moved up to rank of captain.  And

7    then January of 2017 to rank of chief officer.

8    Q.   Okay.  And can you tell us about the defendant's

9    employment history with the Middlesboro Fire Department?

10   A.   Yes.  He come on board with us in 2007 or '8 as a

11   volunteer, and then received a full-time position, I'm

12   thinking 2009, without looking, and was ranked firefighter, or

13   just rank and file firefighter until 2017.  I think it is

14   February, March, April, somewhere early 2017, he received

15   lieutenant rank.

16   Q.   Okay.  And are you familiar with the laptop that's at

17   issue in this case?

18   A.   Yes.

19        MR. ROSSMAN:  And Your Honor, I would like to pass to

20   the witness Defense Exhibits 5 and 6.

21        THE COURT:  Okay.  Those can be shown to the witness.

22   BY MR. ROSSMAN:

23   Q.   Can you tell us what we are looking at with Defendant's

24   Exhibits 5 and 6, please?

25   A.   On the second photo, it's Exhibit 6 I believe I'm looking

1    at, that shows a name label of Chris England on it that I

2    placed on that laptop.

3         On Exhibit 5, it looks like the same one, but I can't

4    make the name out.  I believe it does say Chris England on it.

5    I'm not sure.

6    Q.   Okay.  And the sticker that's depicted in Exhibit 6, when

7    was that placed on there?

8    A.   I'm really not a hundred percent sure.  It would have

9    probably been somewhere around early 2017, somewhere around

10   after he received lieutenant.

11   Q.   So would it have been placed there when it was assigned

12   to him?

13   A.   When I put the three computers that we have out to each

14   lieutenant, that's when I put those names on those.

15   Q.   And would that have been around April 2017?

16   A.   Sounds close.  I don't know exactly for sure what that

17   date is without looking, but that sounds very close.  It's

18   whatever date he made lieutenant.  It would have fell within a

19   month or two after that.

20   Q.   Between the time you placed that sticker on the laptop

21   and the time the laptop was seized, was that sticker ever

22   removed?

23   A.   Not that I'm aware of.

24   Q.   Okay.  And was that sticker on there the date the police

25   took it?

*England - Direct*                                                204

A.    I'm pretty certain it was.  I can't verify that I opened

the laptop and looked to see if it was on there, but I'm

assuming that it was because I didn't remove it or know of it

being removed.

Q.    After that lap -- after that sticker was placed on there,

did you ever see the laptop without that sticker?

A.    I did not.

        MR. ROSSMAN:  Okay.  Moving on, I would like to show

him Exhibits 9, 14, and 15.

        THE COURT:  And those can be provided to the witness.

Those are Defense Exhibits 9?

        MR. ROSSMAN:  Yes, Your Honor, Defense Exhibits 9,

14, and 15.

BY MR. ROSSMAN:

Q.    Would you take a look at Defense Exhibit 9 and tell us

what we are looking at?

A.    Exhibit 9 would be a document that I produced and put up,

looks like on here, February 8th of 2018, and it was just

stating on the office, the lieutenants' office where I wanted

them at to be able to spread their workload of the day out, to

be able to have information out without it being moved,

disarrayed, or just absolutely removed.  So we just had them

placed in that room.

Q.    So this is a memo that you issued on or about February 8,

2018, correct?

*England - Direct*                                                    205

1    A.   Yes.

2    Q.   Okay.  And it references sensitive information --

3    A.   Yes.

4    Q.   -- being in the lieutenants' office.  Can you tell us

5    what that sensitive information could be?

6    A.   Sensitive information could have been anything.  Mostly

7    would have been any complaints from any other employee to the

8    lieutenant that they may have out of a grievance if they

9    received one from them.  Mostly it would have been from the

10   patient care reports because some of the lieutenants at that

11   time entered in the patient care reports in for billing, and

12   those are protected information under HIPAA violation, so they

13   are supposed to be in a secured room when you have those out

14   and doing those.

15   Q.   What about personnel files?

16   A.   They could possibly have some personnel files out.  Those

17   mostly stay in my office.  They would have training records

18   out and test exams out that we tested on and stuff that we try

19   to maintain the integrity on those also.

20   Q.   And in addition to being in the lieutenants' office,

21   would some of this information be on the defendant's laptop?

22   A.   Should be, yes.

23   Q.   Okay.  Are you generally familiar with the policy and

24   guidelines of the City of Middlesboro and Middlesboro Fire

25   Department?

*England - Direct*                                                           206

1   A.   I got a pretty good understanding of them, and I've got a

2   pretty good knowledge of them and know where to look for them

3   at if it's unclear.

4   Q.   Is a memo like this, is this a policy or a guideline?

5   A.   It's a guideline is what we are looking at.  As those is

6   put out, they are not policy.  Policy would be through --

7   personnel policy should have to go through the council and the

8   mayor and be put in an ordinance to enter into the personnel

9   policy.

10  Q.   Does this have to be on a letterhead?

11  A.   We've never done it before on letterhead.  I never would.

12  Run into an issue and we need to address it, I type it up such

13  as these right here, give it to who it needs to be given to or

14  post it in the building.

15  Q.   Is this memo done like every other memo that you've done?

16  A.   They are all pretty close to the same thing.  Some of

17  them may vary a little bit different, but I don't use one set

18  template for that.  Myself, I do not.

19  Q.   And do you have the authority as chief to issue this memo

20  without anybody else's approval?

21  A.   I do, or I assume I do.  I haven't been told that I

22  don't, so...

23          MR. ROSSMAN:  Let's move on to 14 and 15.

24          THE COURT:  Counsel, could you approach for a moment,

25  please?

1        (Sidebar conference.)

2            THE COURT:  I'm just mentioning this for your

3    knowledge.  Because you may not be able to see it, but the

4    defendant is nodding, and at one point looked like he was

5    shaking his head.  Now, I haven't seen the witness looking in

6    his direction, but sometimes I'll admonish people who like to

7    do that, and I can, but it's time -- the truth is, is that if

8    it keeps continuing, it's hard not to notice it and remember

9    it.

10       Mr. Rossman.

11           MR. ROSSMAN:  He has a palsy that causes him to have

12   a facial tic and do kind of unusual things with his face.

13           THE COURT:  Okay.

14           MR. ROSSMAN:  It gets worse when he's tired and

15   stressed.

16           THE COURT:  Okay.

17           MR. ROSSMAN:  He does this in meetings with me.  I

18   don't think it is necessarily a reaction or an attempt to

19   influence anybody.  I think it's just part of that.

20           THE COURT:  Okay.

21           MR. ROSSMAN:  I can speak with him and let him know

22   it's a concern and tell him to stop.

23           THE COURT:  If it's something he can't control, then

24   that's -- I'm not at all concerned about it.  What I would

25   suggest is you all watch the witness.  And if you think the

*England - Direct*                                                                208

1    witness is responding in some way, ask him about it.  Is that

2    fair enough?

3             MR. ROSSMAN:  And I'll tell him about the concern and

4    maybe if he knows about it, he may not realize he's doing it.

5             THE COURT:  Okay.

6             MR. ROSSMAN:  Maybe he can calm down a little bit.

7             THE COURT:  Okay.  Any question about any of this?

8             MS. REED:  No, Your Honor.

9             THE COURT:  Okay.  Thank you both.

10        (Sidebar concluded.)

11   BY MR. ROSSMAN:

12   Q.   Okay.  I would like to hand the witness Government's

13   Exhibits 1, 3, and 4.

14            THE COURT:  Those can be provided to the witness.

15   BY MR. ROSSMAN:

16   Q.   I would ask you to take a look at those and tell us if

17   you've ever seen those documents before.

18   A.   No, I have not.

19   Q.   Do those reflect any official policy of the City of

20   Middlesboro or the Middlesboro Fire Department?

21   A.   Just what I glanced at here and seen what the header on

22   what they are referring to.  I've never seen these or seen

23   anything similar to them in our personnel policy or our

24   guidelines.

25   Q.   Is there any policy or procedure in effect at the

1    Middlesboro Fire Department that would diminish an employee's

2    expectation of privacy in a laptop or an electronic device?

3    A.   I don't understand your question.

4    Q.   Is there any policy in effect at Middlesboro Fire

5    Department or the City of Middlesboro where the city can say,

6    hey, you don't have an expectation of privacy in your laptop

7    or electronic device; we can come search it whenever we want.

8    A.   Not that I'm aware of, no.  I never seen one, been told

9    of one, informed of one.

10   Q.   Was there any discussion about enacting such policy?

11   A.   We've always, over a period of time, talked about we

12   needed to get control of electronic devices, social media

13   things, things like that.  But as far as sitting down and

14   putting a committee together and starting the paperwork on it,

15   I haven't been involved in those or seen anybody from the

16   mayor's administration down to my office, or from mine out to

17   the captains and the lieutenants.

18        I guess we could have some that's maybe done -- you know,

19   I've got some that will do research on their own on some

20   things and then bring them to me after they get it, but I'm

21   not aware of any.

22   Q.   Was there any policy or procedure in effect at the

23   Middlesboro Fire Department or the City of Middlesboro that

24   would allow for a routine search of a laptop or electronic

25   device?

*England - Direct*                                                        210

1    A.   You mean from a law enforcement research standpoint or --

2    Q.   I'm just asking if there is anything in effect in the

3    City of Middlesboro or the fire department that says, hey, we

4    can come search your laptop whenever we want as routine

5    procedure?

6    A.   Not that I'm aware of, no.

7    Q.   And was anything like that under consideration at any

8    point?

