UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:18-CR-56-CHB-HAI |
| | ) | |
| v. | ) | |
| | ) | RECOMMENDED DISPOSITION |
| ROBERT CHRISTOPHER ENGLAND, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On October 25, 2018, Defendant Robert Christopher "Chris" England was indicted and charged with three counts of receiving child pornography in violation of 18 U.S.C. § 2252(a)(2). D.E. 1.   A superseding indictment, issued March 21, 2019, added a fourth count under § 2252(a)(4)(B) for possessing a laptop computer which contained visual depictions of a minor less than twelve years old engaged in sexually explicit conduct.  D.E. 55.

On May 3, 2019, Defendant moved to suppress the images that were discovered on the laptop, which was a work computer he used as a lieutenant with the Middlesboro Fire Department. D.E. 59.  The government responded in opposition.  D.E. 62.  The Court conducted an evidentiary hearing, which began on July 9, 2019.  D.E. 78.  Due to the arrival of new evidence, the hearing had to be continued, and the remainder was held September 12-13, 2019.  D.E. 93, 94.  Defendant filed a post-hearing brief (D.E. 101), as did the government (D.E. 105).  The transcripts of the hearing are filed in the record.  D.E. 89, 90, 97, 99, 100.  There is also a transcript of the December 19, 2018 detention hearing.  D.E. 27.

1

## I. Factual Background

This case arose after state authorities began investigating Defendant on allegations that he had exposed himself to a minor in a Walmart bathroom on June 4, 2018. On the morning of June 23, 2018, Middlesboro Police Sergeant Floyd Patterson approached Defendant at the fire department and asked him to join him across the street at the police department for an interview. After Defendant returned from the police department interview, a co-worker, Jonathan Farmer, thought Defendant was acting suspicious. D.E. 97 at 136-38.[1] Farmer saw Defendant go to the lieutenants' office (an enclosed office with large windows on the front). Through the window, Farmer could see Defendant packing a bag and doing something on his department-issued laptop computer.

Farmer, who was aware of the indecent-exposure investigation, believed Defendant was deleting items from his computer. D.E. 97 at 138. Farmer could not see the computer screen. He only knew that Defendant was doing something on the computer right after talking to police. And he knew Defendant's reputation among the firefighters as someone who might have a sexual interest in young boys.[2] *Id*. at 138-39; *see also id*. at 36-39. Farmer had a "hunch" that Defendant was deleting "kiddie porn." D.E. 97 at 141-42. Defendant appeared "frantic" and "scared" after the police interview, and his activities on his computer "looked suspicious" to Farmer. *Id*. at 138, 142, 146, 155.

---

[1] All page number references are to the page numbers generated by ECF.

[2] First, Defendant had shown other firefighters pictures on his phone depicting boys in the snow wearing only their underwear. D.E. 97 at 37, 93-94, 127, 131; D.E. 99 at 73. Defendant told his colleagues that he told the boys they had to strip and make snow angels or else they would not be allowed back inside. D.E. 97 at 37. Second, the firefighters were aware of a rumor that Defendant had inappropriately touched a boy (prior to the Walmart incident) in the fire station. *Id*. at 36-37, 127-28. Third, Defendant coached a youth football team, and firefighters had heard him discussing his players' pubic hair. *Id*. at 37; D.E. 99 at 73-74. Additionally, Defendant had made sexual comments and gestures toward a newly hired firefighter named Harris, including talking about sexting and having a "boner" and sticking his tongue down Harris's throat. D.E. 97 at 95, 106-07, 111-12; D.E. 99 at 97.

Defendant then left work early (with his Captain's permission), taking the laptop home with him. D.E. 99 at 92-93. Farmer text-messaged a friend, George Howard, who was a state trooper. Farmer and Trooper Howard had the following text-message conversation, as memorialized in Defense Exhibit 17:

| | |
|---|---|
| Farmer: | I think [the Middlesboro Police Department] is ready to drop the hammer on the chief[']s boy over here |
| Trp. Howard: | Lol, what did he do |
| Farmer: | Stalking some little boy in Walmart, shook his dick at him in the bathroom |
| Trp. Howard: | Said that has been going on for months, he needs took out and hung! |
| Farmer: | Anyway they called him over there to interview him a while ago, he come back and went straight to hi[s] computer. I'm pretty sure he's erasing kiddy porn. [Sgt.] Floyd [Patterson is] the one working it I think. He needs to get that comp[uter] |
| Trp. Howard: | No doubt! I rec[k]on everytime he goes in Wal mart he goes straight to the toys |

Trooper Howard than contacted Sgt. Patterson and Officer Johnson at the Middlesboro Police Department. This was about 20 minutes after Defendant's interview. D.E. 97 at 13, 16, 24, 176. Sgt. Patterson testified that Trooper Howard did not mention possible child pornography. *Id*. at 177. The only investigation at the time concerned the Walmart incident. *Id*. at 177-78. Sgt. Patterson then had Officer Jeremiah Johnson contact the Chief of the Middlesboro Fire Department, Robert England, who is Defendant's father. *Id*. at 178. Chief England was at home with his son when he received the call from Officer Johnson asking him to retrieve the laptop. *Id*. at 209-12, 241-43.

Around 12:30 in the afternoon that same day, June 23, 2018, Chief England delivered the laptop computer to Sgt. Patterson at the Police Department.[3]  Chief England told the officers they would not find anything suspicious on the laptop except perhaps searches for AR-style rifles.  D.E. 97 at 192.[4]  Sergeant Patterson had Chief England sign a consent-to-search form (Defense Exhibit 15), which states:

**Consent to Search**

I, Robbie England (MFD Chief), knowing that I have the constitutional right to refuse a search of City of Middlesboro Fire Dept. Acer Laptop Computer Model V5WE2 . . . . hereby authorize [] Sgt Floyd Patterson of the Middlesboro Police Department, who are conducting an investigation concerning [a] criminal investigation [t]o make a complete search . . . and to seize any contraband or evidence found.

