UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 6:18-CR-056-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| ROBERT CHRISTOPHER ENGLAND, | ) | **ORDER ON OBJECTIONS TO** |
| | ) | **MAGISTRATE JUDGE'S** |
| Defendant. | ) | **RECOMMENDED DISPOSITION** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on Defendant Robert Christopher England's ("Chris England") Objections to the Recommended Disposition of the Motion to Suppress. [R. 107] Defendant's Motion to Suppress [R. 59] seeks to exclude all evidence obtained from law enforcement's search of a Middlesboro Fire Department laptop[1] ("the laptop").  Magistrate Judge Hanly A. Ingram recommended that the Court deny the Motion to Suppress. [R. 106]  The matter is now ripe for the Court's review.  This Court must make a *de novo* determination of those portions of the Recommended Disposition to which objections are made. 28 U.S.C. § 636(b)(1).  Because the Court agrees with the Magistrate Judge's analysis and because the Defendant's Objections fail to rebut the reasoning of the Magistrate Judge, the Recommended Disposition will be accepted as the opinion of the Court.

The Recommended Disposition found that there was no basis for suppression of the evidence in question because Chief Robert England ("Chief England")—the highest-ranking fire department official[2]—had actual (or at least apparent) authority to consent to the search. [R. 106]

---

[1] Specifically, the laptop is an Acer Aspire El Series Laptop Model V5WE2 with Serial No. NXM8EAA0084121DE33400.
[2] Chief England is also Defendant's father.

- 1 -

Defendant made a series of objections to Judge Ingram's ruling: Chief England did not possess actual or apparent authority to consent to search; Chief England was unable to give valid consent to search because he was a state actor; and Chief England was unable to give valid consent because of the private search doctrine. [R. 107]  The Defendant's Objections are addressed in turn below.

## I.      Factual Background[3]

This case arose when state authorities initiated an investigation into allegations that Defendant, a lieutenant with the Middlesboro Fire Department, exposed himself to a minor in a Walmart bathroom in June 2018. [R. 97 pp. 136–38][4]  Later information that Defendant might be deleting evidence on his fire department-issued laptop ultimately led state and local police to contact Chief England and request he turn over the laptop for inspection. [*Id.* at pp. 178, 209–12, 241–43]  Chief England retrieved the laptop from his son, the Defendant, who lived with him, and told investigators they would not find anything suspicious on the laptop except perhaps searches for AR-type rifles. [*Id.* at p. 192]  Chief England signed a consent to search form:

**Consent to Search**

I, Robbie England (MFD Chief), knowing that I have the constitutional right to refuse a search of City of Middlesboro Fire Dept. Acer Laptop Computer Model V5WE2 . . . . hereby authorize [] Sgt Floyd Patterson of the Middlesboro Police Department, who are conducting an investigation concerning [a] criminal investigation [t]o make a complete search . . . and to seize any contraband or evidence found.

[R. 59-2]  Defendant never gave consent to search the laptop; no one ever asked him for it. [R. 97 pp. 29, 35]  A forensic search of the laptop revealed child pornography. [*Id.* at pp. 31–32]

---

[3] The facts in this case are largely undisputed, and the Recommended Disposition ably outlines them.  The Court, therefore, will address only those facts necessary to rule on the objections.
[4] All page number references are to the page numbers generated by ECF.

After Chief England became chief of the Middlesboro Fire Department in January 2017 the fire department purchased three laptops, and Chief England assigned them to the lieutenants at the time, one of whom was Defendant. [*Id.* at pp. 75, 201]  When Chief England assigned the laptops he made clear to Defendant and the other lieutenants that the laptops were to be available to other firefighters who needed them for training, certificates, or other work purposes: "I made it clear to [the lieutenants] when they got the laptop that if [another firefighter] needed them, they was [*sic*] to be made available to them." [*Id.* at pp. 236–37]  Unlike other lieutenants, Defendant largely controlled access to his work laptop. [R. 89 p. 15]  Defendant's laptop was password-protected [R. 59-1 p. 8]; he frequently took the laptop home with him at night [R. 89 p. 15]; and whenever he left the lieutenant's office (which was shared by all the lieutenants), he would lock his laptop inside. [R. 89 pp. 15, 18]  Six people had keys to the lieutenant's office. [R. 99 p. 72]  The forensic examiner reported that Defendant's assigned laptop appeared to have a single user [R. 97 p. 8], though there was testimony that on at least one occasion Chief England told Defendant to let another firefighter use the laptop because it was the only device containing a certain program. [R. 99 pp. 70–71; R. 89 p. 29]  Other lieutenants did not password protect their assigned laptops, often sharing their laptops with colleagues and leaving them lying around for others to use. [R. 97 pp. 101–02, 124]  Defendant's laptop mainly contained fire department files, documents, policies and information, including personal and confidential information about fire department personnel and citizens. [*Id.* at pp. 48–49]

Although it is largely undisputed that Defendant physically controlled access to his assigned laptop, testimony at the hearing also demonstrated that Chief England had ultimate authority over all fire department property, including the laptops.  Mayor Kelley and Chief England testified consistently that as the highest ranking officer, Chief England was responsible

for and in charge of all fire department equipment (including the laptops), had authority to tell

the lieutenants how to use the laptops, and had the authority to re-assign them or take them back.