9    A.   Not that I recall.

10   Q.   Are you aware of any routine search taking place at the

11   Middlesboro Fire Department?

12   A.   No.

13   Q.   Now, I want to go back to the day that the laptop was

14   seized, June 23, 2018.   Do you remember that day?

15   A.   I've got a fair recollection of it, yes, sir.

16   Q.   And can you describe the day's events for us?

17   A.   It was on a Saturday morning because I was off and wasn't

18   at work.   Chris comes home and tells me he needs to talk to

19   me.   We step out on the porch, he tells me about the event of

20   Officer Patterson requesting him to come over for a statement

21   on an allegation.   And when he told me what the allegation was

22   and told him that he just wouldn't give him a statement

23   without counsel, and Officer Patterson dismissed him from

24   that, he come back over to the station and was quite upset

25   with the allegations that was throwed at him --

*England - Direct*                                                                211

1    Q.   Let me stop you there.

2    A.   Yes, sir.

3    Q.   Did you see him after the interview but before he went

4    home from the fire station?

5    A.   No.

6    Q.   Okay.  Go ahead and keep going.

7    A.   So -- and this was at my house.  He come to my house.  Or

8    it's where he lived at too, but he stated that he told his

9    shift commander, which was Rick Evans at that time, that he

10   needed to go, that he was going home and to get somebody to

11   cover for him.  And I'm going to assume that Rick told him he

12   could get somebody to cover for him and go on because he did

13   show up at the house.  He was there.

14   Q.   Was he upset when he got home, when you first saw him?

15   A.   He was -- yes, he was visibly upset, visibly concerned

16   with an allegation such as -- yes.

17   Q.   Were his hands shaking?

18   A.   Yes.

19   Q.   Did he appear to be sweaty?

20   A.   Not as much sweaty, I don't think.  Just kind of

21   bewildered at the accusation.

22   Q.   Did he appear to be frantic?

23   A.   Just anxious.  I guess the best way I could describe it

24   is just not really knowing what was going on, you know.

25   Q.   At that point, was there any discussion about deleting

*England - Direct*                                                     212

1   things off the laptop?

2   A.   No.

3   Q.   From the time he got home until the time you took the

4   laptop to the police, did he access it?

5   A.   No.

6   Q.   And I guess follow-up question would be did he try to

7   delete anything or instruct anyone else to delete anything?

8   A.   No.

9   Q.   So what happens next?

10  A.   We are having a talk and we -- I just, the best I can

11  remember, we told him with representation, we would take care

12  of this.  We'll see where it goes with it.

13       And then I received a call from Officer Jeremiah Johnson,

14  which is a patrol officer, stating that he would like -- or

15  that Floyd asked him to call, which is Officer Patterson,

16  asked him to call and see if I would bring the two laptops

17  that Chris left with back to the station, or back to him.

18       I told him there wasn't two laptops, there was only one.

19  There hasn't been two laptops.  And we had a little heated,

20  not discussion, just over where did the two -- number two

21  laptops come from?  Why would you think two when there's only

22  one?  Jeremiah told me that at that time that he wasn't

23  involved in the case.  It wasn't his case.  He was just asked

24  to make that phone call.

25       And I told him, sure, I'll bring it down to him, that --

*England - Direct*                                                                213

1    and he said, you know, when?  I'll leave with it in a few

2    minutes.  I took it down there, but Mr. Patterson was on

3    another call and was probably about 30 minutes before he

4    arrived there, roughly.

5    Q.   And what happened next?

6    A.   I had a conversation with Mr. Patterson over the laptop

7    and signed papers, which is these other ones I'm seeing, that

8    he could take the laptop.

9    Q.   And is that Defense Exhibit 15?

10   A.   Yes.

11   Q.   Is that your signature on that document?

12   A.   It is.

13   Q.   Okay.  And do you see on there where it looks like it

14   starts with a word that's scratched out and then it says

15   "criminal investigation"?

16   A.   Yes, I see that.

17   Q.   What can you tell me about that?

18        Let me ask it another way.

19   A.   Okay.

20   Q.   Was there any discussion between you and the police about

21   the investigation for which the laptop was being handed over?

22   A.   Yeah, I asked him that -- how it come about that he had

23   to call and ask for the laptop, and he stated that he received

24   a call, an anonymous call, that he was -- left with two

25   laptops that may be of interest to him or somewhere along

*England - Direct*                                                    214

1    those lines.  And I asked him who called and he said he didn't

2    know.  It was anonymous.

3         And during the course of that conversation, it went from

4    being anonymous to it might have been a KSP officer.  He had

5    his number blanked out, and I believe I told him something on

6    the lines of why would another fellow officer hide his number

7    from you to call him?  It just don't make no sense.  Just

8    wanting to know who called and told you that he left with the

9    computer and that you need them.

10   Q.   Did he say it was for the investigation of a Walmart

11   incident or something else?

12   A.   I don't know if he ever said on that.  I was assuming it

13   was for the Walmart incident.  That was what was the incident

14   that was at hand there.  It was never said that it was for

15   anything else.

16   Q.   Okay.  Was there anything about Walmart that was work

17   related?

18   A.   Not that I know of, no.

19   Q.   Was the defendant on duty when the Walmart incident

20   allegedly occurred?

21   A.   No.

22   Q.   Was he in uniform?

23   A.   No.

24   Q.   Did it occur at the fire department premises?

25   A.   No.

1  Q.   Did it involve anybody as a victim connected to the fire

2  department in any way?

3  A.   Not that I'm aware of, no.

4  Q.   Did anyone ever accuse the defendant of violating a fire

5  department regulation, guideline, or policy, or city

6  regulation, guideline, or policy in connection with the

7  actions at Walmart?

8  A.   No.

9  Q.   Was there any kind of discipline for the defendant, work

10 related, relating to the Walmart incident?

11 A.   The Walmart incident, if I remember right, was on the 4th

12 of June is when the allegation was made.  He was talked to on

13 the 23rd.  And I'm going on memory here so I'm not sure, I

14 would have to look, but I believe that the mayor, at that

15 time, asked for me to keep him -- just to send him home, and I

16 don't even know if it was with pay or suspended without pay,

17 until this matter was cleared up.

18 Q.   Okay.  So he was suspended because of the Walmart

19 incident?

20 A.   Yes.

21 Q.   And when was that?

22 A.   I don't know if he reported back to work after the 23rd.

23 I'm not certain on that.  And he might have come back to work

24 on the 23rd until they actually issued the arrest warrant,

25 maybe on the 20 -- late July is when he actually may have been

*England - Direct*                                                                216

1    suspended from there.  I'm not 100 percent sure.

2    Q.   But on June 23rd, 2018, there's no sort of formal

3    disciplinary charge against him, right?

4    A.   No.

5    Q.   Was his suspension just kind of an informal agreement?

6    A.   Yes.

7    Q.   How did that work?

8    A.   The mayor just asked me to just have him stay at home

9    with pay, and I'm pretty sure it was with pay.  I'm not sure.

10   It could have been using his bank time, but have him be at

11   home until this was cleared up.

12   Q.   But as far as that, there was no adjudication that found

13   that he had violated some policy or anything?

14   A.   No, and that's -- no.  That's why the mayor sent him home

15   with pay, I'm almost certain.

16   Q.   This was just really out of an abundance of caution kind

17   of thing?

18   A.   Yes, that would be a good way of saying it.  I think the

19   mayor actually, if I remember correctly, the mayor actually

20   said, too, that he had a council member approach him and said

21   this was a serious issue, that we needed to do something, and

22   that's what was decided from there.  And I don't know who that

23   was.  That was just my remembrance of that conversation with

24   him.

25   Q.   You don't want to cloud suspicion over your firefighters?

England - Direct                                                          217

1    A.   Right, yes.

2    Q.   Coming back to that day, June 23, 2018, your meeting with

3    the police to hand over the laptop, was anything said to you

4    about child pornography?

5    A.   No.

6    Q.   Was anything said to you about deleting evidence?

7    A.   Do what?

8    Q.   Deleting evidence.

9    A.   Oh, deleting evidence.

10   Q.   Or destruction of evidence.

11   A.   No, not that I recall.  Just wanted the computer.

12   Q.   When you took the laptop to the police, was it on or off?

13   A.   I really don't know.

14        THE COURT:   I need you to speak up, please, sir.

15   A.   Yes, sir.  I really don't know if it was on or off.  I

16   didn't open it and look.  I don't believe it was on.

17   Q.   So however it was at home when the defendant brought it

18   home, you took it straight to the police and it stayed that

19   way --

20   A.   Yes.

21   Q.   -- as far as you know?

22        Okay.  Now, when you took it to the police, were you

23   acting in your individual capacity or your capacity as fire

24   chief?

25   A.   Since he called me and wanted the department equipment, I

*England - Direct*                                                                218

1    was acting, in my opinion, in the interest of the fire

2    department as the chief.

3    Q.   And was it your intent to aid the investigation?

4    A.   My intent was to give him what he asked for.  It was city

5    equipment, and I had a city police officer asking for it.

6    Q.   Okay.  And they asked you to go get it, right?

7    A.   They asked me to bring it forward.  It was already there

8    with me, so they called and asked me to bring it to them.

9    Q.   Did you believe that you could say no?

10    A.   I didn't think -- I would never really thought that I

11    could, no.  It wasn't my computer.  It belonged to the city.

12    Q.   Now, did you have any discussion that day with the mayor

13    or anyone superior to you at the city about this issue?