Sgt. Patterson never opened the laptop.  D.E. 97 at 180.  It went straight into evidence, and then was sent to the KSP lab a few days later, on June 29, 2018.  *Id*. at 29, 68, 196.  Sgt. Patterson testified that the only matter under investigation at the time was the alleged Walmart incident.  *Id*. at 177.  The investigation into the Walmart incident remains pending.  *Id*. at 244.

The police later obtained another consent-to-search letter from William Paul Kelley, who was then mayor of Middlesboro.  Mayor Kelley testified (in contrast to Chief England) that his

---

[3] There is a discrepancy in the record as to whether this interview occurred on Saturday, June 23 or Tuesday, June 26, 2018.

In Defense Exhibit 13, Sgt. Patterson noted on his witness interview sheet (prepared on September 21, 2018) that the interview and laptop seizure occurred on June 26.  *See also* D.E. 97 at 24.

However, other evidence indicates the interview and seizure occurred on June 23.  A memorandum on the receipt of the laptop (Defense Exhibit 14), prepared by Sgt. Patterson, is dated June 26, 2018, but states the laptop was obtained on June 23.  Testimony from the chief of the fire department (D.E. 27 at 12, 25; D.E. 97 at 214, 255) and the FBI case agent (D.E. 27. at 62; D.E. 97 at 15, 21-22) support June 23.  And Sgt. Patterson himself testified that the interview occurred on June 23.  D.E. 97 at 176, 188.  Perhaps the best piece of evidence is Defense Exhibit 15, the consent-to-search form signed by the fire chief, which is dated June 23, 2018.  The fire chief also specified that he remembered it was "a Saturday morning" when he turned over the laptop, which would be consistent with the June 23 date.  D.E. 97 at 209.

[4] Chief England did not recall mentioning "AR-15 websites" to Sgt. Patterson.  D.E. 97 at 243.

consent was based on child pornography allegations, not the alleged Walmart incident. D.E. 99 at

28. Mayor Kelly's letter (Defense Exhibit 16) states:

> To whom it may concern,
>
> The computer described below is the property of the City of Middlesboro and was purchased through the Middlesboro Fire Department. This computer was intended for official use in the Fire Department / Ambulance Service. Personal use of City owned computers is not authorized in any division of City operations.
>
> Sgt. Floyd Patterson of the Middlesboro Police Department is conducting an investigation into alleged sexual misconduct involving minors and the computer has become part of the investigation. I hereby give consent for a complete examination of the computer by the Kentucky State Police Electronic Crimes Unit for the purpose of discovering any evidence relating to child sexual abuse, child pornography, or any other violation of Kentucky Revised Statutes.

On June 29, 2018, Middlesboro police sent the laptop to the Kentucky State Police lab in

Frankfort. D.E. 97 at 29, 68, 196. A lab report issued September 18, 2018, indicated the presence

of child pornography. *Id*. at 31-32. According to Agent Lambdin, there was clear evidence that

child pornography had been deleted. *Id*. at 69. The computer also had CCleaner installed, which

is a program that can be used to "scrub or clean" a computer's data. *Id*. at 54-55.

Defendant never gave law enforcement consent to search the laptop. D.E. 97 at 29. No

one ever asked him for it. *Id*. at 35.

Defendant argues that the search of the laptop was invalid because there was no warrant

and Chief England did not possess actual or apparent authority to consent to the search. This

Recommended Disposition will address the three arguments offered by the government as to why

the search did not violate the Fourth Amendment. The questions are: (1) whether Defendant had

a legitimate expectation of privacy in the laptop; (2) whether law enforcement received consent to

search from a person with actual or apparent authority to give consent; and (3) whether the "special

needs of the workplace" exception applies. The parties in their post-hearing briefs do not argue

that the facts are in dispute. Rather, the issues turn on the application of constitutional principles interpreted by case law to the facts. The Court will begin with question (2) because Chief England had clear authority to provide the laptop to police and to consent to the search, regardless of the answers to questions (1) and (3).

## II. Chief England Had Authority to Consent to the Search

The Fourth Amendment guarantees the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Warrantless searches and seizures are considered "per se unreasonable—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). A search conducted with an individual's consent is one of these exceptions. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). For consent to be valid, the consent has to be (1) voluntary and (2) made by a person with authority to consent. *United States v. Matlock*, 415 U.S. 164, 171 (1974).

Consent to search can be provided by a third party "who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171; *United States v. Moore*, 917 F.2d 215, 223 (6th Cir. 1990). Common authority is

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Matlock*, 415 U.S. at 171 n.7.

The government has not shown that then-Mayor Kelley's consent was given *prior* to the search being conducted. As detailed above, the computer was delivered to police on June 23, 2018, and sent to the crime lab on June 29. Mayor Kelley's consent-to-search form was not dated.

6

At the time, Mayor Kelley was suffering from major health issues. D.E. 99 at 58. And no witnesses recalled exactly what day the mayor signed it. Mayor Kelley's best recollection was that he signed the form "within the first week to ten days" after he heard that "the computer had been picked up." *Id.* at 8. Chief England testified he thought the police contacted the mayor "a few days later," but "it could have been a week or a month." D.E. 97 at 255. Thus, Mayor Kelley's consent could very well have been given after the search.

> The Sixth Circuit does not recognize retroactive consent:
>
> "When an individual consents to a search after an illegal entry is made, consent is not valid and 'suppression is required of any items seized during the search . . ., unless the taint of the initial entry has been dissipated before the "consents" to search were given.'" *United States v. Chambers*, 395 F.3d 563, 569 (6th Cir. 2005) (quoting *United States v. Buchanan*, 904 F.2d 349, 356 (6th Cir. 1990)); *see also United States v. Hotal*, 143 F.3d 1223, 1228 (9th Cir. 1998) ("Consent to search that is given after an illegal entry is tainted and invalid under the Fourth Amendment.").

*United States v. Hardin*, 539 F.3d 404, 424 (6th Cir. 2008). "Dissipation of the taint . . . ordinarily involves showing that there was some significant intervening time, space, or event." *Buchanan*, 904 F.2d at 356. The government posits that Chief England's and Mayor Kelley's consents were both valid. D.E. 105 at 7. But the government has not established that Mayor Kelley's consent preceded the search or, if it did not, that something intervened to validate his retroactive consent. Mayor Kelley's consent therefore cannot legitimatize the search.