[R. 106 pp. 9–13; *see also* Def.'s Obj., R. 107 pp. 8–9 ("It is undisputed that Chief England

assigned the laptops to the Lieutenants, he had the authority to reassign them at any time he saw

fit, and he was responsible for Middlesboro Fire Department property.")]  Mayor Kelley and

Chief England both testified they believed Chief England had authority to sign the

consent-to-search form at the time he signed it. [R. 99 p. 30; R. 97 p. 254]  The investigating

Agent, based on his conversations with the Mayor and others, similarly described Chief

England's authority over the laptop. [R. 97 pp. 33–35]

## II.    Objections

### A.    Actual Authority

Defendant first objects to Magistrate Judge Ingram's conclusion that Chief England had

actual authority to consent to the search of the city-owned laptop.  Defendant's objection boils

down to the following: the city's ownership of the laptop is insufficient on its own to confer

valid authority to Chief England to consent to the laptop's warrantless search, and in any event,

Chief England failed to actually exercise any authority over the laptop because he never mutually

used it or inspected it. [R. 107 p. 9]

Warrantless searches and seizures are considered "per se unreasonable—subject only to a

few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S.

347, 357 (1967).  A search conducted with an individual's consent is one of these exceptions.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  Where valid consent is given, a search is

permissible under the Fourth Amendment even without a warrant or probable cause. *Id.*  Valid

consent may be given not only by the defendant but also by "a third party who possessed

common authority over or other sufficient relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171 (1974).  As the Supreme Court in *Matlock* explained, common authority does not derive from "the mere property interest a third party has in the property," but rather stems from

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Id.* at 171 n.7.  Stated another way, the question, as framed by the Supreme Court in a co-tenant case, is "whether customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection."  *Georgia v. Randolph*, 547 U.S. 103, 121 (2006).

### Chief England had Common Authority over, or Another Sufficient Relationship to, the Laptop

The Court agrees with the conclusion of the Recommended Disposition that Chief England possessed "common authority over or other sufficient relationship to" the city-owned laptop that he himself issued to Defendant. [R. 106 p. 7 (quoting *Matlock,* 415 U.S. at 171)]. Judge Ingram further noted that although there was no evidence of actual "mutual use" by Chief England, the Chief did have "joint access or control for most purposes" (quoting *Matlock*, 415 U.S. at 171 n. 7), such that "it is reasonable to recognize" that Chief England had the "right to permit the inspection in his own right" and that Defendant "assumed the risk" that Chief England might permit the laptop to be searched. [R. 106 p. 8 (quoting *Matlock*, 415 U.S. at 171 n.7)].  In following the analysis prescribed in *Matlock*, the Recommended Disposition emphasized that while the city owned the laptop, the Chief's actual authority to consent to the laptop's search did not spring merely from that property interest. [R. 106 p. 7]  Instead, the "culture, customs, and

expectations" in the fire department were such that Chief England was ultimately in charge of the laptop and could obtain or use it at any time. [*Id.*]

Defendant argues that Chief England could not consent to the search because the United States "cannot carry its burden to show that Chief England had common authority over the laptop" and that he "did not exercise control for 'most purposes' as required to be able to consent." [R. 107 pp. 6, 9]  While he does not explicitly couch his argument in these terms, his argument implies that unless Chief England himself used the laptop, there was no "mutual use of the property by persons generally having joint access or control for most purposes."  His arguments fail for three reasons.

### 1.    Defendant Fails to Distinguish the Relevant Authority.

First, Defendant offers unconvincing bases on which to distinguish the persuasive authority relied upon by the Recommended Disposition.  Magistrate Judge Ingram cited to persuasive authority expanding upon the application of the *Matlock* standard because the Sixth Circuit has not squarely addressed whether an employer can consent to the search of an employee's work-issued computer under the specific facts presented by this case.  Defendant argues that these cases turn on the degree of control or "common authority" *actually exercised* by the employer, which, he argues, is absent here [R. 107 p. 7], and further maintains that Chief England's rights to assign, reassign and compel the return of the laptop arose "solely from the city's property interest in the laptop, not the 'culture, customs, and expectations' of the Fire Department."  [*Id.* at p. 9]

To support his argument that an employer's access or control must be "actually exercised," Defendant first cites to *United States v. Ziegler*, 474 F.3d 1184 (9th Cir. 2007) (a case cited by the Recommended Disposition for other points of law).  *Ziegler* held that an

- 6 -

employer could exercise common authority over an employee's workplace computer such that it could validly consent to a search. *Ziegler*, 474 F.3d at 1191 (citing *Mancusi v. DeForte*, 392 U.S. 364, 369–70 (1968)).[5]  But Defendant correctly points out that in *Ziegler* the employer had complete administrative access to everyone's computer, had installed a firewall to monitor internet traffic, actually monitored internet activity, and advised employees of the monitoring efforts through training and the employment manual. *Ziegler*, 474 F.3d at 1191–92.  Defendant argues that because these "hallmarks of employer control" are absent here, Chief England did not have common authority to consent to the laptop's search. [R. 107 pp. 8, 11]