14    A.   Not that I'm aware -- no.

15    Q.   Do you know when the mayor became aware of this issue?

16    A.   I don't know exactly how many days later it was.  It's

17    been a little while back.  A lot of things went on.  I do

18    remember having a conversation with him that he told me that,

19    if I'm remembering it right, that he told me he would have had

20    to have been the one that signed the release for it, is the

21    best I can remember how that conversation went.

22    Q.   And did that occur after you signed Defense Exhibit 15?

23    A.   Yes.

24    Q.   Okay.  And when Defense Exhibit 15 was presented to you

25    for signature, was it completely filled out?

1    A.   I was looking at that, and I don't believe it was.   I

2    couldn't tell you what was filled out on it or what was left

3    off, but when I signed this, there's no way that the serial

4    numbers on the computer could have been wrote down on there,

5    the type of it, because I just had handed it to him.

6         He walked into the department, within a short minute come

7    back outside and I signed this.   I think it had my name on it

8    and my title up there, and I believe that may be all that was

9    on it.

10   Q.   Now, there was never any allegation that the defendant

11   had the laptop with him at Walmart, correct?

12   A.   No.

13   Q.   Okay.   Did anyone ever say anything to you about what

14   evidence they thought might be found on the laptop relating to

15   Walmart?

16   A.   No.

17   Q.   Did anyone say anything to you about what evidence they

18   thought the defendant might be deleting?

19   A.   No.

20   Q.   Did anyone say anything to you about the defendant

21   allegedly receiving child pornography prior to seizure of the

22   laptop?

23   A.   No.

24   Q.   Okay.   And did you learn anything subsequent to the

25   seizure of the laptop about the facts that gave rise to the

England - Direct                                                    220

1    tip?

2    A.   I'm not sure I understand what you're asking me.

3    Q.   So somebody called in an anonymous tip, right?

4    A.   Yes.

5    Q.   That's what the police told you?

6    A.   Right.

7    Q.   Did you learn anything about the substance of that tip?

8    A.   The only thing that I learned was when I handed it to him

9    and he said it was a blanked out number.  He thought it was a

10   Kentucky State Trooper.  He didn't know who the trooper was.

11   And before the conversation was over, it might not even have

12   been a trooper.  It could have been one of my employees.

13   That's what Mr. Patterson told me out in the parking lot.

14   Q.   And is there any fact about that day where you took the

15   laptop from your home to the police that we've not talked

16   about?

17   A.   Not that I'm aware of, no.

18   Q.   And is there anything else about the consent you signed,

19   Defendant's Exhibit 15, that we've not talked about?

20   A.   I couldn't recall, no, sir.

21            MR. ROSSMAN:  That's all I have for this witness.

22            THE COURT:  Ms. Reed?

23            MS. REED:  Yes, Your Honor.  Thank you.

24   ///

25   ///

*England - Cross*                                                           221

1          THE COURT:  You're welcome.

2                        CROSS-EXAMINATION

3    BY MS. REED:

4    Q.   Sir, you said that you're aware that there is a standard

5    operating guideline for the Middlesboro Police Department,

6    correct?

7    A.   For the police department?

8    Q.   Fire department, excuse me.

9    A.   Yes, there's an SOG in place.

10          MS. REED:  Can I hand the witness what's been marked

11   as Government Exhibit 6?

12          THE COURT:  Yes, that can be provided.

13   BY MS. REED:

14   Q.   Sir, if you could look at the document and look up at me

15   when you're done.

16   A.   Yes, ma'am.

17   Q.   Do you recognize that document?

18   A.   I do.  I've seen it.  If it's the same one I've got in my

19   building, I have.

20   Q.   Okay.  So it's maintained in the fire department,

21   correct?

22   A.   There's a copy of this SOG at the department, yes.

23          THE COURT:  Are you saying S-O-G?

24          THE WITNESS:  SOG, Standard Operating Guideline.

25          THE COURT:  Just wanting to make sure I heard you

1    correctly.  Sorry for the interruption.  Go ahead.

2    BY MS. REED:

3    Q.    Thank you, sir.  The SOG, if you turn to Section A of

4    this document.

5    A.    Section 8?

6    Q.    A like apple.  It's the very first section after the

7    table of contents, rules and regulations.

8    A.    I'm still not finding it.  Section A?

9         THE COURT:  I'll tell you what, why don't you pass it

10   back to Ms. Reed and you can identify the portion for him.

11        MS. REED:  Yes, Your Honor.  I apologize.  Can I get

12   a copy -- can I please have a copy of Government's Exhibit 7

13   and 8?

14        THE COURT:  All we have are the originals, but you

15   may.  You want 7 and 8?

16        MS. REED:  Yes, Your Honor.

17        THE COURT:  Okay, sure.

18   BY MS. REED:

19   Q.    I'm going to fold the page here on Government Exhibit 7.

20        Sir, do you see, of the Middlesboro Fire Department

21   Standard Operating Guidelines, that Section A?

22   A.    Yes.

23   Q.    And it requires every employee of the Middlesboro Fire

24   Department to be familiar with and obey all rules and

25   regulations, policies, directives, procedures, standard

1    operating procedures, and personnel policies and procedures,

2    correct?

3    A.   Correct, yes.

4    Q.   And then if you move to 16 and 17 of Section A.  16

5    states that, again, "Every employee will always conduct

6    themselves in a manner that creates good order within the fire

7    department and city government," correct?

8    A.   Correct.

9    Q.   And "always" would imply both on duty and off duty,

10    correct?

11    A.   Should, yes.

12    Q.   17 states that, "Every employee will obey the law,"

13    correct?

14    A.   Correct.

15    Q.   Section B has restrictions.  "No employee of the City of

16    Middlesboro shall," and number one is "appropriate for their

17    own or another's use any public commodity or property,"

18    correct?

19    A.   I see that, yes.

20    Q.   The laptop in question, that was property of the City of

21    Middlesboro, correct?

22    A.   Correct.

23    Q.   Number 3 states, "That no employee of the city shall

24    conduct themselves in a manner that will reflect discredit on

25    the fire department or impair its efficiency," correct?

*England - Cross*                                                                224

1    A.   Correct.

2    Q.   You would agree, the allegation of exposing -- of a

3    firefighter exposing themselves to a minor in a Walmart would

4    tend to reflect discredit upon your fire department?

5    A.   I agree that an allegation of any such like that would,

6    yes; an allegation.

7    Q.   Moving to number 7, it states that no employee of

8    Middlesboro Fire Department shall use departmental telephone

9    or other equipment or facilities for private enterprise;

10   correct?

11   A.   Correct.

12   Q.   Was the laptop in question equipment of the fire

13   department?

14   A.   Yes, it was.

15   Q.   And then if you look at Section C, Number 5 states

16   generally that a violation of the rules and regulations may

17   result in disciplinary action, correct?

18   A.   Correct.

19   Q.   Now, you are ultimately responsible for all equipment

20   issued to the fire department, correct?

21   A.   Yes.

22   Q.   And that's laid out in the city manual, correct --

23   A.   Yes.

24   Q.   -- somewhere?  You would agree that just like you had

25   authority to assign the laptops, you had authority to reassign

1    the laptops at any time?

2    A.   Yes.

3    Q.   Did you ever issue a formal policy that contradicted the

4    city policy that we just reviewed or the standard operating

5    guideline with the fire department with regards to fire

6    department equipment?

7    A.   Not to my knowing.  Not intentionally I wouldn't have,

8    no.

9    Q.   Did you ever have a written policy in memo or any form

10   that said you can use department equipment for personal use or

11   enterprise?

12   A.   There was probably a memo or a statement regarding the

13   computer, that they could use their laptop as their personal

14   use.  The reason being is that these guidelines right here are

15   from the '70s and '80s.  We since went from handwritten copies

16   of patient care reports to all of our training is electronic.

17   All of our data entry is electronic.  And therefore, there is

18   just not enough time in the day to get it done.  They may work

19   on it some at home in the evenings.  It's been going on since

20   before I received any rank of any kind.

21   Q.   When you told the defense attorney that you didn't know

22   of any policy that would diminish their expectation of privacy

23   in department equipment, you would agree that these policies

24   clearly diminish some expectation of privacy in

25   department/city equipment and property?

*England - Cross*                                                    226

1    A.   I don't know if -- my opinion is no, I wouldn't.  I

2    expect that when I'm on my computer in my office, I've got a

3    reasonable expectation of privacy.

4    Q.   You previously testified under oath here, correct?

5    A.   Yes.

6    Q.   And you've previously testified that the word "assigned"

7    was not really the appropriate word for those laptops,

8    correct?

9    A.   It's the word that was throwed out that I was forced to

10   use was assigned, so if that is how you want to look at it,

11   you know.

12   Q.   You didn't agree with that, did you?

13   A.   Whether I agreed with it or not, I was -- the computer

14   was give to the lieutenants to be in their charge.  If one of

15   the computers would have been found setting on the bumper of a

16   truck, destroyed, the lieutenant is whom I would have went to.

17   So they was in charge of that computer.

18   Q.   Everything that you testified to under oath on

19   November 1st, 2018, was that all truthful?

20   A.   Yes.

21   Q.   For example, when you told this Court that the defendant

22   had been on home incarceration for 45 days, and then you went

23   on to say that he's been abiding to the fullest extent of all

24   of the rules and regulations placed on him as part of that

25   home incarceration, that was the truth?

1    A.   When he was on home arrest, or home incarceration, I

2    never knowed of him to do anything outside of those guidelines

3    that was set forth for him.