On the other hand, the undersigned finds that Chief England had actual authority to consent to the search of the laptop. Chief England possessed "common authority over or other sufficient relationship to" the city-owned laptop that he himself issued to Defendant. *Matlock*, 415 U.S. at 171. This finding of actual authority is not based solely on ownership of the laptop. Rather, the culture, customs, and expectations in the fire department were such that Chief England was ultimately in charge of the laptop and could obtain or use it at any time.

7

This case is unusual in that there is no evidence of Chief England ever using the laptop. Although Chief England did not exercise "mutual use," he did have general "joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7. Thus, "it is reasonable to recognize" that members of the fire department "assumed the risk" that Chief England could permit the laptops to be searched. *Id.*

The specific facts concerning the laptop are critical to the Court's finding. Chief England testified that he had been with the fire department since 1998 and became chief in January 2017. D.E. 97 at 201. The Middlesboro Fire Department then purchased three laptops in early 2017. Defendant was one of three firefighters promoted to lieutenant in April 2017. *Id.* at 75. Chief England assigned the three laptops to the three lieutenants—Defendant, Lieutenant Troy Perry, and Lieutenant (now captain) Rick Evans. The laptop in question has a sticker above the monitor with Defendant's name on it, as pictured on defense exhibit 6. Chief England testified he put the sticker there when Defendant was promoted to Lieutenant. *Id.* at 202-03. After Lieutenant Evans was promoted to captain, he continued to use the laptop that was assigned to him. *Id.* at 67.

Unlike the other laptops, Defendant's was password-protected. D.E. 59-1 at 8. The reviewer who conducted the forensic examination reported that the laptop appeared to have a single user. D.E. 97 at 8. And the contents were consistent with having one user. *Id.* The laptop contained, among other things, fire department personnel files and patient reports that included personal and confidential information about fire department personnel or citizens.

The other laptop-assignees left their laptops sitting around and allowed anyone to use them, but Defendant maintained control over access to the laptop that was assigned to him. D.E. 89 at 15.[5] The laptop was used simultaneously with Defendant by another firefighter to review training

---

[5] For example, Andrew Harris, who was trained by Defendant, said he never saw anyone besides Defendant use the laptop. D.E. 97 at 82-84, 87. But Harris himself had used the other lieutenants' laptops; they were left sitting around

8

materials. *Id*. at 29. Defendant frequently took the laptop home after work. *Id*. at 15. Whenever he left the lieutenant's office, Defendant would lock the laptop inside. *Id*. On February 8, 2018, Chief England issued a memo stating that the lieutenant's office should be kept locked to protect confidential information.[6] *Id*. at 18. But Defendant was the only lieutenant who followed that directive. The memo was posted on the wall of the lieutenants' office. But it was eventually taken down. D.E. 97 at 152; D.E. 99 at 71-72, 95. Six people had keys to the lieutenant's office. D.E. 99 at 72.

Although Defendant controlled access to the laptop, his use of it was always subject to Chief England's authority. The testimony at the hearing established that, per city regulations and the customs and culture of the fire department, Chief England possessed complete authority over the laptop. In the eyes of the firefighters, the police officers, the mayor, and Chief England himself, Chief England could have used, obtained, or reassigned the laptop at any time. There was no hint at the evidentiary hearing that anyone would have second-guessed Chief England's authority to control the laptop.

Based on his investigation, Agent Lambdin testified:

---

and were not password-protected. *Id*. at 101-02. Similarly, firefighter Joseph Cheek testified he had never seen anyone besides Defendant use Defendant's assigned laptop. *Id*. at 119. He said Defendant always locked the office, and always took the computer home. *Id*. at 118-19. He had used the other laptops, which were not password-protected. *Id*. at 124. Farmer, a paramedic who worked with Defendant, also testified that, unlike the other lieutenants, Defendant maintained exclusive control of his laptop. *Id*. at 135-36.

[6] The memo (Defense Exhibit 9) states, in part:

> LIEUTENANTS OFFICE HAS SEVERAL DIFFERENT THINGS GOING ON AT DIFFERENT TIMES. SENSITIVE INFORMATION AND HARD TO OBT[AI]N INFORMATION AT ANY GIVEN TIME MAY BE LEFT OUT IN THE OPEN. FOR THIS REASON I HAVE REQUESTED THAT ACCESS TO THIS OFFICE TO BE LIMITED. SHOULD THERE BE A NEED FOR ANY EMPLOYEE TO NEED THE USE OF THIS OFFICE LET THE LIEUTENANT OR CAPTIAN KNOW THEY WILL ACCOM[O]DATE YOU IF POSSIBLE.

> NO NEED TO GIVE ANY GRIEF TO AN OFFICER CONCERNING THIS[.] IT COMES STRAIGHT FROM MY OFFICE. SHOULD YOU HAVE ANY QUESTION FEEL FREE TO ASK ME.

The mayor said that if it's city property, it's the responsibility of the fire department, or the head of whatever department the property is under, to maintain who uses the property and how it's used. And then the fire chief would have the ultimate authority as to, you know, who was using the computer and who was assigned, you know, that type of thing. . . .

The fire chief, and from what I was told by the mayor, was in charge of everything issued to the fire department and he had the ability to determine who controlled it, who had it, and where it went. So if he ordered somebody to bring it in, they would have to bring it in under that control of the property. That's the control that I understood was there. Not that [the chief or the mayor] had used the item, but they had control of the physical item, and it was owned by the city and they could choose what happened with it.

D.E. 97 at 33-35. This is a description of actual and common authority over the city-issued laptop.

There is no evidence to the contrary.

Consistent with Agent Lambdin's understanding, then-Mayor William Paul Kelley testified that the laptop was under the Fire Chief's authority. D.E. 99 at 36-37. He testified that, under city and fire department policies, Chief England had "responsibility and control over fire department equipment." *Id*. at 36. He further testified:

Q.    So [Chief England] had the authority to tell employees how to use these laptops, correct?

A.    Yes.

Q.    And he had authority to say, you're going to use this laptop for this and you're going to use this laptop for that, correct?