The Court declines to read *Ziegler* so narrowly.  While the Court agrees that *Ziegler* involved facts not present in this case that supported the employer's authority to consent, *Ziegler* does not foreclose the possibility that other case-specific factors might establish such authority. First, although the fire department lacked a written policy specifically addressing computer use, the fire department had clear written policies concerning fire department equipment and the Chief's ultimate authority over such equipment, and the firefighters were aware of this policy. [R. 97 pp. 39–46, 223–25, 250–52, 259–61; R. 99 pp. 35–37]  Moreover, the *Ziegler* court reasoned that "the computer is the type of workplace property that remains within the control of the employer 'even if the employee has placed personal items in [it].'" *Ziegler*, 474 F.3d at 1191 (quoting *O'Connor v. Ortega,* 480 U.S. 709, 716 (1987)).  In reaching its conclusion the *Ziegler* court analogized to an employee who brings a piece of personal luggage to his work office. *Id.* (citing *Ortega*, 480 U.S. at 716).  Although the "outward appearance of the luggage is affected

---

[5] The Supreme Court offered this observation in passing, noting that:

> It is, of course, irrelevant that the [employer] or some of its officials might validly have consented to a search of the area where the records were kept, regardless of [the employee's] wishes, for it is not claimed that any such consent was given, either expressly or by implication.

*Mancusi*, 392 U.S. at 369–70.

by its presence in the workplace, the employee's expectation of privacy in the *contents* of the luggage is not affected in the same way." *Id.* (quoting *Ortega*, 480 U.S. at 716 (emphasis in original)).  A "workplace computer, however, is quite different from the piece of personal luggage." *Ziegler*, 474 F.3d at 1191.  Even though the computer was subject to an individual log-in (or password-protected), the court further reasoned that "[t]he *contents* of [Ziegler's] hard drive . . . were work-related items that contained business information and which were provided to, or created by, the employee in the context of the business relationship."  *Id.* at 1192 (emphasis added).  In this context, the employee "could not have expected that the computer was his personal property, free of any type of control by his employer." *Id.*

So too here.  Like the work computer in *Ziegler*, the "vast majority" of the laptop's *contents* were fire department-related items which were provided to or created by Defendant in his role as an employee. [R. 97 pp. 48–50]  The laptop contained policies, procedures, minutes from fire department meetings, training material, HIPAA information, and other documents related to the operation of the fire department. [*Id.* at pp. 48–49]  Thus, the fire department (and Chief England) had a "sufficient relationship" to and interest in the *contents* of the laptop. *Matlock,* 415 U.S. at 171.  This is no less true whether Chief England actually exercised his authority over the fire department-issued laptop or not.  Under the circumstances of this case, Defendant "could not have expected that the computer was his personal property, free of any type of control by his employer." *Id.*  Under the logic of *Ziegler*, Chief England thus had the clear authority to "consent to a search of the . . . computer that [the fire department] provided to [Defendant] for his work." *Ziegler*, 474 F.3d at 1192.

- 8 -

Defendant next attempts to distinguish *United States v. Yudong Zhu*, 23 F. Supp. 3d 234 (S.D.N.Y. 2014) [6] where the employer, New York University (NYU), "had access to the computer because the defendant signed an authorization form acknowledging that the university could inspect its own computer." [R. 107 p. 7]  Zhu was an assistant professor at NYU who purchased a laptop using grant funds. *Zhu*, 23 F. Supp. 3d at 236.  Zhu password-protected and configured the laptop himself, took it home in the evenings, and "not even NYU's computer-system administrators had access to Zhu's computer." *Id.* at 238.  Although there was no evidence that NYU ever exercised its right to inspect prior to the investigation at issue, the *Zhu* court found that NYU had "access" to Zhu's computer sufficient for third party consent to search based on the "signed authorization permit[ting] NYU to access the laptop . . ." *Id.* at 241. Importantly, the *Zhu* court specifically *rejected* Zhu's arguments (echoed by Defendant here [R. 107 p. 7]) that the employer must have *actual physical access* (i.e., actually exercised control) to have the authority to consent to the search. *Zhu*, 23 F. Supp. 3d at 241.  The court reasoned that the security measures taken by Zhu to block access to the computer were "not determinative." *Id.* Rather, his written authorization "which communicated the *understanding* that NYU could inspect the laptop" was the controlling point. *Id.* (emphasis added); *accord United States v. Aaron*, 33 F. App'x 180, 184 (6th Cir. 2002) (holding that girlfriend had actual authority to consent to the search of live-in boyfriend's computer even though she had never actually used the computer, reasoning that "we cannot infer that [the girlfriend's] lack of use signaled lack of access").

---

[6] The *Zhu* court applied the Second Circuit's two-part test for third party consent: (1) the third party had access to the area searched, and (2) either (a) common authority over the area, (b) a substantial interest in the area, or (c) permission to gain access.  *Id.* (citing *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992)).

Defendant contends that Chief England lacked the "access" or "mutual control" required for common authority under *Matlock*. [R. 107 p. 8]  But Defendant misses the driving point in *Zhu* and *Matlock.*  The rationale rests on there being an *understanding* that the employer had the *right* to access the employee's computer (even if it did not actually exercise that right) such that the employee would not be unfairly surprised if the employer exercised that right.  That such right was formalized in a written policy in *Zhu* does not compel a different outcome here.  That is, an unwritten (but nevertheless *understood*) right, one derived by "culture, customs and expectations," is reasonable and should be sufficient to demonstrate "common authority over or other sufficient relationship to" the laptop for purposes of authority to consent. *Matlock*, 415 U.S. at 171.