4    Q.   And you had to be aware of those guidelines because he

5    was residing at your residence at the time, correct?

6            MR. ROSSMAN:   I want to object, Your Honor.   I think

7    we are getting pretty far afield.

8            THE COURT:   No, it's relevant with respect to

9    credibility if she thinks there is a lack of candor in

10   previous testimony.   I'll certainly allow it.

11       Go ahead.   Answer the question, sir.

12           THE WITNESS:   Yes, sir.

13   BY MS. REED:

14   Q.   You had to be aware of those regulations placed on your

15   son, the defendant, because he was residing within your home

16   during the home incarceration period, correct?

17   A.   Correct.

18   Q.   Did you have firearms within the residence during the

19   period of home incarceration?

20   A.   No, I did not.   Not that I'm aware of unless -- I've got

21   firearms throughout my house.   When he come home on home

22   incarceration, I took what firearms I have, because I did know

23   those was not supposed to be around him, to my daughter's

24   house.

25   Q.   You also testified with regard to the laptops, that you

*England - Cross*                                                              228

1    issued them out, quote, issued them out into the department,

2    that was for public use for anybody in there who needed to

3    enter a PCR report, which is a patient care record.

4    A.    Correct.

5    Q.    And then you continued, stating so -- and this is talking

6    about then -- "currently, they are open in a room, they could

7    be entering it any time from 7:00 in the morning until they

8    get off of work"; is that correct?

9    A.    Yes.

10   Q.    Is that how those laptops were maintained during the time

11   that your son was a lieutenant?

12   A.    From 2014, '15, when we purchased them and went through

13   the process, that's how they was maintained up until he made

14   rank around that time because they was more firefighters that

15   made rank and they was assigned to them.  They was just

16   anywhere in the building at any given time.

17   Q.    Let's talk about specifically after they were assigned

18   when your son became a lieutenant.  You stated that after that

19   period of time, "Yes, I seen other people on the laptops,

20   including that one," referring specifically to your son's

21   laptop.  Do you recall making that statement?

22   A.    I do.

23   Q.    And is that true?

24   A.    To the best of my knowledge, that is true.  We had three

25   laptops.  I didn't know which one was which, who was on which

1    one of the three.  But it was a time that we was scurrying

2    around and getting their certification up for the end of the

3    year, and all three computers was in that lieutenants' office

4    with different people on it.  So somebody had to be on one of

5    them, on that particular one.

6    Q.   On that specific laptop?

7    A.   Yes.  There was only three of them that I know of.

8    Q.   And again, this is referring to the time period after

9    they were assigned.

10        You were asked:  Were there times that that building was

11   left totally unsecured by anybody there?

12        And you responded:  Yes.  If we leave out on an

13   emergency, on a fire call, the doors are open, and yes, it's

14   been -- I've pulled in many a times and there would be

15   nothing, nobody in the building.

16        Is that correct?

17   A.   That's correct.  Yes.

18   Q.   When asked whether you wanted to tell us anything else

19   about the laptops during the relevant time frame, you stated

20   that these laptops had multiple users on them for multiple

21   years.  And you said, "Only recently have they been assigned

22   out, or what you call assigned.  And they are still not

23   assigned.  They are still sitting in -- on the lieutenants'

24   office on the counter, on the desk, whether it be there or in

25   the captain's office on that counter or desk."

1          Is that true?

2    A.   When I -- when we issued them out, assigned them out,

3    whichever term you want to use, probably means the same.  One

4    lieutenant took his home every single night, brought it back

5    every single day.  That would be Rick Evans.

6          Chris England, the other lieutenant, would take his home,

7    bring it back, sometimes leave it, sometimes not.  His

8    computer would be left out until 10:00, 11:00, 12:00 the next

9    morning because he slept in.

10         Lieutenant Troy Perry's computer would sit on the counter

11   24/7, seven days a week.  He did not take it home, none that

12   I'm aware of.  That's my best explanation of how those

13   computers went.

14   Q.   And you stated that they were often left in vehicles,

15   that you had to pick them up out of the kitchen and other

16   rooms and put them back into the offices, correct?

17   A.   I don't recall them being left in vehicles.  The iPads

18   would be what would be left in vehicles.  But yes, I picked

19   up the -- prior to, I picked up the computers off of the

20   kitchen table, off the benches, out of the recliners and carry

21   them back into the office and put them in there, yes.

22   Q.   Well, you're saying the prior two.  What do you mean by

23   that?

24   A.   I don't understand what you're --

25   Q.   Maybe I misunderstood what you said.

1    A.   Okay.

2    Q.   Are you talking about the laptops generally?

3    A.   Yes.  Yeah.

4            THE COURT:  The statement was:  Yes, I picked up

5    the -- prior to, I picked up the computers off the kitchen

6    table and off the benches.

7        What did you mean when you were referring to prior to?

8            THE WITNESS:  Prior to them being assigned out or

9    issued out, and not as much so afterwards.

10   BY MS. REED:

11   Q.   So now your testimony is that something changed after

12   they were assigned to these three lieutenants?

13   A.   They wasn't left out every day, all day.  When I come in,

14   there would be a process every day, but Troy Perry's was

15   sitting in an unlocked room, sitting on the counter.

16   Q.   Now, you've testified previously that you assigned the

17   computers approximately three months after your son got pinned

18   on lieutenant; is that correct?

19   A.   I'm going on the recollection.  Without looking, I don't

20   recall when he was pinned on as lieutenant.  It didn't -- I

21   just don't remember that date, exactly, and I don't remember

22   how close to our -- to thereafter that I did issue them out or

23   they did put them in their possession.  So I'm not sure on

24   those dates.  Sometimes I think something might have been

25   three months ago and it was ten months ago.  I don't recall

1    those dates.

2    Q.   You were specifically asked if your son ever brought the

3    laptop home.  Do you recall that?

4    A.   I do.

5    Q.   And you were specifically asked how often that would

6    occur, and you said:  As often as not, I really don't know.

7    It -- I didn't monitor whether he had it.  I know I would be

8    at home calling for something and he would be at work or

9    whether call at home for something, but his computer would be

10   at work or vice versa.  So, I mean, it was 50/50 if it was at

11   home or at work.

12   A.   A guess, yes.

13   Q.   So that's true, you remember it being at home just as

14   often as you recall it being left at work?

15   A.   I remember as if I had the need to know where it was at,

16   that 50/50 it could be at home or at work, or he could be in

17   opposite places of it.  But I didn't check every day to see if

18   it was there or not.  I'm just -- if I called and I needed him

19   to look up something, whether I be at work, calling him at

20   home, or him be at work and me calling him from home.  On

21   occasions, it seemed equal as not 50/50 that it would be in

22   his possession or not.

23   Q.   You lived with him during this whole time frame, correct?

24   A.   I did, yes, absolutely.

25   Q.   And you worked with him as his boss?

*England - Cross*                                                                 233

1    A.   Absolutely, yes.

2    Q.   So if anyone would know if it was 50/50 or as often as

3    not, it would be you, correct?

4    A.   I don't know how to answer you that correctly on what

5    you're asking.  I don't know what you're asking.  If you're

6    asking me did he bring it home every single day, or leave it

7    every single day, or bring it 50/50, I don't know the answer.

8    I didn't check what was in his hands coming in the door.

9    Q.   I'm asking when you testified in November if it was the

10   truth when you said he brought it home as often as not and it

11   was 50/50.

12   A.   I'm telling you that my statement under that that was

13   made is when I needed to know if he had it at home, it was

14   50/50 if it was there or not.  I'm trying to answer you the

15   best I can.

16   Q.   With regards to the lieutenants' office, we talked a lot

17   about a policy, memo that you put out.  I think it's Defense

18   Exhibit 9.  You got to see that, correct?  You recognize that

19   document?

20   A.   Let me see.  I got it.

21   Q.   Okay.  Now, you were specifically asked about the

22   lieutenants' office during the November hearing.  Do you

23   recall discussing that with us?

24   A.   I recall some of it.  I don't recall it in detail.  I do

25   recall that the office was brought into question, yes.

*England - Cross*                                                                234

1    Q.   And you were specifically asked if the office was ever

2    locked, and you said, "At times.  And then it got to where it

3    was never locked.  It was initially -- okay, to make a short

4    story -- or a long story short, we worked on that room,

5    cleaned it up, straightened it up and painted it.  We got it

6    to the modern look and didn't want it destroyed."

7         Is that when you put the memo out?

8    A.   This memo was put out, and I don't know if it's exactly

9    at that time.  This office was used for a gathering spot.

10   That's where they gathered at.  That's where they got away

11   from authority at.  That's where they wanted to go to for

12   whatever reason.

13        This office, since we had -- at this time, we wound up

14   having three captains, three lieutenants.  We could actually

15   have a use for that office.  I wanted the lieutenants to play

16   a role in developing new SOGs, to developing fire training.

17   The room was in disarray and a mess, just hadn't had no upkeep

18   on it in a while.  We didn't clean it up.  Chris cleaned it

19   up.  He painted it, he detailed it out, he put it up.

20        I wanted it for the lieutenants' office.  I asked for the

21   lieutenants to keep the door locked.  I supplied the three

22   lieutenants and the captains with keys to it.  They had those.

23        This memo was put out because prior to the room being

24   cleaned up, my rank and file firefighters were being stubborn

25   about them having access to that room, stating they wouldn't

1   clean it.  They didn't get to use it, they wouldn't clean the

2   bathroom.  They didn't use it.  So that's what generated this

3   was for -- in order for the lieutenants to keep that room

4   clean in the morning.