A.    Yes.

Q.    He also had authority to reassign or take back those laptops at any point and tell a different employee to run certain official documents on them?

. . . .

A.    Yes.

D.E. 99 at 36-37. Mayor Kelley also testified he believed Chief England had authority to sign the consent-to-search form. D.E. 99 at 30.

Chief England also testified consistently with this understanding:

Q.    As the chief of the fire department, you are responsible for and are in charge of all fire department equipment, correct?

A.    Correct.

Q.    That is a responsibility that is detailed . . . within the manual, correct?

A.    Yes.

Q.    Is there any doubt in your mind that you are not responsible for and in control of fire department equipment?

A.    I'm in control of fire department equipment, yes.

Q.    And that includes the subject laptop. It was equipment that was assigned to and in the control of the fire department?

A.    Yes.

Q.    Your fire department?

A.    Yes.

Q.    No one outranks you in that fire department?

A.    No.

D.E. 97 at 259-60.

The Court also questioned Chief England along the same lines:

Q:    So I understand the hierarchy within the fire department, are you the most senior official within the fire department?

A:    Yes.

Q:    Does anybody else in the fire department have greater authority than you?

A:    It would be the mayor.

Q:    If the mayor instructed you to obtain one of the fire department's pieces of property, would you be obligated to do it?

A:    I would assume I would. I would do it, yes.

11

Q:    What do you think would happen if you didn't?

A:    I really don't know.

Q:    Do you think you had the ability, as chief, to instruct fire department employees to provide you with fire department property that might be in their possession?

A:    I would have thought I did, yes.  If somebody had a nozzle at home and I told them to bring it home -- or back, yes.  If they had a computer, bring it back, yes.

. . . .

Q:    If you instructed any lieutenant to retrieve one of these [three] laptops and provide it to you, do you think they would be required to do that?

A:    Yes.

Q:    What would happen if they did not do that? . . . Would there be discipline as a result?

A:    There could be if it wasn't accountability for the computer, if it was missing or something, or -- I just never been faced with that.  I mean, I've asked for something, I've usually got it.

. . . .

Q:    Anybody else within the fire department have a greater ability than you to tell fire department personnel what to do with fire department property?

A:    No, unless I leave them with orders to do that.

Q:    But that would be a delegation of authority from you to someone else?

A:    Yes, right.

D.E. 97 at 250-52.

Chief England also testified that, when he signed the consent-to-search form, he had no doubt that he had the authority, as Fire Chief, to authorize the search.  D.E. 97 at 254.  "I felt like when I signed it at the time that my signature was sufficient to give it to them[.]"  *Id.*  His only doubts about his authority to do so emerged after he was questioned in court about it, *id.*, or when the mayor told him that the police needed the mayor's consent, *id.* at 255.  The mayor also testified

he believed Chief England had authority to sign the consent-to-search form. D.E. 99 at 30. But he also said he was unaware Chief England had signed one. *Id*.

Again, the Court's reasoning on this issue does not rest merely on the city's ownership of the laptop. As Defendant points out (D.E. 101 at 19-20), authority to consent to a search is not based on property law, but upon "the authority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness in specific circumstances." *Georgia v. Randolph*, 547 U.S. 103, 121 (2006). The question (as framed in *Randolph*, a co-tenant case) is "whether customary social understanding accords the consenting [person] authority powerful enough to prevail over the co-tenant's objection." *Id*. Here, Chief England possessed actual authority over the computer, as evidenced by the customs, culture, and policies of the fire department. No witness questioned his authority to obtain and turn over the computer. And, although ownership does not establish authority to consent to search, ownership can be indicative of "common authority" and a "substantial interest." *United States v. Yudong Zhu*, 23 F. Supp. 3d 234, 241 (S.D.N.Y. 2014) (finding actual authority to search a laptop under the *Davis* factors). So, the fact that the laptop belonged to the fire department (and ultimately the city) is simply one non-determinative factor weighing in favor of Chief England's actual and apparent authority to consent to the search.

Other courts have held that "a third-party consent to a search will validate the search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992). Here, Chief England had access to the laptop. All witnesses agreed that he could have obtained it from Defendant at any time. As such, in light of the authority structure of the fire department, he held common authority over the

laptop, even though he rarely, if ever, exercised it.  Chief England also had a substantial interest in the laptop because it was used for personnel training and maintaining of fire department records. Chief England was ultimately responsible within the department for this training and record-keeping.  The question of whether the Chief had permission from Defendant to gain access is of limited relevance because Defendant did not testify.  But the Chief did testify that his son handed him the computer when asked.  D.E. 97 at 243.  And there is no other evidence as to whether Defendant agreed or disagreed with his father's decision to turn over the computer.  But, even if he disagreed, he could not overrule the Chief.  The *Davis* factors (which are helpful and persuasive, but not binding) are therefore met.

The facts of this case resemble those in *Humphries v. Chicarelli*, No. 1:10-CV-749-SJD, 2013 WL 1832669 (S.D. Ohio May 1, 2013), *aff'd*, 554 F. App'x 401 (6th Cir. 2014).  The plaintiff in that civil-rights action, Humphries, was mayor at the time his office computer was searched. The city manager had given officers consent to enter into Humphries's office, where they ran a program on Humphries's computer that uncovered sexual images.  *Id*. at *9.  Humphries argued that this search violated his Fourth Amendment rights.  The District Court found it was a "close question" of actual authority.  *Id*.  But the court ruled against Humphries on summary judgment.

Concerning Humphries's laptop, the court found:

> during the relevant time period, Humphries kept the computer in his office in the city building.  His office door was usually locked.  Humphries believed that the laptop was password protected, but he used the log-in name and password of the former mayor.  He understood that the laptop was City property and was provided for his use while he was mayor, but he did not believe his use of it was restricted. He acknowledged that the City could access the laptop to obtain public records stored on the laptop.  On one occasion, another City employee used the laptop to make a presentation to City Council.

*Humphries*, 2013 WL 1832669, at *2 (citations omitted).