Defendant further attempts to distinguish two additional cases cited in the Recommended Disposition.  He attempts to minimize the Recommended Disposition's discussion of *Humphries v. Chicarelli*, No. 1:10-CV-749-SJD, 2013 WL 1832669 (S.D. Ohio May 1, 2013), *aff'd*, 554 F. App'x 401 (6th Cir. 2014), a civil-rights action with facts similar to those here.  In that case, law enforcement searched the mayor's office computer after the city manager consented to their entry into the mayor's office. *Id.* at *9.  The district court found that the city manager's decision to consent to the search was not a clearly established violation of federal law. *Id.* at *9–*10.

Defendant halfheartedly cites two factual distinctions between Chief England's and the *Humphries* city manager's access and control.  First, he contrasts *Humphries* because Chief England did not access the laptop to respond to requests for public records. [R. 107 p. 15] Although there was no evidence that the city manager in *Humphries* actually did use the mayor's laptop to respond to public records requests, it was understood that the city "could access" the device for this purpose. *Humphries*, 2013 WL 1832669, at *2.  The *Humphries* court reasoned

that the city manager was the chief executive of the city, the city had at least some authority over the laptop to the extent that the city could "access the laptop to respond to a public records request," and therefore it followed that the city manager would also "have authority on behalf of the City to access the laptop for that purpose." *Id.* at *9.  Likewise here, Defendant's laptop contained records maintained for public purposes, and Chief England, as the highest ranking officer would also "have authority on behalf of the [fire department] to access the laptop for that purpose." *Id.*  The fact that Chief England did not actually use the laptop for such purposes is a limp distinction because the evidence makes clear he had the authority to do so.

Defendant further attempts to contrast *Humphries* because Defendant kept the laptop with him almost constantly, including taking it home after work (whereas the mayor in *Humphries* worked only part-time and kept the computer in his office).  But how Defendant treated the laptop does not answer the question of Chief England's common authority over the property. *Zhu*, 23 F. Supp. 3d at 241 (discussing that "the laptop's security measures are not determinative" of an employer's access to the device).  Importantly, the Recommended Disposition aptly recognized the limitations of *Humphries* (e.g., "*Humphries* is not binding on this Court, but its reasoning is persuasive" [R. 106 p. 16]; and "the *Humphries* court's [conclusion] . . . lends credence to the finding that Chief England in this case had actual authority to consent to the search" [*id.*]).

Defendant also takes issue with the Recommended Disposition's citation to *United States v. Gargiso*, 456 F.2d 584 (2d Cir. 1972) because of the Second Circuit's "little discussion" [R. 107 p. 15] of a search conducted with consent from the "highest officer" of the company on the scene. *Gargiso*, 456 F.2d at 586.  However, the Recommended Disposition explained that:

> "Consent to a search is effective when given by one whose right to occupancy or possession is at least equal to that of the person contesting the search." [*Gargiso*,

456 F.2d at 587.]  The same applies here.  Chief England, Defendant's superior, had clear supervisory power over the laptop and therefore could legitimately consent to the search.

[R. 106 p. 17]  The rule in *Gargiso* essentially mirrors the determination posed by the Supreme Court in both *Matlock* and later *Georgia v. Randolph*: "whether customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection." *Georgia v. Randolph*, 547 U.S. 103, 121 (2006) (citing *Matlock*, 415 U.S. at 171 n.7). The Second Circuit simply answers that inquiry in the context of an employment relationship instead of a co-tenant relationship.  Contrary to Defendant's objection, the Recommended Disposition accurately analogizes Chief England's supervisory power to the company officer's authority in *Gargiso*.  In any event, since the Recommended Disposition correctly applied *Matlock*, there can be no harmful error from this citation.

## 2.    Chief England Clearly had Mutual Use of, Joint Access to, and Control over the Laptop under *Matlock*.

Second, having disposed of the argument that Chief England actually had to exercise his rights over the laptop, there is abundant evidence that he in fact had "mutual use of the property" (even if he did not in fact *exercise* that right to use) and "generally ha[d] joint access or control [over it] for most purposes," *Matlock*, 415 U.S. at 171, and that this was not derived from mere property interests.

No one questioned Chief England's right to assign, re-assign, or control Defendant's work laptop, not even Defendant:

It is undisputed that Chief England assigned the laptops to the Lieutenants, he had the authority to reassign them at any time he saw fit, and he was responsible for Middlesboro Fire Department property. . . . Defendant England has never argued that he had the right or authority to refuse an order from Chief England reassigning the laptop.  Defendant England has never argued he could deprive the Fire Department or the City of Middlesboro of ownership of the laptop.  He could not do these things.

- 12 -

[R. 107 pp. 8–9]  If Chief England had the broader right to assign, re-assign, or take back the laptop, as conceded by Defendant, it follows logically that he also had the more limited authority to consent to its search such that the "customary social understanding accords [Chief England] authority powerful enough to prevail over [Defendant's] objection." *Georgia v. Randolph*, 547 U.S. 103, 121 (2006).

Defendant argues such rights were all grounded in city's *property interest alone*, not the "culture, customs and expectations" of the Fire Department and therefore are insufficient. [R. 107 pp. 12–13]  But this argument takes the *Matlock* distinction—mere property rights alone do not give third-party common authority, but mutual use of the property by persons generally having joint access or control for most purposes does—out of context.  After all, at some level, all rights of access or control to anything will ultimately be grounded in *someone's* property interest.  For example, where written access agreements exist, as in *Ziegler* and *Zhu,* the same can be said of them—such agreements are ultimately grounded in the employer's ownership of the computer. *See Zhu*, 23 F. Supp. 3d at 241 ("[The employer's] ownership of the laptop meant that it both exercised common authority over and had a substantial interest in the laptop.") (citations omitted).