5   Q.   So you previously testified that after putting that memo

6   out, after telling them to, quote, keep this door locked, it

7   got to where it would be unlocked 50 percent.  "So I just quit

8   even arguing about it.  The door just stays open and it stays

9   open.  It's been that way for I guess a year or so, something

10  in that neighborhood."

11  A.   It's in my memory, it seemed like it's been that way for

12  that long.  The only one I noticed would lock the door when he

13  was gone from it for a specific amount of time or if he went

14  out to the store or something in the initial beginning of it

15  was Chris.

16       Troy and Rick refused to lock it.  They intentionally

17  didn't lock it because it would cause their subordinates to

18  ride on and agitate them about it.  That's why they didn't

19  lock it.  I got to the point to where I just wasn't going to

20  holler at one lieutenant and not the other three.  If it was

21  going to stay unlocked when I'm gone, okay, fine, leave it

22  unlocked.

23  Q.   And you testified that it stayed majority unlocked for

24  about a year prior to the seizure of the laptop, correct?

25  A.   Unlocked a year?  I don't know those specific times and

1    dates on that, I really don't.

2    Q.   Well, you stated, "But was it unlocked most of the time?

3    Most of the time, it was unlocked."  Correct?

4    A.   Regardless of when it's locked or not, even when it was

5    being maintained a lock, it stayed unlocked more than it did

6    locked, in my opinion.  I didn't go set a time clock by it.  I

7    didn't set nothing on it.  But when I would go by, the door

8    would be ajar or unlocked and nobody in it the majority of the

9    time.

10   Q.   You specifically testified in November that you did not

11   intend that laptop to be for your son's exclusive use,

12   correct?

13   A.   I don't recall what I said on that one, to be honest with

14   you.  It was my intent for that to be used, that he could use

15   it for what he needed for the fire department, for his

16   personal, just like I did with the other three.  But if

17   another member of the department needed access to it, they was

18   to make it available to them.

19   Q.   So Mr. Rossman asked you:  We talked about assigning a

20   laptop, does that mean it's for his exclusive use?

21        And you said:  No.

22        Is that correct?

23   A.   Correct.  It wouldn't.  In my opinion, if they had made

24   it available to other people, it wouldn't be their exclusive

25   use.

*England - Cross*                                                      237

1   Q.   Well, it's not your opinion because you're the chief of

2   the fire department, correct?

3   A.   Correct.

4   Q.   So when you assigned, whatever word you want to use for

5   the laptops, did you inform the lieutenants that they were

6   going to be used by other people for training, certificates,

7   whatever they needed to do for purposes of work at your fire

8   department?

9   A.   Yes.

10  Q.   And you made that clear to them when they got those

11  laptops?

12  A.   I made that clear to them when they got the laptop that

13  if somebody needed them, they was to be made available to

14  them.

15  Q.   You stated that on the day, June 23rd, 2018, when your

16  son was interviewed by now Lieutenant Patterson, then Sergeant

17  Patterson I believe, that he came home and he looked like he

18  was shocked, or I forget how you phrased it.  Something to

19  that effect?

20  A.   Yeah.

21  Q.   Is it your testimony that that is the first time that you

22  or your son had heard about the Walmart allegation?

23  A.   That is my testimony, yes.

24  Q.   So you did not know that your son was alleged to have

25  exposed himself to a minor in Walmart, but every other person

*England - Cross*                                                              238

1    in that fire department did?

2    A.   Absolutely, yes.

3    Q.   Did anyone inform you that your son had been showing

4    people photographs of minors in their underwear on his cell

5    phone in your firehouse?

6    A.   Nobody come to me and told me that, no.

7    Q.   None of your captains came to you and mentioned that?

8    A.   No, they did not.

9    Q.   Did anyone mention to you the fact that your son was

10   playing XBox Live with minors in the lieutenants' office?

11   A.   Nobody mentioned to me that they was doing that, but I've

12   seen him in there playing that.  I've seen other ones in there

13   doing the same thing, but nobody mentioned that to me and

14   addressed that there was an issue, no.

15   Q.   So you've seen the defendant in that office playing on

16   the gaming station before?

17   A.   Yes.

18   Q.   With minors?

19   A.   With his son or his son's friends, yes, or his nephew,

20   yes.

21   Q.   Did anyone make you aware of lewd, inappropriate comments

22   that your son made to Firefighter Harris?

23   A.   No.

24   Q.   Is it your testimony that no captain and no lieutenant

25   came to you with any complaint or allegation of inappropriate

*England - Cross*                                                      239

1    conduct by your son?

2    A.   Nobody come to me and made any to me.  If they had, they

3    would have been instructed to do exactly what I do when they

4    come to me with any other complaints.  You have a disciplinary

5    form.  You need to fill it out, write it up, bring it to me so

6    we handle it appropriately.

7         I do not have one of those forms.  Nobody has approached

8    me.  It was as big a shock on me on the 23rd of those

9    allegations as it was to anybody.  I hadn't heard.

10   Q.   And you testified that you have never been asked by the

11   defendant to move, get rid of, or destroy any electronic?

12   A.   No, I have not.

13   Q.   Not an external hard drive, not a thumb drive, not a

14   computer?

15   A.   No, I have not.

16   Q.   Did anyone come to you with the allegation that your son

17   had inappropriately touched another firefighter's child in the

18   firehouse?

19   A.   No, absolutely not.

20   Q.   The firehouse that we've been referring, though, that's

21   Fire Station One?

22   A.   Yes.

23   Q.   There's a Fire Station Two, correct?

24   A.   Correct.

25   Q.   When is the last time that's been manned?

*England - Cross*                                                    240

1    A.   Three years, maybe longer than that.  Maybe even longer

2    than that.  2014, '15, somewhere through there, if I'm

3    guessing, without looking.

4    Q.   And does the fire station have a projector, like, to

5    watch movies?

6    A.   Station One?

7    Q.   Or Station Two.

8    A.   Yes, it's got one.

9    Q.   Is it still in Station One?

10   A.   Yes, it's in my office on the bottom shelf.

11   Q.   We've talked a lot about an employee's right to privacy

12   with regards to the electronics.  Now, the two fire stations,

13   do you allow employees to house personal items in the fire

14   station?  Is that a personal storage container for them?

15   A.   No, it's not, but they have at times.  We got -- we had

16   one that had a trailer with some furniture on it, and it was

17   raining just a little while back and he parked it in the empty

18   bay in number two station to keep it dry.

19        We've had people to bring personal things in to work on

20   them and projects in the evenings and when they had some down

21   time, and it would be set up in the corner somewhere.

22   Q.   But there's no policy that employees can store personal

23   items in either Fire Station One or Two?

24   A.   I don't know if there is a policy for or against or if

25   I've interpreted or seen it or been brought to my -- brought

1   to question about it, I'm not aware of it, but --

2   Q.   What about firearms?  Pretty clear that fire department

3   employees are not supposed to bring personal firearms into the

4   department, correct?

5   A.   I disagree.  There's a law --

6           MR. ROSSMAN:  Your Honor --

7           THE COURT:  Hang on.

8           MR. ROSSMAN:  I would object.  I don't see how this

9   is relevant to anything.

10          THE COURT:  Ms. Reed?

11          MS. REED:  If I could have just a moment, Your Honor.

12          THE COURT:  Sure.

13          MS. REED:  I withdraw that question, Your Honor.

14      If I could just have a moment to see if I have any

15  additional questions.

16          THE COURT:  That's fine.

17  BY MS. REED:

18  Q.   You stated that your son came home and you talked a lot

19  about what he looked like on June 23rd, 2018, after he had his

20  interview, but what did he say to you?

21  A.   He just told me that Officer Patterson pulled him in over

22  there for an interview.  He went over there and talked to

23  Floyd, and Floyd brought those allegations up to him, and that

24  it just dumbfounded him.  He didn't even know how to respond

25  or answer to them.  But he did remember me telling him that

*England - Cross*                                                    242

1    any time an officer is questioning him, you may want to have

2    your attorney present, and that he invoked that right, and

3    Officer Patterson let him come home.

4        We've had multiple discussions over the past months, so I

5    don't know exactly what was said that day, but we just -- we

6    talked and went on about our lives and started dealing with

7    the situation in front of us.

8    Q.   How did you find out he went back to the fire station?

9    A.   How did I find out?  He told me when he came home that

10   when he left the police department he went back to the station

11   and gathered his stuff up, or told Rick he was leaving and

12   gathered it up, or gathered it up and told Rick he was

13   leaving, and my understanding is Rick granted him permission

14   to go.

15   Q.   Did he explain why he gathered up the work laptop if he

16   leaves it at work just as much as he leaves it at home?

17   A.   The morning there, he was just -- it was there and he got

18   it and brought it home.  No, we didn't discuss that particular

19   event of why he brought it home that day.

20   Q.   And how long did you -- how long were you in the house

21   before you left with the laptop?

22   A.   No more than an hour, I don't think, and I see the 12:30

23   time on there.  I think I got down there early, waited for a

24   while before Floyd come.  I had a conversation with Floyd, and

25   then gave him the laptop, so...

1    Q.   So you spent approximately an hour in the house?

2    A.   Jeremiah called, it seems like, within 15 minutes of him

3    getting home.  It seemed like I left within a short time after

4    that.  I didn't look at my clock, to be honest with you.  I

5    don't know.