14

In arguing that his Fourth Amendment rights had been violated, Humphries "focuse[d] on the fact that the City did not restrict his use of the laptop and that the laptop was located in his locked office." *Humphries*, 2013 WL 1832669, at *8. The district court noted:

> On the other hand, Humphries worked in his office, which was located in a City-owned building, only three days per week. At least five people other than Humphries had keys to the mayor's office, including the city manager, the police chief, and the city finance director. As to the laptop, Humphries admitted that the laptop had been used by another person to make a presentation to City Council. He had not updated the log-in and password on laptop from those used by the former mayor. He understood that communications he made using the computer regarding City of Carlisle business were public records and subject to public records searches. These facts present a close question as to whether Humphries had a legitimate expectation of privacy in the laptop.

*Id.* at *9 (citations omitted).

The court indicated that whether Humphries had a legitimate expectation of privacy in the computer was a close question. *Humphries*, 2013 WL 1832669, at *9. But the court discussed whether the city manager had actual "common" authority with the mayor to consent to the search of the city owned laptop:

> The Charter of the Municipality of Carlisle provided that the city manager is the "chief executive and administrative officer" of the City of Carlisle. Humphries conceded that "the City" had at least some authority over the laptop to the extent that "the City" could access the laptop to respond to a public records request. It follows that Callahan, as the City's administrative officer, would have authority on behalf of the City to access the laptop for that purpose. Additionally, Callahan was one of several city officials with keys to the mayor's office where the laptop was kept, an office in which Humphries worked only three days per week. Again, these facts present at least a close question of whether City Manager Callahan had common authority over the laptop to permit Lt. Slyder and Chief Boggess to search the City-owned laptop without violating Humphries's Fourth Amendment rights.

*Id.* (citations omitted). The District Court reiterated:

> The relevant specific facts in this case include that the laptop was City-owned, that it was located in an office in a City-owned building in which Humphries worked in only part-time and for which multiple city officials had key access, that it contained

15

public records which Humphries understood the City had a right to obtain, and that consent for the search was given by the City's top administrative officer.

*Id*. at *10. The court ultimately held that any constitutional violation under these circumstances would not have been clearly established. *Id*. Of course, *Humphries* is not binding on this Court, but its reasoning is persuasive. That the *Humphries* court found the city manager's decision to consent to the search was not a clearly established violation of federal law lends credence to the finding that Chief England in this case had actual authority to consent to the search.

Here, the case for Chief England's actual "common" authority over the laptop is stronger than the case for the city manager's authority in *Humphries*. As in *Humphries*, the laptop was city-owned. As in *Humphries*, it was kept in an office that was locked when unoccupied and the computer was password protected. In both cases, multiple people had keys to the office. In both cases, the laptop contained records maintained for public purposes (here, firefighters' training records and patients' medical records).

However, Chief England's authority over the laptop is more firmly established. Unlike in *Humphries*, the laptop here was assigned for Defendant's use in the context of an organization with a clearly defined hierarchy. Chief England assigned the laptop to Defendant. The witnesses testified consistently that Chief England had the authority to commandeer or reassign the laptop, or to order that someone else could use it. None of the witnesses ever doubted that Chief England could obtain the laptop from Defendant and control its use. For example, Lt. Perry described an occasion when Chief England told Defendant to let Perry use Defendant's laptop because it was the only laptop containing a certain program. D.E. 99 at 70-71. This was an actual exercise of Chief England's authority. Also, echoing *Humphries*, Middlesboro city policy recognized the Fire Department Chief as the person with control over city property within his organization. Chief

16

England thus had a "sufficient relationship" to the laptop to amount to common authority, *Matlock*, 415 U.S. at 171, despite the fact that he does not appear to have ever used the computer himself.

Similar to *United States v. Gargiso*, 456 F.2d 584, 586-87 (2d Cir. 1972), law enforcement obtained consent to search from the highest-ranking officer in the organization—specifically here the fire department.  In *Gargiso*, officers searched an enclosed area over which the defendant had "supervisory power."  *Id*. at 587.  But consent to search had been granted by the vice-president, the defendant's "superior," who also had supervisory power over the area.  *Id*.  "Consent to a search is effective when given by one whose right to occupancy or possession is at least equal to that of the person contesting the search."  *Id*.  The same applies here.  Chief England, Defendant's superior, had clear supervisory power over the laptop and therefore could legitimately consent to the search.

Defendant argues that the Court "should not even consider" the issue of consent.  D.E. 59-1 at 11.  He reasons that the "special needs of the workplace exception" would be unnecessary if government employers could legally consent to searches of property in which the employee had a legitimate property interest.  *Id*.  But the Court cannot ignore all the caselaw applying third-party consent principles to workplace-related searches or the facts that establish Chief England's authority.

Even if the third-party lacks the authority to consent, a search may be valid if the police rely in good faith on a third party's "apparent authority" to consent and the reliance is reasonable based on the facts known by the police at the time of the search.  *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990); *United States v. Morgan*, 435 F.3d 660, 663-64 (6th Cir. 2006).  The apparent-authority exception allows officers to rely on third-party consent when the third party lacked actual authority, but the officers' mistake was reasonable.

17

It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable.  As we put it in *Brinegar v. United States*, 338 U.S. 160, 176 (1949):

> "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part.  But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability."

> We see no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search.  Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably.  The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.

*Rodriguez*, 497 U.S. at 185-86.

> As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises?  *Terry v. Ohio*, [392 U.S. 1, 21-22 (1968)].

*Id*. at 188.