Here, it is clear that far more than mere property interests gave Chief England his joint access and control over the laptop.  Instead, as the Recommended Disposition points out, the fact that the laptop belonged to the fire department (and ultimately the city) is one non-determinative factor weighing in favor of Chief England's actual authority to consent to the search. [R. 106 p. 13]  The evidence in this case demonstrates that per the city's written policies concerning fire department equipment [R. 97 pp. 39–46, 223–25, 259–61; R. 99 pp. 35–37], the hierarchy of the fire department, and the culture, customs and expectations of the department, Chief England

- 13 -

possessed complete control over all the laptops, including the one assigned to Defendant. Then-Mayor William Paul Kelley testified that under the city and fire department policies [*id.*], Chief England had "responsibility and control over fire department equipment" and affirmed that Chief England "had the authority to tell employees how to use these laptops . . . had authority to say 'you're going to use this laptop for this and you're going to use this laptop for that' . . [and] had authority to reassign or take back laptops at any point and tell a different employee to run certain official documents on them." [R. 99 pp. 36–37]

Chief England testified consistently that per the Middlesboro Fire Department Manual, "I'm in control of fire department equipment, yes." [R. 97 p. 260]  He further affirmed that he is "responsible for and [] in charge of all fire department equipment [*id.*] . . . includ[ing] the subject laptop [*id.*] . . . [that] no one outranks [him] in that fire department [*id.* at p. 261] . . . [and that he] had the ability, as chief, to instruct fire department employees to provide [him] with fire department property that might be in their possession" [*id.* at 252].  He further testified that if he had instructed one of the lieutenants to retrieve one of the three laptops and provide it to him, they would have been required to do so. [*Id.*]  Chief England also testified that, when he signed the consent-to-search form, he had no doubt that he had the authority, as Chief, to authorize the search:  "I felt like when I signed it at the time that my signature was sufficient." [*Id.* at p. 254][7] Agent Lambdin's investigation matched this testimony, "the fire chief was in charge of everything issued to the fire department [including the laptop] and he had the ability to determine

---

[7] Chief England's only doubts about his authority to consent to the search emerged after he was questioned in court about it, [*id.*], and when the Mayor told him that the police needed the Mayor's consent, [*id.* at p. 255]. The Mayor also signed a consent to search form, but it is unclear from the record whether this consent was executed before the search took place. [R. 99 p. 8]  Consequently the Recommended Disposition assumed that such consent form was not executed prior to the search. [R. 106 pp. 6–7]  In any event, the Mayor's consent was unnecessary since the Court agrees with the Recommended Disposition that Chief England's consent was sufficient.

who controlled it, who had it, and where it went." [R. 97 pp. 33–35]  Other firefighters testified consistently concerning Chief England's common authority over the laptops. *See, e.g.*, [R. 99 pp. 70–71, 94–95]  Chief England further testified that when he assigned the laptops to his lieutenants he made clear they were to be shared as needed with other firefighters for fire department work: "I made it clear to [the lieutenants] when they got the laptop that if [another firefighter] needed them, they was [*sic*] to be made available to them." [R. 97 pp. 236–37]

Chief England in fact enforced this custom/expectation with respect to Defendant's laptop at least once when he directed Defendant to let another firefighter (Christopher Perry) use the laptop because it was the only device containing a certain program. [R. 99 pp. 70–71]  This expectation that the laptops remained shared fire department resources was borne out in the testimony from other lieutenants who frequently shared their laptops with colleagues, leaving them unlocked and readily accessible to other firefighters to do the work of the department. [R. 97 pp. 101–02, 124] This expectation was reasonable because the sole purpose of acquiring the laptops was to use them for fire department work.  Of course, the Court agrees with the Defendant that assigning a computer and demanding its return is not, in and of itself, sufficient to establish a custom or common authority—because all employers necessarily do that when they provide equipment to an employee [R. 107 pp. 12–13], but the Court's finding does not rest on so narrow a view.  Chief England's consent was reasonable based on the fire department's written policy concerning equipment, the Chief's clear and expressed expectations that the laptops be shared among firefighters who needed them, and the broader culture and customs at the fire department.  Chief England's right to assign the laptop is one factor among several that establishes the "customary social understanding" here. *Georgia*, 547 U.S. at 121.

Defendant argues that Chief England never actually used or physically controlled the laptop, that there was no written policy expressly permitting its search, and Defendant had "total control" over the laptop (citing the fact that it was password protected, had a sticker with his name on it, and Defendant took it home at night). [R. 107 pp. 11–13]  But, while it is largely undisputed that Defendant controlled access to the laptop, it is equally undisputed that his use and control was always subject to the authority and control of Chief England.  And as just discussed in depth, the question is not whether Chief England *actually exercised* his right of access or control.  *See Zhu*, 23 F. Supp. 3d at 241 (holding that the security measure taken by the employee to block employer access was "not determinative").  No doubt many employers who require employees to execute written access agreements never actually exercise that right, and any rule requiring such a showing would no doubt lead to unintended (and unfair) consequences.  Nor is the question limited to whether there was a *written* access/inspection agreement signed by the employee.  The critical question is whether Chief England had "mutual use of the property" and was a "person generally having joint access or control for most purposes, so that it is reasonable to recognize that [Chief England] ha[d] the right to permit the inspection in his own right and that [Defendant] assumed the risk that [Chief England] might permit the [laptop] to be searched." *Matlock,* 415 U.S. at 171 n.7.  Put simply, was it reasonable to expect that Chief England might consent to the laptop's search and that Defendant assumed that risk?  The answer is yes.