6    Q.   So after Officer Johnson called, what did you say to your

7    son?

8    A.   That I was taking the computer down to give it to them.

9    Q.   Did you tell him what Officer Johnson said?

10   A.   Yeah, that they wanted the two computers, and that's what

11   we discussed.  There's not two computers, dad, there's only

12   one.  And I know there was only one.

13   Q.   Did he have any other concerns about you taking the

14   computer?

15   A.   I don't believe I left him any option.  The computer

16   belonged to the city, and they asked for it, and I'm taking it

17   to them, and that's pretty much how that went.  I don't recall

18   whether he objected to it or not, to be honest with you.

19   Q.   So the only conversation that you had with him was with

20   regards to whether it was one or two computers because Officer

21   Johnson said he was looking for two?

22   A.   To the best of my memory.  We probably talked more on

23   some things -- with Officer Johnson, is that who -- with

24   Jeremiah?

25   Q.   No, with your son, the defendant.

*England - Redirect*                                                244

1  A.   Oh.  No.  I may have even -- I really don't recall.  I

2  may have asked him, is there something on here I have to be

3  worried about, or you have to be worried about?  No.

4  Q.   Why did you tell Officer Johnson or Sergeant Patterson

5  about AR15 websites?

6  A.   I don't -- I don't recall speaking on AR15s.  I'm not

7  saying I didn't, I just don't recall.  I think -- I'm not sure

8  of what you're asking me.

9            MS. REED:  I have no additional questions, Your

10 Honor.

11           THE COURT:  Mr. Rossman, do you have redirect?

12           MR. ROSSMAN:  Yes, briefly.

13           THE COURT:  Does anybody need a break?  I'm fine to

14 keep going.  We've been going for close to two hours, I think,

15 but...

16           MR. ROSSMAN:  I shouldn't have much.

17           THE COURT:  Court staff okay?

18     Okay.  Go ahead.

19           MR. ROSSMAN: Thank you.

20                     REDIRECT EXAMINATION

21 BY MR. ROSSMAN:

22 Q.   Sir, you testified about regulations that every employee

23 will obey the law and not cause disruption at the fire

24 department and the like, correct?

25 A.   Right.

*England - Redirect* 245

1    Q.   And your son, the defendant, has been charged with a

2    misdemeanor offense of indecent exposure in Bell County,

3    correct?

4    A.   Yes.

5    Q.   Now, that charge remains pending, correct?

6    A.   Yes.

7    Q.   He's never been found guilty of that by a judge or a

8    jury?

9    A.   No.

10   Q.   And he's presumed innocent under the law?

11   A.   I thought so.

12   Q.   So, there's been no discipline of him or conclusion that

13   he violated policy because it remains unadjudicated, correct?

14   A.   Correct.

15   Q.   Has he ever been convicted of any crime?

16   A.   No.

17   Q.   Now, we've heard talk about how, you know, if you violate

18   a city guideline that that can justify an investigation or

19   diminish your privacy.  If somebody gets a speeding ticket at

20   the fire department, do they come search his locker?

21   A.   No.

22   Q.   Do they come down and do a full investigation for

23   something like that?

24   A.   No.

25   Q.   Is there any policy that specifically states if you

*England - Redirect*                                                    246

1  violate a policy or are accused of violating a policy, then we
2  can search your stuff?
3  A.   Not that I'm aware of, no.
4  Q.   It just says if you violate, you may be disciplined,
5  right?
6  A.   Yes.
7  Q.   How many employees, since you've became chief, have been
8  disciplined for personal use of city property?
9  A.   None.
10 Q.   And has the defendant ever been disciplined?
11 A.   No.
12 Q.   You would agree with me that firefighters often spend the
13 night at the fire station, correct?
14 A.   Correct.
15 Q.   And they may work 24-hour shifts?
16 A.   Yes.
17 Q.   And sometimes during those shifts there's not much going
18 on, right?
19 A.   Right.
20 Q.   But everyone has to remain awake and alert in case a call
21 comes in?
22 A.   Not awake, but alert, or able to be woke up pretty quick,
23 yes.
24 Q.   And there are bunk beds there at the facility for people
25 to sleep, right?

*England - Redirect*                                                    247

1    A.   Yes.

2    Q.   And so during that down time, is it your testimony that

3    they could use the laptops for personal purposes such as

4    checking e-mails, that sort of thing, without it being a

5    violation?

6    A.   Yes.

7    Q.   And if someone uses a city laptop to check their e-mail

8    or book a flight, does that cost the city anything?

9    A.   Not that I know of.  I ain't never seen a charge that I

10   billed for it, so...

11   Q.   You testified about the XBox in the office.  Was there

12   ever any allegation that you know of that the defendant did

13   anything inappropriate with the XBox?

14   A.   No.

15   Q.   Or the children who played there?

16   A.   No.  There's been gaming devices down there for the last

17   15 years from the Wii's when they come out, to the Xboxes, and

18   I don't know of, other than myself and Rick Evans and a few of

19   us older -- older ones that hasn't been on them playing them

20   and hasn't had family down playing them.  Family comes down

21   there all the time and spends time with them.

22   Q.   Now, you testified that firefighters sometimes bring

23   personal items to the fire station, right?

24   A.   Uh-huh.

25   Q.   And if they are spending the night, they might bring a

*England - Redirect*                                          248

1    backpack or a duffle bag or something like that with personal

2    items in it?

3    A.   Yes.

4    Q.   Are those items subject to search?

5    A.   No.

6    Q.   If you had an allegation that an employee committed

7    misconduct away from work, some sort of crime, would that give

8    you grounds to search their backpack under the city

9    guidelines?

10   A.   No.

11   Q.   Has any such search ever occurred?

12   A.   No, not that I know of.

13   Q.   Now we talked about your authority to reassign the

14   laptops.  Do you recall that?

15   A.   Somewhat, yes.

16   Q.   After you assigned the laptop at issue to the defendant,

17   did you ever assign it to someone else?

18   A.   No, I don't think so, because it's in the possession of

19   the federal government now, or somebody.

20   Q.   Was any of the other laptops ever reassigned?

21   A.   Rick still has his right now.  Troy's is -- Troy's may be

22   on the desk in there for them to use, I'm not sure where it's

23   at, to be honest with you.

24        MR. ROSSMAN:  That's all I have.

25        THE COURT:  Ms. Reed?

1        MS. REED:  No additional questions, Your Honor.

2        THE COURT:  Okay.  Thank you.  Sir, it's really odd

3    for me to have questions in here like this.

4        THE WITNESS:  Yes, sir.

5        THE COURT:  But I've got several for you.

6      You testified about the Defense Exhibit 9.  Do you have

7    that in front of you?

8        THE WITNESS:  I do.

9        THE COURT:  And you were asked questions about what

10   the reference to sensitive information right in the middle of

11   that text was, and the examples you gave, I think, were

12   patient care records and training materials.  Do you recall

13   that testimony this afternoon?

14       THE WITNESS:  Yes.

15       THE COURT:  Why is that type of information

16   sensitive?

17       THE WITNESS:  Patient care information has their -- a

18   person's -- say if we transport you in an ambulance, it would

19   have your personal demographics with you, your Medicaid,

20   Medicare numbers.  It would also have your medical history of

21   diseases you may have or your complications.  And the federal

22   government passed a law several years back, HIPAA, which

23   protects that right from being just blatantly let out into the

24   general public.

25       THE COURT:  Is that information personal to the

250

1     lieutenant who's gathering those records in any way?

2               THE WITNESS:  I don't understand.  Personal to him?

3               THE COURT:  Do those records reflect personal

4     information about the fire department employee who's working

5     with them in any way?

6               THE WITNESS:  I don't think so.

7               THE COURT:  Say that again?

8               THE WITNESS:  I don't think so.  I think it reflects

9     more of the customer we would be servicing.

10              THE COURT:  Here's a better way to put it.  If a

11    lieutenant is entering the information from the patient care

12    records into the laptop, we are viewing a patient care record

13    on the laptop, is that private to that lieutenant in any way?

14              THE WITNESS:  If the lieutenant -- I have the

15    authority to be in there to do administrative work on it, and

16    some of my lieutenants do.  If I'm entering your patient care

17    report for billing or whether I'm QAing it for quality

18    assurance or whatnot, if one of my rank and file guys or

19    somebody who has not had hands on with your personal

20    information, they are just -- they are not entitled to that

21    information either.

22              THE COURT:  Is it personal in any way to the

23    lieutenant who's working with those records?

24              THE WITNESS:  Not that I'm aware of, no.  If I'm

25    understanding your question right.

1          THE COURT:  Well, my question is, did it have any

2    personal information about the lieutenant in there?

3          THE WITNESS:  Oh, no.  No.

4          THE COURT:  Is the same true with the training

5    material?

6          THE WITNESS:  It would just have their ID that they

7    was the one that was on there entering it in or documenting

8    that.  That's -- that would be about it.

9          THE COURT:  But assuming it wasn't their own training

10   record --

11         THE WITNESS:  Right.

12         THE COURT:  -- it's only sensitive in the sense that

13   it shouldn't be openly displayed, even to other fire

14   department employees.  It's not personal and private with

15   respect to that lieutenant, right?

16         THE WITNESS:  I don't think so, no.

17         THE COURT:  So I understand the hierarchy within the

18   fire department, are you the most senior official within the

19   fire department?

20         THE WITNESS:  Yes.

21         THE COURT:  Does anybody else in the fire department

22   have greater authority than you?