Apparent authority is not an issue in this case because Chief England had actual authority to consent to the search.  Thus, there was no mistaken belief by law enforcement to be assessed within the framework of apparent authority.  But, if the presiding District Judge disagrees as to actual authority, apparent authority would then validate the search.  This is because law enforcement's belief that Chief England, as the highest-ranking officer in the fire department, had the ability to obtain the laptop and provide it for the express purpose of the search was eminently reasonable.  The defense argues that belief could not rest solely on the notion that the laptop was

city-owned property. On this point, the defense emphasizes Sgt. Patterson's testimony that he believed Chief England could consent because the laptop was city property. *See* D.E. 101 at 19-21. But the standard is one of reasonableness and cannot therefore be narrowed by a single answer concerning an officer's subjective belief. Instead, it was entirely reasonable for any law enforcement officer to rely upon the consent from Chief England given that he was the highest-ranking officer in the fire department, he obtained the laptop from his subordinate, he provided the laptop to law enforcement for the express purpose of conducting the search, and he predicted (erroneously) what would be found. It was not merely the status of the laptop as city-owned property, but, consistent with the defense's cited authority of *Georgia v. Randolph*, 547 U.S. 103, 120-21 (2006), it was how the laptop was obtained and provided to law enforcement, and the clear control exercised by Chief England during that sequence, that gave rise to a very reasonable belief that Chief England had authority to consent to the search. So, apparent authority would save the search even if actual authority did not exist.

Defendant also argues that Chief England "had become a government agent for Fourth Amendment purposes who was acting in furtherance of the investigation at the time he consented because the police sent him to retrieve the laptop." D.E. 59-1 at 13; *see also* D.E. 101 at 16. The government does not address this argument in its briefs.

Because Chief England had actual, or at least apparent, authority to consent to the search, there is no need to consider the third-party search doctrine. Nevertheless, the analysis is conducted as follows:

> This Circuit uses a two-factor analysis in determining whether a private party is acting as an agent of the government such that the Fourth Amendment applies. Those two factors require an analysis of (1) the government's knowledge or acquiescence to the search, and (2) the intent of the party performing the search. If *the intent of the private party* conducting the search *is entirely independent* of the

government's intent to collect evidence for use in a criminal prosecution, then the private party is not an agent of the government.

*United States v. Bowers*, 594 F.3d 522, 525-26 (6th Cir. 2010) (citations and quotation marks omitted). If the person who conducted the initial search is found to be a private actor, then the question becomes whether any subsequent warrantless search by law enforcement exceeded the scope of the search by the private actor who uncovered the evidence. *United States v. Chapman-Sexton*, 758 F. App'x 437, 451 (6th Cir. 2018) (collecting cases related to the scope of the search).

The problem with Defendant's argument is that Chief England was not the person who *conducted* or *performed* the search. *See Bowers*, 594 F.3d at 525-26. Chief England turned over the laptop computer to the police at their request. The two-factor test is not applicable here because Chief England conducted no search and found no evidence of criminal activity. Chief England did not expect any evidence of a crime to be found on the computer—Defendant had told him there was nothing on there to be worried about, and the Chief told Sgt. Patterson there would be nothing suspicious except perhaps AR rifle websites. D.E. 97 at 192-93, 243. And because he conducted no search and found no evidence of a crime, it makes no sense to take the next step and assess whether the subsequent law enforcement search exceeded the scope of Chief England's search. In other words, the scope of his search was zero. The facts of this case simply do not fit within the framework of the citizen-search doctrine.

The Sixth Circuit's 2017 *Lang* decision confronts this issue squarely. *United States v. Lang*, 717 F. App'x 523, 541 (6th Cir. 2017), *cert. denied*, 138 S. Ct. 1179 (2018). The search at issue in *Lang* occurred when an undercover DEA agent named Delaney posed as a patient and visited a nurse practitioner (named Peterson), who was an undercover informant in a clinic under investigation. *Id.* at 540-41. Lang, a doctor targeted in the investigation, argued that Peterson was acting as a government agent when he brought Delaney into the examination room, where

20

incriminating evidence against Lang was collected. *Id*. Therefore, Lang argued, Peterson's consent for Agent Delaney to enter the room was constitutionally ineffective. *Id*. at 541. The Court of Appeals rejected Lang's argument on the basis that "Peterson *did not conduct a search*." *Id*. The Court explained: "in every case where we have found a violation of the private-search doctrine, the private person at issue had always conducted a search on the government's behalf." *Id*. at 541-42. The private-search doctrine was "therefore inapplicable" when the person who was alleged to be a government agent was not the person who conducted the search. *Id*. at 542.

Here, Chief England turned the laptop over to police on Saturday, June 23, 2018. D.E. 97 at 22. The laptop was closed, and Chief England and Sgt. Patterson did not know whether it was powered on, powered off, or in hibernation mode. *Id*. at 180, 216. Chief England assumed no evidence of a crime would be found. *Id*. at 192-93, 243. The laptop was closed when Chief England retrieved it from Defendant, and Chief England did not open it. *Id*. at 216. Nor did Sgt. Patterson open it. *Id*. at 180. The laptop was not searched until after June 29, when it was sent to the KSP crime lab. Because Chief England never conducted a search and was aware of no incriminating evidence on the computer, the private-search doctrine is inapplicable to this case.

Accordingly, Defendant's motion to suppress should be denied because Chief England possessed actual (or at least apparent) authority to turn over the laptop to police and consent to its search. The remainder of this Recommendation addresses, in the alternative, the parties' other arguments. But, if the District Judge agrees with the analysis above, the analysis below is moot.

### III.  Defendant Had a Reasonable Expectation of Privacy in the Laptop

Defendant bears the burden of showing he had a legitimate expectation of privacy in the laptop, meaning that he had a subjective expectation of privacy that was also objectively reasonable. *Smith v. Maryland*, 442 U.S. 735, 740 (1979); *United States v. Ziegler*, 474 F.3d 1184,

1189 (9th Cir. 2007).   To establish a subjective expectation of privacy, the defendant must show that he sought to preserve something as private.   *Smith*, 442 U.S. at 740.   To establish the "objective" prong, the expectation of privacy must be one that society is prepared to recognize as reasonable, *e.g.*, justifiable under the circumstances.   *Id.*   In this case, the government argues that neither prong has been met.   D.E. 105 at 4.

There is no dispute in this case that Defendant's laptop was password protected, that his name was on the laptop, that Defendant rarely allowed others to use the laptop, that Defendant often took the laptop home with him, and that Defendant otherwise kept the laptop in his office. Defendant shared the office with two other lieutenants, although they worked different shifts. Defendant also kept the office door locked when he was not inside, although five other people had keys to the office.   *See* D.E. 101 at 7-8.