As Judge Ingram explained, "In the eyes of the firefighters, the police officers, the Mayor, and Chief England himself, Chief England could have used, obtained, or reassigned the laptop at any time.  There was no hint at the evidentiary hearing that anyone would have second-guessed Chief England's authority to control the laptop." [R. 106 p. 9]  That includes Defendant,

- 16 -

who concedes in his Objection "he could not do this." [R. 107 p. 9]  This is a description of actual and common authority over the city-issued laptop.  There is no evidence to the contrary.

### 3.    In the Alternative, Chief England had Another Sufficient Relationship to the Laptop.

Third, Defendant's arguments completely ignore the second part of the *Matlock* test, which calls for "common authority over *or* other sufficient relationship to the premises or effects sought to be inspected." *Matlock*, 415 U.S. at 171 (emphasis added).  As just discussed, there is a plethora of evidence in this case demonstrating that Chief England had a very significant relationship with the laptop, such that nobody could second guess his authority to control it.  It is hard to imagine a description of greater authority over an object.  Thus, even assuming for the sake of argument that Chief England did not have "common authority" over the laptop under the *Matlock* test, this evidence shows that he had the requisite "other sufficient relationship" to the laptop such that he could consent to its search. *Id.*

The Court pauses to note the complex and case-specific nature of the foregoing analysis. The determination of actual authority to consent to a search is an intensely fact-driven inquiry. Based on the specific facts and circumstances discussed above, the Court is satisfied that such authority was present here and overrules Defendant's objection to this finding.

### B.    Apparent Authority

Defendant's second objection addresses the Recommended Disposition's finding that even in the absence of actual authority, Chief England's apparent authority would validate the search. [R. 106 pp. 18–19]  Even if third-party consent comes from an individual without actual authority over the property searched, there is no Fourth Amendment violation if officers rely in good faith on the third party's apparent authority to consent and the reliance is reasonable based

- 17 -

on the facts known by the officers at the time of the search. *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990); *United States v. Morgan*, 435 F.3d 660, 663–64 (6th Cir. 2006).

Defendant argues that the apparent authority doctrine does not apply because "no reasonable officer could have believed that the Chief . . . had authority to consent to the search based on the city's property interest alone." [R. 107 p. 17]  However, Judge Ingram squarely addressed and dismissed this argument in the Recommended Disposition:

> [L]aw enforcement's belief that Chief England, as the highest-ranking officer in the fire department, had the ability to obtain the laptop and provide it for the express purpose of the search was eminently reasonable.  The defense argues that belief could not rest solely on the notion that the laptop was city-owned property. On this point, the defense emphasizes Sgt. Patterson's testimony that he believed Chief England could consent because the laptop was city property.  But the standard is one of reasonableness and cannot therefore be narrowed by a single answer concerning an officer's subjective belief.  Instead, it was entirely reasonable for any law enforcement officer to rely upon the consent from Chief England given that he was the highest-ranking officer in the fire department, he obtained the laptop from his subordinate, he provided the laptop to law enforcement for the express purpose of conducting the search, and he predicted (erroneously) what would be found.  It was not merely the status of the laptop as city-owned property, but, consistent with the defense's cited authority of *Georgia v. Randolph*, 547 U.S. 103, 120–21 (2006), it was how the laptop was obtained and provided to law enforcement, and the clear control exercised by Chief England during that sequence, that gave rise to a very reasonable belief that Chief England had authority to consent to the search.

[R. 106 pp. 18–19 (internal citation omitted)].  The Court agrees.  In light of the facts discussed by Judge Ingram, it was objectively reasonable for the officers to believe that Chief England had either (1) common authority over the property because he had "mutual use of the property" and was a person "generally having joint access or control for most purposes" over it, or (2) another sufficient relationship to the laptop to permit him to consent to its search.

Defendant's discussion of *Boyer v. Peterson*, 221 F. Supp. 3d 943, 957 (W.D. Mich. 2016) is unavailing.  In *Boyer*, an officer's "sole reliance" on an estranged wife's status "as the 'owner' and 'deed-holder' was not sufficient to conclude that [she] had 'actual' or 'apparent'

- 18 -

authority over the residence." *Id.*  Even the estranged wife—who lived at a separate residence than the one searched, whose husband had cancelled an appointment for her to visit and retrieve belongings, and who decided to go regardless—admitted that she lacked both actual and apparent authority to consent to the search. *Id.* at 958.  Because the officer knew these facts at the time of the search, his reliance on the wife's "consent" to search was objectively unreasonable. *Id.*  None of these circumstances—including "sole reliance" on a property interest by law enforcement— are present here.  Instead, officers reasonably relied on Chief England's status as the highest-ranking official in the fire department who obtained the laptop from his subordinate, provided it to law enforcement, predicted (erroneously) what officers would find on the laptop, and signed a consent-to-search form for the express purpose of conducting the search.