23         THE WITNESS:  It would be the mayor.

24         THE COURT:  If the mayor instructed you to obtain one

25   of the fire department's pieces of property, would you be

252

1    obligated to do it?

2         THE WITNESS:  I would assume I would.  I would do it,

3    yes.

4         THE COURT:  What do you think would happen if you

5    didn't?

6         THE WITNESS:  I really don't know.

7         THE COURT:  Do you think you had the ability, as

8    chief, to instruct fire department employees to provide you

9    with fire department property that might be in their

10   possession?

11        THE WITNESS:  I would have thought I did, yes.  If

12   somebody had a nozzle at home and I told them to bring it

13   home -- or back, yes.  If they had a computer, bring it back,

14   yes.

15        THE COURT:  So there were three lieutenants and three

16   laptops, right?

17        THE WITNESS:  Yes.

18        THE COURT:  If you instructed any lieutenant to

19   retrieve one of these laptops and provide it to you, do you

20   think they would be required to do that?

21        THE WITNESS:  Yes.

22        THE COURT:  What would happen if they did not do

23   that?

24        THE WITNESS:  Explain to me as to why they didn't.

25        THE COURT:  Would there be discipline as a result?

253

1          THE WITNESS:  There could be if it wasn't

2     accountability for the computer, if it was missing or

3     something, or -- I just never been faced with that.  I mean,

4     I've asked for something, I've usually got it.

5          THE COURT:  Would you have the power, as chief, to

6     discipline them?

7          THE WITNESS:  Not -- no.  I can, to my understanding

8     that I've been brought up into that department by tradition

9     and the way things are, is I can send somebody home with pay,

10    so that's what I can do, and then they got rights that they

11    can approach the council or the mayor, an informal, and take

12    their discipline to there.  I can't suspend, fire, or

13    terminate.

14         THE COURT:  Anybody else within the fire department

15    have a greater ability than you to tell fire department

16    personnel what to do with fire department property?

17         THE WITNESS:  No, unless I leave them with orders to

18    do that.

19         THE COURT:  But that would be a delegation of

20    authority from you to someone else?

21         THE WITNESS:  Yes, right.

22         THE COURT:  Look with me at Government Exhibit 15 for

23    a moment.  That's the consent to search form.

24         THE WITNESS:  Okay.  Yes, sir.

25         THE COURT:  Do you have it there, sir?

254

1          THE WITNESS:  I do.

2          THE COURT:  That bears your signature, right?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Now, as chief, not with respect to this

5    consent specifically, but have you ever been asked to do

6    anything that you did not have authority as chief to do?  You

7    ever been asked to investigate a crime and say, well, no,

8    that's not up to me.  You need to contact the police.

9    Anything like that?

10          THE WITNESS:  No.

11          THE COURT:  You ever question, when you're confronted

12   with something as chief, whether you have the authority to do

13   it or not?

14          THE WITNESS:  Sometimes.

15          THE COURT:  Yes.  And what do you do if the answer is

16   no, I don't have the authority to do that?

17          THE WITNESS:  If I'm really unaware and it's a big

18   issue, I try to make contact with the mayor and try to reach

19   out to there.

20          THE COURT:  And do you have -- is there a lawyer

21   available to the city and to you to advise you on matters like

22   that?

23          THE WITNESS:  I've never contacted them directly from

24   my office.  It's usually through the mayor's office, and then

25   I usually just go to my next up in command.

255

1        THE COURT:  When you were presented with this consent

2   to search form, did you ask yourself if you had the authority

3   to enter into it or to sign it?

4        THE WITNESS:  I really didn't know -- I don't know

5   what how to answer you that without -- I just signed it

6   because I thought that it was city property.  I didn't have

7   the right to tell them no on that.  If that -- and it's the

8   best way I can answer it.

9        THE COURT:  When you read this form, did you have any

10  doubt that you had the authority as chief to authorize this

11  such?

12       THE WITNESS:  Probably not till later, to be honest

13  with you.

14       THE COURT:  Why did you have a doubt later?

15       THE WITNESS:  Just after you -- just being hit with a

16  question right off the bat and you give an answer and then two

17  hours later you think, whoa, could I have done that?  I mean,

18  we make those calls on fire scenes.  Ours is a little

19  different, you know.  And every time we sit back and we reread

20  what we did, did we make the right decision right there?

21  Well, is that in the SOGs?  And did we follow those along?

22  And after I turned that in, I really didn't know.  It just hit

23  me I didn't know.

24       I felt like when I signed it at the time that my

25  signature was sufficient to give it to them at that time, but

256

1    I don't know if the weight of the -- everything around that

2    that's involved with it put doubt in my head from there.  I

3    don't know.

4              THE COURT:  Well, did you, when you started to have

5    that doubt, did you look into it any more?

6              THE WITNESS:  No.  They already had it.  I was

7    approached -- I was approached a few days later -- I don't

8    know.  When I say a few, it could have been a week or a month.

9    But Mayor Kelley at the time, I think, wound up signing the

10   same thing for them, that he told me, and I think he might

11   have been the one that informed me that I couldn't do that, if

12   I'm remembering right.  And I believe that may have been where

13   that came from.

14             THE COURT:  You think the mayor told you that you

15   didn't have the authority to sign this consent?

16             THE WITNESS:  I'm thinking that his comment was that

17   he was the one that had to sign that, not me.

18             THE COURT:  When did he have that conversation with

19   you?

20             THE WITNESS:  It was -- there was a long lapse of

21   period from like the June 4th accused date to the 23rd, when

22   they asked for this on the 23rd.  I really don't know exactly

23   when I spoke to him after that, but it was fairly, reasonably

24   quick, I would think.  And it was just in a conversation that

25   we had about that computer.

257

1          THE COURT:  Is there anyone else within the fire

2     department that would have more authority than you to

3     authorize this consent?

4          THE WITNESS:  Not inside the fire department,

5     actually there, I wouldn't think, no.

6          THE COURT:  Back to the patient care records and the

7     training materials for just a moment.  I forgot to ask you one

8     question about that.

9        Are those materials that the lieutenant used in one of

10    these laptops would have gathered in the course of their work?

11         THE WITNESS:  They could have.  They could have been

12    on an ambulance run, if I'm understanding your question right.

13    They would have been on an ambulance run, they could have even

14    their own on that, so yes.

15         THE COURT:  Yes, but that information, either in the

16    form of the patient care record or the training materials you

17    talked about, is that information that the lieutenant would

18    have collected as part of their work duties and

19    responsibilities?

20         THE WITNESS:  I don't -- the lieutenants and the

21    captains had those.  I don't exactly recall every which one of

22    them.  My intentions was that the captain runs the day-to-day

23    operations and the lieutenants assist under him, and they both

24    worked hand in hand of getting this data entered in.  I don't

25    know what captain delegated that on down and followed through

1    with it or not because they were getting done.  I wasn't

2    having an issue of a pile of PCR built up that wasn't sent in

3    for billing.  So I don't know which ones decided that they

4    just do it their own self or delegate some of it down.

5              THE COURT:  That's not my question.

6              THE WITNESS:  Okay.

7              THE COURT:  Here's a better way to put it, perhaps.

8    These patient care records or training materials, would those

9    have been gathered by the lieutenant in the course of their

10   work obligations or for some personal purpose?

11             THE WITNESS:  It would have been for the lieutenants

12   through their work obligations, you know, is when somebody

13   goes out on a tablet and they do one, they would submit it,

14   and these guys would get on the laptop, open it up, go to

15   IPCR, plug on it.  When it comes up, they can pull each one of

16   them up individually and they can send them where they need to

17   go.  That better explains your question.

18             THE COURT:  Okay.  Any follow-up questions,

19   Mr. Rossman?

20                   FURTHER REDIRECT EXAMINATION

21   BY MR. ROSSMAN:

22   Q.   You talked about the HIPAA information and other private

23   information, sensitive information.  It wasn't personal to a

24   lieutenant in any way, right?

25   A.   Right.

*England - Further Redirect*

1    Q.   Was this information really kind of on a need to know

2    basis though?

3        Let me give you an illustration.  Lieutenant one calls

4    lieutenant two and says, hey, I've got a patient care report

5    on your cousin.  Why don't you come over here and look at all

6    his medical conditions, and we'll have good laugh.  Is that

7    appropriate?

8    A.   No, that would be a violation.

9    Q.   Okay.  So it's important that each lieutenant or whoever

10   possesses this sensitive information be responsible for it,

11   safeguard it, and not allow unauthorized access, right?

12   A.   Right.

13   Q.   Okay.  Moving back to Exhibit 15, the consent you signed,

14   there's no doubt you signed that in your official capacity as

15   chief, right?

16   A.   Yes.

17   Q.   And you intended to aid the investigation by permitting

18   this search, right?

19   A.   I gave them the computer and signed that.

20   Q.   And it didn't occur to you at the time that this was

21   essentially the government authorizing the search by the

22   government, right?

23   A.   Right.

24   Q.   And you didn't act in your capacity as dad or private

25   citizen in any way?

*England - Further Recross*

1    A.   No.

2    Q.   And you don't have any law training or anything like that

3    about probable cause, search warrants, anything like that?

4    A.   No.

5            MR. ROSSMAN:  That's all I have.

6            THE COURT:  Okay.  Ms. Reed, follow-up questions?

7                  FURTHER RECROSS-EXAMINATION

8    BY MS. REED:

9    Q.   As the chief of the fire department, you are responsible

10   for and are in charge of all fire department equipment,

11   correct?