Based on his investigation, Special Agent Lambdin concluded that Defendant "controlled" access to the laptop.   By this he meant:

> It would have been in his office, and if he was out of his office, the office would have been locked.   If he wasn't there, the computer was taken home with him on a daily basis and brought back in in the morning. . . . the vast majority of witnesses told me that.

D.E. 89 at 15.   To provide one example, Defendant's coworker, Joseph Cheek, testified that "England was weird about locking his office.   If England left the office for any reason, to go to the refrigerator for a Coke or to use the bathroom, he would lock the door.   England always took his computer with him when he left for the day."   D.E. 97 at 118.   One of the other three lieutenants, Troy Christopher Perry, testified that he only used Defendant's computer once, and he asked Defendant's permission to do so.   D.E. 99 at 70-71, 75-76.   He used Defendant's computer because Defendant's laptop had a program that his did not.   *Id.*   He said nobody used Defendant's laptop without Defendant's permission because Defendant maintained nearly exclusive use and

possession of the laptop. *Id*. at 76. Importantly, Chief England told Defendant to let Lt. Perry use the laptop. *Id*. at 71.

Password-protecting a computer often suffices to establish both a subjective and objective expectation of privacy. In a ruling from this District, the Court found that the defendant "sought to keep the data on his laptop private using basic password protection." *United States v. Wilson*, 984 F. Supp. 2d 676, 685 (E.D. Ky. 2013). Even though the password protection in *Wilson* was weak, the court found that, when a password is employed, "society is likely to recognize Defendant's subjective expectation of privacy as reasonable." *Id*. Similarly, in *Ziegler*, a case involving an office computer, the Court of Appeals found that the defendant's "use of a password on his computer and the lock on his private office door" sufficed to establish a legitimate expectation of privacy. *Ziegler*, 474 F.3d at 1189. In *Leventhal*, the employee "did not share use of his computer with other employees," some of the computer's "menu selections" were password-protected, and the employee had a private office with a door. *Leventhal v. Knapek*, 266 F.3d 64, 68, 73 (2d Cir. 2001). The Court of Appeals found these facts, similar to the current case, warranted a finding of a reasonable expectation of privacy. *Id*. at 73; *see also United States v. Aaron*, 33 F. App'x 180, 184 (6th Cir. 2002) (finding no expectation of privacy when the computer was not password-protected).

In this case, not only was the computer password protected. The computer was marked with a sticker bearing Defendant's name. Defendant regulated access to the computer by keeping it locked in the office when he was not present and often taking it home at night. Regardless of whether Defendant stored personal information on the computer, and despite the fact that he occasionally allowed other people to use it for training, there is no denying Defendant treated the

computer as his (subject to any potential orders from the Chief that Defendant let others use it, D.E. 99 at 70-71). Defendant had both a subjective and objective expectation of privacy.

In some cases, courts find an employee has no expectation of privacy in a work computer because company policies put the employee on notice that the computer is subject to monitoring. *See O'Connor v. Ortega*, 480 U.S. 709, 717 (1987). To measure an employee's expectation of privacy in his computer files, courts often consider four factors:

> (1) does the corporation maintain a policy banning personal or other objectionable use, (2) does the company monitor the use of the employee's computer or e-mail, (3) do third parties have a right of access to the computer or e-mails, and (4) did the corporation notify the employee, or was the employee aware, of the use and monitoring policies?

*In re Asia Glob. Crossing, Ltd.*, 322 B.R. 247, 257 (Bankr. S.D.N.Y. 2005).

In this case, there is no evidence Defendant's computer was ever monitored. The Middlesboro Fire Department had no specific policies related to computer use. Draft computer-use policies downloaded from the internet were found on Defendant's laptop. D.E. 97 at 9-10. But there is no evidence the policies were ever adopted. Chief England testified that the fire department had no policy of routine search. He did not recall such a policy ever being under consideration. And no routine searches took place. *Id*. at 208-09.

The government argued that a city policy that generally banned using city property for "private enterprise" amounted to a policy banning personal use that would diminish Defendant's expectation of privacy. D.E. 105 at 4. But in practice, fire department personnel were able to use the city-issued laptops for personal use. Chief England testified that his firefighters were free to access the laptops for personal use. D.E. 97 at 246. He agreed there was "no policy that would prohibit personal use" of the laptops. D.E. 27 at 18. And Mayor Kelley was not aware of any firefighters who had been disciplined for violating the policy against "personal use." D.E. 99 at

17-18.  Lt. Perry testified that firefighters did personal business on the three laptops, including playing computer games and making orders on Amazon.  *Id*. at 80.  He was not aware of any firefighters being disciplined for misusing the computers.  *Id*.  Captain Evans likewise testified that he did not know personal use of the laptops was a violation of policy.  *Id*. at 102-04.

Finally, as previously explained, fire department personnel understood that Chief England had the ability to exercise control over the laptop, and this fact could negatively impact Defendant's expectation of privacy.  However, Considering the *Asia Global* factors together, the facts suggest Defendant had a legitimate expectation of privacy in his laptop.  This case is distinguishable from the cases collected by the *Asia Global* court in which no legitimate expectation of privacy was found.  *See Asia Global*, 322 B.R. at 257-58.

Defendant has met his burden of showing he had a legitimate expectation of privacy in the laptop marked with his name.  But, of course, consent would still authorize the search at issue even without a warrant.

### IV.  The Special-Needs-of-the-Workplace Exception Does Not Apply

The government argues that, if Defendant had a legitimate expectation of privacy in the laptop and the consent to search was ineffective, then the search of the laptop was nevertheless proper under the special-needs-of-the-workplace exception to the Fourth Amendment's exclusionary rule.  D.E. 10 at 10-12.

A warrant or probable cause standard does not apply when a government employer searches an employee's office, desk, file cabinet, or computer to retrieve government property or to investigate work-related misconduct.  *See O'Connor v. Ortega*, 480 U.S. 709, 719-26 (1987).  Such non-criminal workplace searches are constitutional if they are reasonable under all the circumstances.  *Id*. at 725-26.  Reasonableness is measured on a case-by-case basis and depends

upon balancing the public, governmental, and private interests at stake in a given situation. *Gossmeyer v. McDonald*, 128 F.3d 481, 490 (7th Cir. 1997).