Defendant further argues that the factual circumstances were "ambiguous" as to whether Chief England had authority to consent because the laptop had a sticker with Defendant's name "prominently displayed."[8] [R. 107 p. 18 (citing *United States v. Waller*, 426 F.3d 838, 846 (6th Cir. 2005))]  In *Waller*, the Sixth Circuit ruled that "if the circumstances make it unclear whether the property about to be searched is subject to mutual use by the person giving consent, then warrantless entry is unlawful without further inquiry." *Id.* (citation and internal quotation marks omitted).

Defendant's argument carries little weight.  First, *Waller* is readily distinguishable.  In that case, officers knew the defendant was storing belongings at a friend's apartment. *Id.* at 849. Officers secured consent to search defendant's closed luggage bag from the friend, who was unaware of its contents, having never looked inside the bag. *Id.* at 842.  Police opened the bag

---

[8] There was some contradictory testimony on this point from Middlesboro Police Sergeant Patterson who did not recall seeing the sticker. [R. 97 p. 180]  The sticker was located above the computer screen [R. 59-6], and Sgt. Patterson testified that the computer was folded closed when delivered and that he did not open the laptop to log it into evidence. [R. 97 p. 180]  The Court will assume for these purposes that the sticker was present.

"precisely because they believed it likely belonged to [the defendant]." *Id.* at 849.  As such, "a reasonable officer would have found ambiguity in the ownership of the luggage bag and in [the friend's] common authority to consent to the search of it," noting that "[m]ost people do not keep a packed, closed suitcase in their own apartment." *Id.*  Unlike *Waller*, here there were no circumstances raising doubt about Chief England's authority to consent, so the ambiguity referenced in *Waller* does not apply. *See, e.g.*, *United States v. Clay*, 630 F. App'x 377, 385 (6th Cir. 2015) (citing *Georgia v. Randolph*, 547 U.S. 103, 122 (2006) ("[I]t would be unjustifiably impractical to require the police to take affirmative steps to confirm the actual authority of a consenting individual whose authority was apparent . . .") (other citations omitted)).

Consequently, even if an officer did see a sticker with Defendant's name on the laptop, it was reasonable based on all the facts the officers had at the time to believe that Chief England had authority to consent to the search: the laptop belonged to the fire department (not Defendant); Chief England was the highest ranking officer at the fire department, and this status suggested that he had control of the laptop; this control was demonstrated when Chief England requested his subordinate (Defendant) to return the laptop to him and Defendant complied; and the Chief executed a consent form for the express purpose of conducting a search, never giving officers any indication that he lacked authority to do so.  Given the totality of what the officers knew at the time, they reasonably relied on Chief England's apparent authority to search the laptop. *Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990); *United States v. Morgan*, 435 F.3d 660, 663–64 (6th Cir. 2006).

For these reasons, the Court adopts the Recommended Disposition's conclusion that Chief England had at least apparent authority to consent to search.

## C.    Other Objections

Defendant's final argument is that Chief England was unable as a matter of law to consent to the laptop's search because a "state actor" (Chief England) is unable to consent to search by another government actor unless the special needs of the workplace exception applies or there is an express policy permitting routine searches (and neither is met here). [R. 107 pp. 20–21]  He also argues Chief England was a private person who, in effect, was "deputized" by law enforcement in consenting to the warrantless search of the laptop, rendering his consent invalid for the same reasons. [*Id.* at p. 24]

The Court agrees with the Recommended Disposition that the caselaw governing third-party consent principles applies with equal force in this case to Chief England, and Defendant has cited no persuasive authority for finding otherwise. [R. 106 p. 17]  Because Chief England had actual authority (or at least apparent authority) to consent to search, the Court rejects Defendant's arguments.

### 1.  State Actor and Special Needs of the Workplace Doctrine

Specifically, Defendant argues that, in the absence of a warrant, a government employer may not give consent to search to another government agency unless the search falls within the special needs of the workplace exception, or a written policy permitting routine searches, both of which are absent here. [R. 107 pp. 20–21]  Under the special needs of the workplace exception, a warrant based on probable cause is not required when a government employer searches an employee's office or workspace (including computer) as part of an investigation into work-related misconduct. *O'Connor v. Ortega*, 480 U.S. 709, 719–26 (1987).  The Supreme Court differentiated that this exception does not apply to searches "for the primary purpose of obtaining evidence for use in criminal or other enforcement proceedings." *Id.* at 721.  Defendant

claims the Recommended Disposition's finding that third party consent applies with equal force to government employers contradicts the "implicit holding" of *City of Ontario, California v. Quon*, 560 U.S. 746 (2010) because, he argues, there would have been no need to analyze the special needs of the workplace exception if the employer in that case could have simply consented to the search. He also cites to *United States v. Taketa*, 923 F.2d 665 (9th Cir. 1991) as support for this argument.

These cases do not persuade the Court that "public employer consent is not on solid Fourth Amendment ground," as Defendant argues. [R. 107 p. 22] First, *Quon* and *Taketa* involved facts where the government employer (a law enforcement agency) actually conducted the complained-of search, and so the issue of consent was not analyzed by those courts. Defendant concedes as much. [R. 107 pp. 21–22] It would make little sense for those courts to probe whether the government employer—the same party actually performing the search— 'consented' to the search, so Defendant's argument that the court's analysis under the special needs of the workplace exception must mean the employer was incapable of giving consent for Fourth Amendment purposes is unavailing.