12   A.   Correct.

13   Q.   That is a responsibility that is detailed in what I would

14   call performance evaluation, but in your duties and

15   responsibilities within the manual, correct?

16   A.   Yes.

17   Q.   Is there any doubt in your mind that you are not

18   responsible for and in control of fire department equipment?

19   A.   I'm in control of fire department equipment, yes.

20   Q.   And that includes the subject laptop.  It was equipment

21   that was assigned to and in the control of the fire

22   department?

23   A.   Yes.

24   Q.   Your fire department?

25   A.   Yes.

*England - Further Recross*

1    Q.   No one outranks you in that fire department?

2    A.   No.

3    Q.   With regards to the patient records and HIPAA

4    information, sensitive information, this pertains to people

5    that you're rendering services to, correct?

6    A.   Yes.

7    Q.   Okay.  So if lieutenant A is inputting something, it's

8    not lieutenant A's personal information?

9    A.   No.

10    Q.   Okay.  That is your -- the customer?

11    A.   Yes.

12    Q.   Whoever citizen you've serviced, correct?

13    A.   Correct.

14    Q.   And with regards to other firefighters having access to

15    it, the captains had access to this information, correct?

16    A.   Yes.

17    Q.   All your captains, correct?

18    A.   Uh-huh, yes.

19    Q.   And all your lieutenants had access to this information,

20    correct?

21    A.   If the captains directed it down and delegated it down to

22    them.  One may have, two may not have, you know.  I don't

23    know.  I left that up to them in their day-to-day operations.

24    Q.   And the paramedics would have access to it one point,

25    correct?

*England - Further Recross*

1    A.   The paramedics would only have had access to enter in on

2    it, unless it would have been Troy Perry.  Because he was a

3    lieutenant, he would have the access to the administrative

4    side of it.

5       In other words, they could only -- a paramedic or any

6    other employee can only access information that they entered,

7    that they worked.

8    Q.   That they gathered?

9    A.   Yeah, that they gathered.  They couldn't see what I

10   gathered, or what this one gathered.

11   Q.   Understood.  And your son was in charge of training,

12   correct?

13   A.   On the fire side, yes.

14   Q.   And he would have used the electronics for that purpose

15   as well, to conduct training?

16   A.   Oh, yes.

17   Q.   You made him the training officer, correct, that was --

18   A.   I don't think I ever titled him training officer on that.

19   I just think we kind of left him in charge of the functions of

20   inner facility and outside training.

21   Q.   Both with the community and internal to the fire

22   department?

23   A.   We all played a role in it.  He had the lead on it would

24   be a good way, yes.

25   Q.   And the subject laptop would have been used to facilitate

263

1    that official duty, correct?

2    A.   Yes.

3            MS. REED:  I have no additional questions, Your

4    Honor.

5            THE COURT:  Okay.  Is the witness finally excused?

6            MR. ROSSMAN:  Yes, Your Honor.

7            THE COURT:  Ms. Reed?

8            MS. REED:  Yes, Your Honor.

9            THE COURT:  Okay.  Thank you for your testimony this

10   afternoon.  You're excused from further testimony pursuant

11   to -- I presume there was a subpoena, but you don't need to

12   come back tomorrow or Monday.

13           THE WITNESS:  But it's all right if I do, correct?

14           THE COURT:  Yes.  It's an open courtroom.

15       Did you bring any records with you?

16           THE WITNESS:  I did not.

17           THE COURT:  Just leave those right up there.  We'll

18   take care of them.  Thank you, sir.

19           THE WITNESS:  Okay.

20           THE COURT:  All right.  Mr. Rossman, do you have more

21   witnesses?

22           MR. ROSSMAN:  Your Honor, our final witness will be

23   the former mayor, Bill Kelley.  He was scheduled to appear

24   tomorrow.  We -- he had some pain and we didn't want to keep

25   him waiting all day.  So if it's okay with the Court, I would

264

1    just suggest that we conclude today and start tomorrow with

2    him.

3          THE COURT:  Fine with me.  Any objection with that,

4    Ms. Reed?

5          MS. REED:  No, Your Honor.

6          THE COURT:  And what are we anticipating tomorrow?

7    We have the former mayor, and then evidence from the United

8    States in a sense?

9          MS. REED:  Your Honor, I'd have to sit down, I don't

10    know if there is anything left uncovered at this point so I

11    would expect less witnesses than originally anticipated.  I

12    will say that I may have an objection or may need to file

13    something if the chief is going to be in the room while his

14    current employees are testifying.

15          THE COURT:  Yeah.

16          MS. REED:  At least on their behalf, or make an oral

17    motion for them just because I probably advised them

18    incorrectly with regards to the rule of keeping the witnesses

19    separate, that he's testified before them and now might be in

20    the room for their testimony.

21          THE COURT:  Yeah.  Once they are excused, they can

22    stay and watch.

23          MS. REED:  Yeah, I guess --

24          THE COURT:  Now, you can correct me if you think I'm

25    wrong.  That's the practice --

1          MS. REED:  Yes, sir.

2          THE COURT:  -- that I've seen in trial.  I've never

3    researched it, although if there is the potential for him to

4    be recalled on rebuttal, that's a different issue.  So I'll

5    entertain -- I'll entertain whatever you find on that.  I

6    certainly will.

7          MS. REED:  Yes.

8          THE COURT:  I want to be clear, what I often hear is

9    you can be finally excused and you can remain in the courtroom

10   if you want to watch the rest of the trial or hearing.  So

11   that's the source of how I have on that.  I've never

12   researched it.

13         MS. REED:  Yes, Your Honor.

14         THE COURT:  But, as I say, and we addressed this at

15   the beginning of the last hearing, it is an open courtroom,

16   it's an open proceeding and so, you know, I think that the

17   remedy, if there is not one available to you in terms of

18   excluding him from observing, is through just do

19   cross-examination.

20         MS. REED:  Yes, sir.

21         THE COURT:  Okay.  What else?

22         MR. ROSSMAN:  I don't have anything else, Your Honor.

23         THE COURT:  All right.  So we are set to start

24   tomorrow at 9:30 and we think the former mayor is available at

25   that time?

266

1          MS. REED:  Yes, sir.  He'll be here.

2          THE COURT:  All right.  Anything further,

3    Mr. Rossman?

4          MR. ROSSMAN:  No, Your Honor.  Thank you.

5          THE COURT:  You're welcome.  Ms. Reed?

6          MS. REED:  No, Your Honor.  Thank you.

7          THE COURT:  You're welcome.  Interesting issues, and

8    I look forward to hearing more about them tomorrow at 9:30.

9        We'll be in recess.  Thank you all.

10

11       (Proceedings adjourned at 4:45 p.m.)

12                        - - -

13                 C E R T I F I C A T E

14          I, ELAINE S. HABERER, RPR, certify that the
     foregoing is a correct transcript from the record of
15   proceedings in the above-entitled case.

16

17   _/s/ Elaine S. Haberer             September/23/2019
     ELAINE S. HABERER, RPR             Date of Certification
18   Official Court Reporter

19

20

21

22

23

24

25

267

1                                INDEX

2     **GOVERNMENT'S WITNESSES**

3     GEORGE W. HOWARD
      Direct Examination.............................. Page 167
4     Cross-Examination............................... Page 171

5

      **DEFENSE WITNESSES**
6
      THAD LAMBDIN
7     Direct Examination (Continued)................... Page 5
      Cross-Examination............................... Page 36
8     Redirect Examination............................ Page 57
      Recross-Examination............................. Page 70
9     Further Redirect Examination.................... Page 76
      Further Recross-Examination..................... Page 78
10
      ANDREW HARRIS
11    Direct Examination.............................. Page 82
      Cross-Examination............................... Page 98
12    Redirect Examination............................ Page 108
      Recross-Examination............................. Page 112
13
      JOSEPH FRANKLIN CHEEK
14    Direct Examination.............................. Page 118
      Cross-Examination............................... Page 125
15    Redirect Examination............................ Page 130

16    JONATHAN FARMER
      Direct Examination.............................. Page 134
17    Cross-Examination............................... Page 149
      Redirect Examination............................ Page 160
18
      FLOYD PATTERSON
19    Direct Examination.............................. Page 176
      Cross-Examination............................... Page 189
20    Redirect Examination............................ Page 196
      Recross-Examination............................. Page 199
21
      ROBERT S. ENGLAND
22    Direct Examination.............................. Page 201
      Cross-Examination............................... Page 221
23    Redirect Examination............................ Page 244
      Further Redirect Examination.................... Page 258
24    Further Recross-Examination..................... Page 260

25
                              - - -

268

**GOVERNMENT'S EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---|---|---|---|
| 5 | Section of FOIA | | 47 |
| 6 | Section of FOIA | 122 | 47 |
| 7 | Section of FOIA | 122 | 47 |
| 1 - 4 | Policies and Procedures | 50 | 51 |
| 8 | FOIA Request | 70 | 72 |

**DEFENSE EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---|---|---|---|
| 7 | Witness Statement | 5 | 6 |
| 8 | Witness Statement | 84 | 6 |
| 9 | Memo | 33 | 6 |
| 10 | Witness Statement | 16 | 6 |
| 11 | Photographs | 18 | 6 |
| 12 | Witness Statement | 141 | 6 |
| 13 | Witness Interview Sheet | 24 | 6 |
| 14 | MPD Memorandum | 23 | 6 |
| 15 | Consent to Search | 24 | 7 |
| 16 | Letter | 26 | 7 |
| 17 | Text Messages | 16 | 7 |

- - -