> A workplace search is reasonable if it is "justified at its inception" and if it is "reasonably related in scope to the circumstances" that prompted the search. [*O'Connor*], 480 U.S. at 726 (citation omitted); [*Shields v. Burge*, 874 F.2d 1201, 1202 (7th Cir. 1989)]. If there are reasonable grounds to believe that the search will uncover evidence of the employee's misconduct, the search is "justified at its inception." [*O'Connor*], 480 U.S. at 726; *Shields*, 874 F.2d at 1202. The search is reasonable in scope if the measures taken by the employer are reasonably related to the search's objective and they are not overly intrusive in light of the nature of the alleged misconduct. *Id.*

*Gossmeyer*, 128 F.3d at 490-91.

Case law makes evident that the special-needs exception applies only to employer searches concerning work-related misconduct; special-needs searches may not be based solely on suspicions of criminal activity. *See United States v. Fernandes*, 272 F.3d 938, 943 n.3 (7th Cir. 2001) (explaining that a search was appropriate because it was about ensuring "proper and efficient" work conduct and was not "a criminal investigation"); *Gossmeyer*, 128 F.3d at 492 (finding that the presence of law enforcement officers during the search "did not transform an agency's work-related search into a criminal search requiring probable cause and a warrant"). The Supreme Court in *O'Connor* carefully delineated between special-needs searches "wholly unrelated to illegal conduct" and searches "for the primary purpose of obtaining evidence for use in criminal or other enforcement proceedings." *O'Connor*, 480 U.S. at 721. The exception is justified because workplace supervisors "are hardly in the business of investigating the violation of criminal laws;" instead, "work-related searches are merely incident to the primary business of the agency." *Id.* at 722. Indeed, the special-needs exception is premised on the notion that special-needs searches are not about obtaining evidence of criminal wrongdoing:

> In contrast to law enforcement officials, [] public employers are not enforcers of the criminal law; instead, public employers have a direct and overriding interest in

> ensuring that the work of the agency is conducted in a proper and efficient manner. In our view, therefore, a probable cause requirement for searches of the type at issue here would impose intolerable burdens on public employers.

*Id*. at 724; *see also Shields*, 874 F.2d at 1206 (relying on the plaintiff's concession that the workplace search was not "part of any criminal investigation," but was "aimed solely at discovering evidence [of] work-related misconduct").

In this case, the testimony at the evidentiary hearing made clear that when the laptop was given to police, Defendant was not under investigation for any work-related misconduct. Instead, the only investigation relevant to Defendant and his laptop was the investigation into the Walmart incident. *See* D.E. 97 at 177, 185 (Sgt. Patterson explaining his investigation was limited to the alleged indecent exposure at Walmart and did not involve child pornography); *id*. at 213 (Chief England stating the only investigation he knew of was for the Walmart incident).

The government argues that Defendant's laptop could have been legitimately searched for evidence that he violated city policy that forbad the use of city property for "private enterprise." D.E. 105 at 4; *see also* D.E. 97 at 41. But, as previously explained, Defendant was never under investigation for violating this policy against using city property for "private enterprise" or any other city or fire department policy. D.E. 97 at 60, 62, 90-91, 144. Even Chief England testified that his firefighters were free to access the laptops for personal use. D.E. 27 at 18; D.E. 97 at 246. And Mayor Kelley was not aware of any firefighters who had been disciplined for violating this policy. D.E. 99 at 17-18. Lt. Perry testified consistently, specifically that firefighters did personal business on the three laptops, including playing computer games and making orders on Amazon. *Id*. at 80. Thus, there is no evidence that, when the laptop was seized, Defendant was under investigation for violating any policy concerning personal use of city property or that any search for such a violation was ever performed.

The government suggested at the hearing that, when Defendant engaged in behavior that warranted an indecent-exposure investigation, he also violated a fire department policy against behavior that discredited the city. *See* D.E. 97 at 40-41, 46-47, 222-23. The government's argument is merely a post-hoc rationalization. Even assuming that the Walmart incident was also a violation of fire department or city policy, when the laptop was seized, Defendant was not under investigation by the fire department or city. Further, Mayor Kelley believed the Walmart incident would only discredit the city if Defendant was proven to have done it. D.E. 99 at 37-38. And because the charges remain pending, Defendant has not discredited the city yet. *Id.* at 46-47. No one involved in turning over the laptop believed the investigation was about any sort of workplace misconduct or violation of fire department policies. The investigation was plainly a criminal one.

Because the only investigation related to Defendant and his laptop was a criminal investigation, the special-needs exception does not apply. It cannot be said that the search of the laptop was "aimed solely at discovering evidence [of] work-related misconduct." *Shields*, 874 F.2d at 1206. As explained in *O'Connor*, special-needs searches are "wholly unrelated to illegal conduct;" the exception does not apply to searches, like the one in this case, made "for the primary purpose of obtaining evidence for use in criminal [] proceedings." *O'Connor*, 480 U.S. at 721.

## V. Conclusion

As described above, the warrantless search of Defendant's laptop was proper because it was based on the valid consent of the fire chief, who possessed actual authority over the device. In the alternative, law enforcement had a reasonable belief that the fire chief had authority to consent to the search. The undersigned thus **RECOMMENDS** that Defendant's motion to suppress (D.E. 21) be **DENIED.** The Court issues this Recommended Disposition pursuant to 28 U.S.C. § 636(b)(1)(B). The parties should consult that statute and Federal Rule of Criminal

Procedure 59(b) concerning the right to appeal to the District Judge.  Any objection must be filed within **fourteen days** of the entry of this order.  Failure to object per Rule 59(b) waives a party's right to review.  Upon expiration of that fourteen-day period, this matter will be submitted to District Judge Boom for her consideration.

   This the 11th day of December, 2019.

**Signed By:**

_Hanly A. Ingram_

**United States Magistrate Judge**