The *Quon* and *Taketa* courts addressed whether the search conducted by the government employer was reasonable for Fourth Amendment purposes, which, at the end of the day, is the same inquiry posed in all Fourth Amendment cases, including the consent to search cases. In *Quon,* the Court found the police department's search of an officer's pager was reasonable under the special needs of the workplace exception because "the search was motivated by a legitimate work-related purpose, and because it was not excessive in scope." *Quon*, 560 U.S. at 764.

In *United States v. Taketa*, 923 F.2d 665, 674–75 (9th Cir. 1991), the court found the Drug Enforcement Agency's initial search of defendant's office reasonable as it concerned

whether defendant was involved in work-related misconduct and such evidence was likely to be found in his office.  But the court found the employer's installation of video surveillance in defendant's office was unreasonable because "when [the employer] switched roles from public employer to criminal investigator, the investigation changed and the standard of reasonableness imposed on the search changed with it." *Id*. at 675.  Thus, the "DEA cannot cloak itself in its public employer robes in order to avoid the probable cause requirement when it is acquiring evidence for a criminal prosecution." *Id.*

Such concerns are not at issue here.  Chief England did not undertake a search of Defendant's laptop at all.  Rather, based on the fire department's policies, as well as its culture, customs and expectations, Chief England had the authority (actual or apparent) to consent to its search, and that search was separately and independently undertaken by law enforcement.  The Fourth Amendment protects against unreasonable searches and seizures, and the Court previously outlined why, under the facts presented, it was reasonable to recognize that Chief England had the authority to consent to the search and that Defendant should not have been surprised by this.

### 2.    Private Search (or Government Agent) Doctrine

Relatedly, Defendant's final objection is that Chief England was a private person acting as a government agent to retrieve the laptop for the police. [R. 107 p. 24]  The Sixth Circuit uses two factors to determine whether a private party is acting as a government agent for Fourth Amendment purposes: 1) the government's knowledge or acquiescence to the search, and 2) the intent of the party performing the search. *United States v. Bowers*, 594 F.3d 522, 525–26 (6th Cir. 2010) (citations and quotation marks omitted).  Defendant's argument overlooks the central purpose of the government agent or "private search" doctrine, which is to "prevent the police

from covertly deputizing private citizens to break the law, thereby circumventing the state-action requirement and the Fourth Amendment's strictures." *United States v. Lang*, 717 F. App'x 523, 541 (6th Cir. 2017) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487–90 (1971)).

Here, there is no evidence of 'covert deputizing' by the police.  Instead, Officer Jeremiah Johnson called Chief England at his home and asked if the Chief could bring in the laptop. [R. 97 pp. 212–13]  Chief England then told Defendant about the call and informed Defendant that he was taking the laptop to the officers. [*Id.* at p. 243]  Although Chief England did not "believe that he left [Defendant] any option" and did not recall whether Defendant objected [*id.*], these facts are a far cry from cases finding a Fourth Amendment violation by a government agent. *Compare United States v. Hardin*, 539 F.3d 404, 420 (6th Cir. 2008) (holding that a landlord— who unlawfully entered the defendant's apartment at the urging of officers under the ruse of a maintenance issue—was a government agent), *with Coolidge*, 403 U.S. at 487–90 (finding that the defendant's wife—who voluntarily produced her husband's guns and clothing to the questioning officers with the intent of clearing the defendant—was not a government agent). Unlike *Hardin*, Chief England was completely truthful and transparent with Defendant as to why he was taking the laptop, and similar to *Coolidge*, Chief England assured the officers that there would be nothing suspicious on the laptop (except perhaps AR rifle websites) because Defendant had told him there was nothing on there to worry about. [R. 97 pp. 192–93, 243]  As the testimony demonstrates, Chief England neither broke the law nor violated any rule by taking the laptop. *Lang*, 717 F. App'x at 541.  Chief England acted well within his power and authority to obtain the laptop from Defendant, execute a consent to search form, and deliver it to police.

Further, as the Recommended Disposition noted, Chief England was not the person who conducted or performed the search, thus failing the second prong in *Bowers*. [R. 106 p. 20]; *see*

*also Lang*, 717 F. App'x at 541–42 ("[I]n every case where we have found a violation of the private-search doctrine, the private person at issue had always conducted a search on the government's behalf.").  The laptop was closed when Chief England retrieved it from Defendant, and Chief England did not open it. [R. 97 p. 216]  Chief England did not know whether it was powered on, powered off, or in hibernation mode. [*Id.* at pp. 180, 216]  The laptop was not searched until it was sent to the state crime lab by the investigating officers.  These facts demonstrate that Chief England neither conducted nor performed a search of the laptop.  As such, this case does not fit within the framework of the private search doctrine.  Instead, as discussed above, consent jurisprudence governs this Fourth Amendment issue. *Lang*, 717 F. App'x at 542.  Defendant's final objection is accordingly overruled.

## III.   Conclusion

The Court agrees with the Recommended Disposition that Chief England had actual (or at least apparent) authority to consent to the search of the laptop.  With Chief England's valid consent, the search of the laptop was permissible under the Fourth Amendment and suppression is not warranted.  Accordingly, and the Court being otherwise sufficiently advised,

**IT IS HEREBY ORDERED** as follows:

1.   The Recommended Disposition [**R. 106**] is **ADOPTED** and is entered as the findings and conclusions of the Court.

2.   Defendant Chris England's Objections to the Recommended Disposition of the Motion to Suppress [**R. 107**] are **OVERRULED**.

3.   The Defendant's Motion to Suppress [**R. 59**] is **DENIED**.

This the 4th day of May, 2020.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY